UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
CASE NO. 09-61652-GOLD/MCALILEY

| | |
|---|---|
| **MDS (CANADA) INC.,** *et al.* | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) |
| | ) |
| **RAD SOURCE TECHNOLOGIES, INC.,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**PLAINTIFFS' AMENDED COMPLAINT**

COME NOW, the Plaintiffs, MDS (Canada) Inc., Best Theratronics, Ltd. ("Best Theratronics"), and Best Medical International, Inc. ("Best Medical"), and for their Amended Complaint against the Defendant, Rad Source Technologies, Inc. ("Rad Source"), state and allege as follows:

**PARTIES**

1.      MDS (Canada) Inc. is a corporation organized under the laws of Canada, with its principal place of business located in the province of Ontario.

2.      Best Theratronics is a corporation organized under the laws of Canada, with its principal place of business located in the province of Ontario.

3.      Best Medical is a corporation organized under the laws of the Commonwealth of Virginia and has its principal place of business in the Commonwealth of Virginia.

4.      Upon information and belief, Defendant Rad Source is a corporation organized under the laws of Florida, with its principal place of business in the state of Georgia.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §1332 in that complete diversity exists between the litigants and the monetary value of the object of the litigation exceeds $75,000, exclusive of interests and costs.

6.      Personal jurisdiction over Rad Source exists in that Rad Source is a corporation organized under the laws of Florida.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a)(3) in that the defendant corporation is subject to personal jurisdiction within this District.

## BACKGROUND

### THE LICENSE AGREEMENT

8.      Upon information and belief, Rad Source is a corporation which specializes in the research and development of irradiation technologies.  Rad Source developed technology for an x-ray blood irradiation system it refers to as the RS 3000 (the "System").  The patents and technical information pertaining to the System are referred to as the Licensed Technology.

9.      On or about August 20, 2003, Rad Source entered into a written agreement (the "License Agreement") with MDS Nordion, a division of Plaintiff MDS (Canada) Inc. ("Nordion"),  whereby Rad Source licensed to Nordion, in consideration for payments in excess of One Million Two Hundred Thousand Dollars ($1,200,000.00), the exclusive world wide rights and license to use the Licensed Technology, and, among other things, to manufacture, have manufactured, distribute, promote, market, sell, lease, and service the System and the single power supply version of the System.  A copy of the License Agreement is attached hereto as Exhibit 1.

2

10.     The closing date for the License Agreement was September 26, 2003.

11.     Pursuant to the terms of the License Agreement, the License Agreement is to remain in full force and effect until the expiration or invalidity of the last to expire of the patents pertaining to the System.  The term of the License Agreement has not expired.

12.     Nordion paid to Rad Source all sums due pursuant to the terms of the License Agreement.

13.     Pursuant to the grant of exclusive license in the License Agreement, Rad Source expressly agreed that, during the term of the License Agreement, it would not, directly or indirectly, develop, manufacture, distribute, promote, market, sell or lease any medical device for blood or blood product irradiation, which is used or useable to reduce the risk of Graft Versus Host Disease or other blood borne pathogen, and which embodies in whole or in part the patents licensed to Nordion.

14.     Pursuant to the non-compete provisions of the License Agreement, Rad Source agreed that, for a period of seven years from the closing date of the License Agreement, it would not, either directly or indirectly, design, promote, manufacture, market, sell, lease, or carry on any other activities, which compete in any way with the blood irradiation business (including irradiation of blood and blood products) carried on by Nordion.

15.     Also pursuant to the non-compete provisions of the License Agreement, Rad Source agreed that, for a period of seven years from the closing date of the License Agreement, it would not provide service or maintenance of the System to third parties, and would not provide service or maintenance to any product, system, or components thereof to third parties, which compete with the System.

3

16.     Pursuant to the License Agreement, Rad Source also agreed to provide Nordion with the right of first negotiation to acquire, from Rad Source, by license or otherwise, the right to use all other irradiation application technology developed by Rad Source.

17.     The exclusive rights and license granted to Nordion under the License Agreement were expressly made transferrable and Nordion had the right to grant sublicenses to third parties.

### SUBLICENSE TO BEST THERATRONICS

18.     Beginning in the fall of 2007, Nordion advised Rad Source that Nordion wanted to, in accordance with the License Agreement, transfer the License Agreement to Best Medical and Best Theratronics.

19.     In violation of the License Agreement, Rad Source unreasonably withheld its consent to an assignment from Nordion to Best Theratronics or Best Medical.

20.     On or about April 30, 2008, in accordance with the terms of the License Agreement, Nordion entered into a written sublicense agreement with Best Theratronics and Best Medical, whereby Nordion sublicensed its exclusive right and license to the Licensed Technology for the System and for the single power supply version of the System, and all of its rights, pursuant to the License Agreement in conjunction with an asset purchase agreement to Plaintiffs Best Theratronics and Best Medical (the "Sublicense Agreement").

### RAD SOURCE'S BREACH OF THE LICENSE AGREEMENT

21.     Subsequent to the execution of the License Agreement, Rad Source developed technology for an x-ray blood irradiator which it refers to as the RS 3400.

22.     Rad Source submitted the RS 3400 for FDA 510(K) review in the fall of 2008.

4

23.     Rad Source's 510(k) Summary pertaining to the RS 3400 states that "[t]he RS 3400 Rad Source X-ray Blood Irradiator is substantially equivalent to the RS 3000 Shielded Cabinet X-Ray Radiation Source…Both are indicated for the irradiation of blood and blood products to reduce the risk of transfusion associated graft-versus host disease in recipients at risk of this complication…Based on the Non-Clinical tests performed, it is concluded that the [RS 3400] is as safe, effective, and performs as well as or better than the [RS 3000]." A copy of Rad Source's 510(k) Summary is attached hereto as Exhibit 2.

24.     In February, 2009, the FDA determined that the RS 3400 was substantially equivalent to the RS 3000 System.

25.     The RS 3400 was intended to compete directly with the RS 3000 System.

26.     Upon information and belief, Rad Source intends to exhibit, promote, market, sell and lease the RS 3400 at the AABB Annual Meeting and TXPO scheduled to take place from October 24, 2009 through October 27, 2009 in New Orleans, Louisiana.

27.     Upon information and belief, Rad Source intends to exhibit, promote, market, sell, and lease the RS 3400 and otherwise compete with Plaintiffs' blood irradiation business, including the RS 3000 System.

28.     Plaintiffs have requested Rad Source to cease and desist all activities pertaining to the RS 3400 and any other blood irradiation technology, product, or services with which Rad Source may be involved.

29.     Rad Source has ignored Plaintiffs' request to cease and desist, despite the express terms of the License Agreement, and has failed and refused to stop its activities that violate the terms of the License Agreement, including but not limited to violations of the exclusive license

5

provision, violations of the non-compete provisions and violations of the right of first negotiation provision.

30.     Plaintiffs have requested Rad Source to provide them with information necessary to enable them to exercise the right of first negotiation to acquire the right to use other irradiation technology developed by Rad Source, including but not limited to the RS 3400, pursuant to the terms of the License Agreement.

31.     Rad Source has ignored Plaintiffs' request to exercise the right of first negotiation, despite the express terms of the License Agreement, and has failed and refused to inform any of the Plaintiffs of any irradiation technology developed by Rad Source and has failed and refused to allow any of the Plaintiffs to exercise the right of first negotiation to acquire the RS 3400 technology or any other irradiation technology developed by Rad Source.

32.     Rad Source's development, design, promotion, marketing, sale, lease and servicing of technology or devices, including but not limited to the RS 3400, which is substantially similar to and directly competes with the RS 3000, is a violation of the License Agreement including but not limited to, the exclusive license granted to Nordion and the non-compete agreement.

33.     Rad Source's failure and refusal to provide any information to any of the Plaintiffs pertaining to any other irradiation technology developed by Rad Source and failure and refusal to entertain negotiations with any of the Plaintiffs pertaining to irradiation technology developed by Rad Source is a violation of the License Agreement including but not limited to the right of first negotiation granted to Nordion.

34.     Rad Source's failure to prosecute and maintain the patents pertaining to the System in good standing, specifically U.S. Patent No. 6,212,255, and Rad Source's failure to pay for all prosecution, processing and maintenance fees with respect to that patent for the System, which caused that patent to expire, is a violation of Sections 3.7 and 11.1(e) of the License Agreement.

35.     Plaintiffs have satisfied any and all conditions precedent to the bringing of this action or they have been waived or made impossible by the actions of Defendant.

**COUNT I – TEMPORARY RESTRAINING ORDER**

36.     Plaintiffs incorporate ¶¶ 1-35 above as if fully restated herein.

37.     Unless enjoined by the Court, Rad Source will continue to design, promote, market, sell and lease technology and devices which infringe upon the exclusive license granted to Nordion and sublicensed to Best Theratronics and Best Medical, and which directly compete with the Licensed Technology, the RS 3000 System and the Plaintiffs' blood irradiation business.

38.     If the Court does not issue a temporary restraining order, Plaintiffs will be wrongfully and irreparably harmed in that their legitimate business interests, including the value of their bargained-for exclusive rights in the Licensed Technology and the System, and the profitability of their blood irradiation business will be severely reduced by Defendant's continued development, marketing, promotion, sale and/or lease of substantially similar or competing technology and devices.  Such injury to plaintiffs outweighs any threatened harm the temporary restraining order may cause to the Defendant.

39.     Because Rad Source is in direct violation of the express terms of the License Agreement, Plaintiffs are likely to prevail on the merits.

40.     Granting a temporary restraining order would serve the public interest by protecting legitimate business interests, enforcing reasonable covenants not to compete, and upholding the enforceability of voluntary contracts entered into between sophisticated commercial entities.

WHEREFORE, Plaintiffs respectfully request this Court to enter a temporary restraining order enjoining and restraining Rad Source, its agents, servants, employees, representatives, attorneys and all others in active concert or participation with it, for a period of ten (10) days from the date such order is entered, from: (i) directly or indirectly exhibiting, promoting, discussing, marketing, or conducting any other activities relating to the RS 3400, the technology for the RS 3400, or any other blood irradiation technology, product, or service, specifically at the October 2009 AABB Annual Meeting and TXPO, and also in any other manner, form, or venue; (ii) directly or indirectly designing, promoting, manufacturing, selling, leasing, or carrying on any other activities which compete in any way with the blood irradiation business carried on by Nordion, Best Theratronics or Best Medical, including with respect to the System; (iii) engaging in any conduct which, directly or indirectly, violates the terms of the exclusive license granted to Nordion and sublicensed to Best Theratronics and Best Medical, including, but not limited to, the development, manufacture, distribution, promotion, marketing, sale, or lease of any medical device for blood or blood product irradiation, which is used or useable to reduce the risk of graft versus host disease or other blood borne pathogen; and (iv) award appropriate costs and attorneys fees to Plaintiffs; and for such other and further relief as this Court deems appropriate.

### COUNT II – PRELIMINARY INJUNCTION

41.     Plaintiffs incorporate ¶¶ 1-40 above as if fully restated herein.

42.     Unless enjoined by the Court, Rad Source will continue to design, promote, market, sell and lease technology and devices which infringe upon the exclusive license granted to Nordion and sublicensed to Best Theratronics and Best Medical, and which directly compete with the Licensed Technology, the RS 3000 System and the Plaintiffs' blood irradiation business.

43.     As a result of Rad Source's violation of the express terms of the License Agreement, there is a substantial threat that the Plaintiffs will suffer irreparable injury if a preliminary injunction is not granted.  Such injury to plaintiffs outweighs any threatened harm the injunction may cause to the defendant.

44.     Because Rad Source is in direct violation of the express terms of the License Agreement, Plaintiffs are likely to prevail on the merits.

45.     Granting a preliminary injunction would serve the public interest by protecting legitimate business interests, enforcing reasonable covenants not to compete, and upholding the enforceability of voluntary contracts entered into between sophisticated commercial entities.

WHEREFORE, Plaintiffs respectfully request this Court to enter a preliminary injunction enjoining and restraining Rad Source, its agents, servants, employees, representatives, attorneys and all others in active concert or participation with it, from the date of such injunction and until the conclusion of the litigation in this matter, from: (i) directly or indirectly exhibiting, promoting, discussing, marketing, or conducting any other activities relating to the RS 3400, the technology for the RS 3400, or any other blood irradiation technology, product, or service including but not limited to, at the October 2009 AABB Annual Meeting and TXPO or in any other forum or venue; (ii) directly or indirectly designing, promoting, manufacturing, selling, leasing, or carrying on any other activities which compete in any way with the blood irradiation

9

business carried on by Nordion, Best Theratronics or Best Medical, including with respect to the System; (iii) engaging in any conduct which, directly or indirectly, violates the terms of the exclusive license granted to Nordion and sublicensed to Best Theratronics and Best Medical, including, but not limited to, the development, manufacture, distribution, promotion, marketing, sale, or lease of any medical device for blood or blood product irradiation, which is used or useable to reduce the risk of graft versus host disease or other blood borne pathogen; and (iv) award appropriate costs and attorneys fees to Plaintiffs; and for such other and further relief as this Court deems appropriate.

### COUNT III – PERMANENT INJUNCTION

46.     Plaintiffs incorporate ¶¶ 1-45 above as if fully restated herein.

47.     If the Court does not issue an injunction, Plaintiffs will be wrongfully and irreparably harmed in that their legitimate business interests, including the value of their bargained-for exclusive rights in the Licensed Technology and the System, and the profitability of their blood irradiation business, will be severely reduced by Defendant's continued development, marketing, promotion, sale and/or lease of substantially similar or competing technology and devices.

WHEREFORE, Plaintiffs respectfully request this Court to grant the following relief:

(A)     Enter an injunction enjoining and restraining Rad Source, its agents, servants, employees, representatives, attorneys and all others in active concert or participation with it, through the remaining term of the License Agreement, from: (i) directly or indirectly designing, promoting, manufacturing, selling, leasing, or carrying on any other activities which compete in any way with the blood irradiation business carried on by Nordion, Best Theratronics or Best

10

Medical, including with respect to the System; (ii) directly or indirectly distributing, promoting, marketing, manufacturing, selling, or leasing any medical device for blood or blood product irradiation, which is used or useable to reduce the risk of graft versus host disease or other blood borne pathogen; and (iii) evading Nordion' right of first negotiation relating to any irradiation application technology developed by Rad Source.

(B)     Award appropriate costs and attorneys fees to Plaintiffs pursuant to Florida Statute §542.335(1)(k).

(C)     Such other and further relief as this Court deems appropriate.

### COUNT IV – BREACH OF CONTRACT

48.     Plaintiffs incorporate ¶¶ 1-47 above as if fully restated herein.

49.     The License Agreement is a valid and binding contract.

50.     Rad Source breached the License Agreement by, *inter alia*, developing the technology and/or device for the RS 3400, failing and refusing to agree to cease and desist its intended actions of exhibiting, promoting, marketing, selling or leasing the RS 3400 technology and/or device at the AABB Annual Meeting and TXPO and otherwise, failing and refusing to provide any of the Plaintiffs with information pertaining to other irradiation application technology developed by Rad Source despite demand, failing and refusing to engage in negotiations with any of the Plaintiffs for the right to acquire from Rad Source, by license or otherwise, the right to use all other irradiation application technology developed by Rad Source. Rad Source also breached the License Agreement by failing to prosecute and maintain the patents for the System in good standing, specifically U.S. Patent No. 6,212,255, and paying for all

11

prosecution, processing and maintenance fees with respect to U.S. Patent No. 6,212,255, which caused that patent to expire, in violation of Sections 3.7 and 11.1(e) of the License Agreement.

51.     As a direct, proximate and foreseeable result of Rad Source's material breaches of the License Agreement, Plaintiffs have been damaged in an amount in excess of $75,000, the exact amount to be proven at trial.  Plaintiffs have also suffered damages as a result of Rad Source's breach of the License Agreement by its failure to prosecute and maintain U.S. Patent No. 6,212,255, since Plaintiffs may have now lost the patent protection afforded by that patent and that was contemplated by the License Agreement.  Plaintiffs' damages include but are not limited to the costs and expenses necessary to recover, if possible, all or part of the protections that would have otherwise been afforded to Plaintiffs by Patent No. 6,212,255 and the License Agreement.  Moreover, Plaintiffs' business interests in, exclusive rights to, and the profitability of, the RS 3000 System, the License Agreement, and the Sublicense Agreement, among other things, are greatly devalued as a direct and proximate result of Rad Source's breaches of the License Agreement.  Rad Source's breaches have directly and proximately reduced the value of the License Agreement.  Additionally, Rad Source's breaches will directly and proximately cause damage in the form of lost sales of the RS 3000, and additional costs associated with addressing Rad Source's and third parties' attempts to use the technology under the expired patent.

52.     Plaintiffs are entitled to payment in an amount to compensate them for the damages they sustained as a result of Rad Source's material breaches of the License Agreement and are entitled to an award of the right, title and interest to the R3 3400 technology and devices and are entitled to specific performance of the License Agreement including, but not limited to, all information pertaining to any other irradiation application technology developed by Rad

12

Source to enable Plaintiffs to exercise their right of first negotiation under the License Agreement pertaining to all other irradiation application technology developed by Rad Source.

WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in favor of Plaintiffs, to award Plaintiffs an amount in excess of $75,000, the exact amount to be proven at trial; award Plaintiffs full right, title and interest in the technology and devices for the RS 3400; order Rad Source to produce all necessary information regarding irradiation application technology developed by Rad Source to enable Plaintiffs to exercise the right of first negotiation under the License Agreement; award appropriate costs and attorneys fees to Plaintiffs; and for such other and further relief as this Court deems appropriate.

Respectfully submitted,

MDS (CANADA) INC.,
BEST THERATRONICS, LTD.,
AND BEST MEDICAL INTERNATIONAL, INC.

By Counsel,

Dated:  April 23, 2010

_____ *s/ Stuart H. Sakwa* _____
Stuart H. Sakwa (Florida Bar No. 0160880)
MOORE & LEE, LLP
500 E. Broward Boulevard, Suite 1820
Ft. Lauderdale, Florida 33394
Telephone:  (954) 525-6110
Facsimile:  (954) 525-6177

Of Counsel:
Robert M. Moore
Kristen A. Bennett
Brian F. Wilbourn
MOORE & LEE, LLP
1650 Tysons Boulevard, Suite 1150
McLean, Virginia  22102-4225
Telephone:  (703) 506-2050
Facsimile:  (703) 506-2051

13

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 23rd day of April, 2010, a copy of the above and

foregoing was filed electronically with the Clerk of the Court by using the CM/ECF system,

which will send a notice of electronic filing on the following:

Kenneth R. Hartmann
Kozyak Tropin & Throckmorton
2525 Ponce de Leon Blvd.
9th Floor
Miami, Florida 33134

Scott E. Taylor
Anuj Desai
171 17th Street, NW
Suite 2100
Atlanta, Georgia 30363
Telephone: (404) 873-8500
Facsimile: (404) 873-8501


_____*s/ Stuart H. Sakwa*_____
Stuart H. Sakwa

14

# AGREEMENT

THIS AGREEMENT is made as of the _20th_ day of _August_, 2003.

BETWEEN:

MDS NORDION, a division of MDS (Canada) Inc.,
a corporation incorporated under the laws of Canada,
Having its principal place of business at
447 March Road, Ottawa, Ontario, K2K 1X8

("Nordion")

- and –

RAD SOURCE TECHNOLOGIES, INC.
a corporation incorporated under the laws of Florida,
Having its principal place of business at
20283 State Road 7, Suite 107
Boca Raton, Florida 33498

("Rad Source")

WHEREAS:

(i)    Rad Source possesses certain rights to technology, with respect to x-ray
blood irradiation systems;

(ii)   Nordion desires to acquire the exclusive, worldwide rights to use the
technology to manufacture or have manufactured, distribute (promote,
market, sell and lease), and service the System and single power supply
version of the System (as defined below);

(iii)  Rad Source is willing to grant the license and distribution rights set out in
accordance with the terms and conditions hereinafter set forth;

(iv)   Nordion prior to marketing and selling the System is required to file a
510(k) medical device approval with the FDA in the United States; and

(v)    The parties desire to enter into this Agreement as of the date first above
written, provided further however, that the grant of license rights by Rad

**Exhibit 1**

2

Source herein contained shall only become effective as of the Closing Date.

NOW THEREFORE in consideration of the premises and mutual covenants contained herein, and the valuable consideration (the receipt and sufficiency of which are hereby acknowledged), the parties agree as follows:

## ARTICLE I - DEFINITIONS

As used herein, the following terms shall have the following definitions:

1.1     "Affiliates" means with respect to any party, an entity directly or indirectly owned, controlled, or otherwise affiliated with such party.  For purposes of this definition "affiliated" with a party means the party controls, is controlled by, or is under common control with such entity; and "control" means:

    (i)     the ability to elect or appoint a majority of the board of directors or other governing body of an entity; or

    (ii)    the ability to employ, appoint or otherwise designate the executive management of such entity.

1.2     "Agreement" shall mean this agreement as may be amended or restated from time to time.

1.3     "Closing Date" shall mean the date that Nordion receives 510(k) clearance from the FDA for the medical device submission filed with the FDA permitting Nordion to market and sell the System in the United States.

1.4     "FDA" shall mean the United States Food and Drug Administration.

1.5     "Inventory" means Rad Source's inventory of spare parts/components for the current design of the System determined in accordance with section 6.3.

1.6     "Licensed Technology" shall mean the Patent(s), and Technical Information as set out in Schedule A.

1.7     "Manual(s)" shall mean with respect to the System (i) methods and procedures for operating the System, (ii) plans and specifications for the System and equipment, including without limitation (a) for all parts of equipment manufactured for use in the System, (b) procedures with respect to service and maintenance of the System, in such form, detail and content as to enable Nordion to operate, service, troubleshoot and maintain such equipment in accordance with the specifications.



3

1.8 "Patents" shall mean U.S. Patent Nos. 6,389,099 and 6,212,255 and United States patent pending application No. 101244-209(including divisional applications thereof), including such patents as are filed in the Territory.

1.9 "System" shall mean the Rad Source RS 3000 x-ray blood irradiation system, including modifications thereto, exploited and/or marketed by Rad Source as at the Closing Date.

1.10 "Technical Information" shall mean all trade secrets, Manuals, proprietary information, drawings, designs, plans, specifications and technology which Rad Source as of the Closing Date owns, has licensed or has in its possession or control which is required with respect to using, operating or enabling the manufacture of the System and the single power version of the System.

1.11 "Territory" shall mean worldwide.

1.12 "Use" in connection with the Licensed Technology and the System shall mean the right to enjoy, copy, commercialize and exploit as well as manufacture, have manufactured, assemble, and use, the apparatus, machinery and all devices embodied in the Licensed Technology and the System and putting it into practice and to distribute, promote, market, sell, lease and service and/or otherwise provide the services of the apparatus, machine(s) or devices forming the System.

## ARTICLE II – CLOSING DATE

2.1 This Agreement is entered into as of the date first written above, provided further that the grant of license rights by Rad Source herein contained shall only be effective as of the Closing Date. In the event that the Closing Date does not take place prior to one hundred and twenty (120) days after the date first appearing above, unless the parties agree to extend this Agreement by mutual consent, this Agreement shall be of no force and effect. Nordion shall provide written notice to Rad Source upon receipt of the 510(k) clearance for the System issued by the FDA. In the event the Closing Date is consummated in accordance with this section, the expiration date of this Agreement shall coincide with the term of the license set out in Section 12.1.

## ARTICLE III-LICENSE

3.1 Grant of License

As of the Closing Date, Rad Source hereby grants to Nordion, and Nordion accepts, for the term of the license as set out in Section 12.1, subject to the second sentence of this Section 3.1, an exclusive right and license (transferable, with the right to grant sublicenses to third parties ("Sublicensees") on such terms as are



4

consistent with this Agreement to Use the Licensed Technology for the System (including as modified by Nordion) and for the single power supply version of the System, in the Territory. The foregoing grant of exclusivity is made subject to Rad Source's retention of the right to use the Licensed Technology to develop, manufacture or have manufactured, distribute, promote, market, sell, lease and service products other than the System and single power supply version of the System, in the Territory. For the avoidance of doubt, Rad Source's retained right to use the Licensed Technology (as set out in the preceding sentence) shall not, during the term of the license, in the Territory, include the right, directly or indirectly, to develop, manufacture or to have manufactured, distribute, promote, market, sell or lease a medical device for blood or blood product irradiation, which is used or useable to reduce the risk of Graft Versus Host Disease or other blood borne pathogen, and which embodies, in whole or in part, the Patents.

3.2     Transfer of Technical Information

Nordion as of the date first written above acknowledges that it has received from Rad Source the Licensed Technology with respect to the System.
Within thirty (30) days of the Closing Date Rad Source shall provide for use by Nordion a trouble-shooting manual for the System generally describing common operational service problems and fixes.
The Licensed Technology also includes a single power supply version of the System. Except as set out in the following sentence, Nordion shall, at its cost, provide the components for a single System (excluding the second power supply) to Rad Source to permit Rad Source to use the parts therefrom to manufacture a prototype of the single power supply version of the System. Rad Source shall at its cost provide the high voltage cable and control panel for such prototype. Within one hundred (100) days from the later of the Closing Date or receipt by Rad Source from Nordion of the single System components for use in the single power supply version protoype, Rad Source shall provide to Nordion (i) the Technical Information (current to the time of delivery) with respect to such single power supply version of the System meeting the specifications set out in Schedule B, (ii) test results showing unit performance as set out in Schedule B and (iii) a protoype of the single power supply version of the System meeting the specifications set out in Schedule B.. Rad Source shall receive an extension to the one hundred (100) day period set out above to the extent corresponding to any delay in Nordion delivering to Rad Source the components for the single System to be used for parts in the manufacture of the single power supply prototype. Any deficiencies or failure by Rad Source to meet specifications as set out in Schedule B in the the single power supply prototype provided by Rad Source shall be notified to Rad Source in writing within ten (10) days of delivery of the prototype to Nordion. Rad Source shall have thirty (30) days to remedy such deficiencies and to meet the specifications. If Rad Source fails to provide the Technical Information, test performance in accordance with Schedule B and prototype with respect to the single power supply version of the System meeting the specifications as set out in Schedule B, within the aforementioned one hundred



5

(100) day period plus applicable remedial period (and notwithstanding any other remedial period available to Rad Source otherwise set out in this Agreement), Nordion shall not be required to pay 35.3% of each remaining payment that may otherwise become due pursuant to sections 7.1(a) (iii) (iv) and (v)  to the maximum amount of a $300,000 US reduction. By the fifteenth (15th) day of each month after the Closing Date Rad Source shall provide to Nordion a written report setting out Rad Source's development progress with respect to the single power supply version of the System, difficulties encountered or anticipated to be encountered in its development and the estimated delivery date to Nordion.

3.3     Marketing and Supplier Assistance

To assist with the timely and orderly transition of the System's manufacture, sale and distribution from Rad Source to Nordion, Rad Source shall, on the Closing Date, provide to Nordion a current System customer list. For a period of ninety (90) days after the Closing Date Rad Source shall at its cost provide to Nordion reasonable technical support to assist Nordion in identifying and transitioning to suppliers of System components.

3.4     Technical Assistance

(a) Commencing from the date first appearing above, Rad Source shall as soon as reasonably possible provide to Nordion at no cost, such relevant technical and design information requested, in order to permit Nordion to respond to FDA inquiries with respect to Nordion's 510(k) System medical device submission to the FDA.

(b) Rad Source, during a period of one (1)  year from the Closing Date, shall make available to Nordion 120 hours of on-site support at Nordion's or its customer's site (in North America only), as requested by Nordion at no charge.  Each site visit to Nordion or to its customer shall be deemed to be at least eight (8) hours for the purpose of calculation of Rad Source's 120 hour commitment.  This Section 3.4 (b) shall be subject to Rad Source's approval of the site destination, which approval will not be unreasonably withheld. Nordion shall reimburse Rad Source, upon receipt of written invoice from Rad Source, all reasonable travel and accommodation expenses incurred in the provision of the System support and consultation services provided pursuant to this section.

3.5     Right to Redesign

Rad Source hereby grants and Nordion retains the right to redesign, to seek regulatory licensing and otherwise implement modifications to the System and the Licensed Technology to achieve market needs, manufacturing cost reductions, improved functionality, reliability, serviceability and other quality and safety improvements.



6

3.6     Improvements

All improvements to the System and the Licensed Technology developed by
Nordion shall be and remain the sole and exclusive property of Nordion and
Nordion shall be entitled, as it sees fit, to protect the intellectual property in such
improvements by patent or otherwise, and shall be entitled to use such
improvements in conjunction with the System and the Licensed Technology.

3.7     Maintenance Fees

Until termination or expiration of this Agreement, Rad Source shall be
responsible for prosecuting and maintaining the Patents in good standing and shall
be responsible for the payment of all prosecution, processing and maintenance
fees with respect to the Patents.  Within thirty (30) days following each due date
of such maintenance fees, Rad Source shall provide to Nordion written notice of
having paid the Patent maintenance fees.  In the event it is determined that any
such fees are outstanding, Rad Source shall make immediate arrangements for
payment failing which Nordion may pay such fees and, in addition to any other
remedies it may have, may deduct the amount of such fees, and associated costs
(including reasonable attorney's fees) from any amounts owing by Nordion
pursuant to this Agreement. Rad Source shall provide Nordion an update on the
status of Patent prosecution as requested by Nordion from time to time.

3.8     Right of First Negotiation

During the term of this Agreement, Rad Source hereby provides to Nordion a
right of first negotiation for the right to acquire from Rad Source, by license or
otherwise, the right to use all other irradiation application technology developed
by Rad Source.  Such negotiations may be initiated by either party and shall
endure for a period of one hundred and twenty (120) days.  If the parties fail to
reach an agreement with respect to the terms and conditions of license within the
aforementioned one hundred and twenty (120)) day period, Rad Source shall be
free to negotiate with such third parties as it deems fit, provided that the terms and
conditions offered to such third parties shall be no less favourable to Rad Source
than those last offered to Nordion pursuant to this Section 3.8.

## ARTICLE IV - REGULATORY MATTERS

4.1     Regulatory Assistance

As promptly as practicable after the Closing Date, Rad Source will make, or cause
to be made, all filings required on its part by any governmental or regulatory body
in order to consummate the transaction contemplated by this Agreement,
including all filings required by the FDA to amend the Device Listing information

7

with respect to the System.. The filing fee incurred by Rad Source to amend the FDA Device Listing information with respect to the System, shall be borne by Nordion.

4.2   CE Mark

Rad Source will cooperate with and provide reasonable assistance to Nordion in connection with Nordion's preparation of an application for a European CE mark for the System. Such assistance shall be provided at one hundred and eighty dollars U.S.($180.00U.S.) per hour. Nordion shall reimburse Rad Source for any reasonable travel, accommodation and incidental expenses incurred in connection with the provision by Rad Source of such services at Nordion's request.

## ARTICLE V - MARKETING and DISTRIBUTION

5.1   Promotion and Marketing

Subject to the terms and conditions set out in this Agreement, Nordion shall use its commercially reasonable efforts to market and promote the sale of the System in the Territory and the parties will not do or permit anything to be done that may hinder or harm the reputation of the other within the Territory.

5.2   Trademarks

Each System, the single power supply version of the System and components thereof may be sold by Nordion under Nordion's trademarks, indications of origin, logos, or other indication of trading style of Nordion. Rad Source acknowledges and in all respects shall co-operate fully with Nordion during the term of this Agreement and thereafter in protecting and maintaining Nordion's exclusive title in the Territory, to any trade mark to which it may be entitled and any effective registrations thereof and will give Nordion all assistance and execute all deeds and documents which may be necessary to register any such trademark in the Territory in the name of Nordion or such other name as it may select. Rad Source shall not register or make any application to register any such trade mark or other indication of origin as aforesaid or any colourable imitation thereof as a trademark in the Territory in respect of any goods whatsoever. All rights and benefits (including without limitation) goodwill associated with or arising out of any use by Nordion of any such trade mark or other indication of origin, shall be the absolute property of Nordion.

5.3   Non Compete

(a)   Subject to the terms and conditions of this Agreement, for a period of seven (7) years from the Closing Date, Rad Source, its respective officers and its Affiliates shall not , directly or indirectly, within the Territory

8

design, promote, manufacture, sell, lease or carry on any other activities, which compete in any way with the blood irradiation business (including irradiation of blood and blood products) carried on by Nordion, including with respect to the System.

(b) Subject to section 6.2, Rad Source, its respective offices and its Affiliates, shall not, for a period of seven (7) years from the Closing Date, directly or indirectly, within the Territory, provide service or maintenance of the System (or the System as modified by Nordion) to third parties, or provide servicing or maintenance to any product, system or components thereof to third parties, which compete with the System.

## ARTICLE VI-OUTSTANDING ORDERS; SERVICE; INVENTORY

6.1 Outstanding Purchase Orders

All purchase orders for the System entered into by Rad Source prior to the Closing Date of this Agreement shall be fulfilled and remain the responsibility of Rad Source.

Within ten (10) days after the Closing Date, Rad Source will provide Nordion with (i) a list, setting out customer quotes issued in the previous twelve (12) month period which as of the Closing Date remain valid and outstanding and have not yet resulted in a customer purchase order, including quote reference number, date of issue, customer name, price quoted and the quote validity period and (ii) copies of such quotes and all customer correspondence related thereto.

Within ten (10) days of receipt of the quote(s) Nordion shall provide notice to Rad Source as to which of the quotes Nordion agrees to abide and honor for the period of quote validity as specified on the quote. Such quotes as agreed to be honored by Nordion, shall bind and be deemed assigned to Nordion by Rad Source. For those quotes issued by Rad Source prior to the Closing Date that Nordion declines to honor, Rad Source may, notwithstanding anything to the contrary in this Agreement, consummate and fulfill any purchase order on such terms as *contained in such quote provided that the purchase order is issued by the customer and accepted by Rad Source within sixty (60) days after the Closing Date.* In addition, as at the Closing Date Rad Source shall provide to Nordion a then current list of the names, addresses and other contact information in Rad Source's possession of prospective customers of the System. After the Closing Date all purchasing inquiries with respect to of the System received by Rad Source shall be immediately forwarded by Rad Source to Nordion.

6.2 Transition Servicing and Warranty Servicing of Existing Systems

Rad Source shall remain responsible for (i) ongoing servicing, including warranty servicing, of each System unit sold by Rad Source prior to the Closing Date and



9

(ii) warranty servicing for those System units that Rad Source is permitted to sell pursuant to a quote issued prior to the Closing Date and declined to be honored by Nordion pursuant to Section 6.1. On the Closing Date Rad Source will provide to Nordion a then current list and copy of the service agreements entered into with customers prior to the Closing Date.

Rad Source represents and warrants that the System unit service agreements entered into by Rad Source prior to the Closing Date, do not and will not exceed one (1) year from the date of delivery of the System to a customer. After the Closing Date, Rad Source shall provide Nordion with written notice of the date of expiry of a customer service agreement entered into prior to the Closing Date at least thirty (30) days prior to the expiration of the service agreement, including a copy of the System unit history file. After the Closing Date Rad Source may advise its service customers requiring System servicing outside warranty that ongoing service availability resides with Nordion.

6.3     Inventory

Within ten (10) days of Rad Source fulfilling outstanding purchase orders as per section 6.1 Rad Source shall provide to Nordion a complete list of all Inventory. Nordion shall within thirty (30) of receiving the Inventory list purchase such Inventory from Rad Source at Rad Sources's option, provided such Inventory is in good condition and fit for its intended purpose.   The purchase price for the Inventory shall be equivalent to Rad Source's cost for such Inventory, inclusive of freight. Nordion shall be required to purchase such Inventory only to the extent of an expenditure of one hundred thousand United States dollars ($100,000 US). Upon Nordion's request Rad Source shall provide to Nordion supporting documentation and records with respect to the purchase price paid by Rad Source. Title in and to the Inventory and risk of loss shall pass to Nordion upon payment of the purchase price.

### ARTICLE VI- COMPENSATION

7.1     IPayments

(a)     In consideration of the rights granted under this Agreement, Nordion shall,

(i)     within five (5) working days of the Closing Date pay to Rad Source an amount of $500,000 US by wire transfer to First Southern Bank, Coral Springs, Florida, ABA # 067012895, account  number 4044691206 or such other banking coordinates provided by Rad Source.

(ii)     during the first year following the Closing Date, pay to Rad Source a fixed amount of $400,000, payable in twelve (12) consecutive



10

monthly installments at the end of each month in the amount of $33,333.33 US per month.

(iii)   during the second year following the Closing Date pay to Rad Source a fixed amount of $400,000 US payable in twelve (12) consecutive monthly installments at the end of each month in the amount of $33,333.33 US per month.

(iv)   during the third year following the Closing Date, pay to Rad Source an amount of $11,250 US per System or single power supply version of the System sold or leased up to a maximum of $225,000 US. If Nordion fails to sell or lease at least twenty (20) Systems including single power supply versions of the System during such third year, Rad Source, on thirty (30) days prior written notice to Nordion provided within thirty (30) days following the end of such third year, shall be entitled to terminate this Agreement. Nordion during such thirty (30) day notice period shall be entitled to pay to Rad Source the difference between the actual amount paid to Rad Source during such year and $225,000 US. If Nordion pays such amount, Rad Source shall not be entitled to terminate this Agreement. Payment of such amounts for Systems or single power supply versions of the System sold or leased shall be made to Rad Source within sixty (60) days of the date of shipment by Nordion to the customer.

(v)   during the fourth year following the Closing Date, pay to Rad Source an amount of $9,000 US per System or single power supply version of the System sold or leased up to a maximum of $225,000 US. If Nordion fails to sell or lease at least twenty five (25) Systems including single power supply versions of the System during such fourth year, Rad Source, on thirty (30) days prior written notice to Nordion provided within thirty (30) days following the end of such fourth year, shall be entitled to terminate this Agreement. Nordion during such thirty (30) day notice period shall be entitled to pay to Rad Source the difference between the actual amount paid to Rad Source during such year and $225,000 US. If Nordion pays such amount, Rad Source shall not be entitled to terminate this Agreement. Payment of such amounts for Systems or single power supply versions of the System sold or leased shall be made to Rad Source within sixty (60) days of the date of shipment by Nordion to the customer.

(vi)   during the period of five (5) years after the Closing Date, in the event that Nordion contracts to sell more than forty (40) Systems including single power supply versions of the System in the United States in a given year commencing from the Closing Date, Nordion



11

shall pay Rad Source an amount of $5,000 US for each such system sold in excess of such forty (40) systems sold in the United States. Such payments shall be made to Rad Source within sixty (60) days of the date of the shipment to the customer.

7.2   Certificate

Upon request by Rad Source, Nordion shall certify to Rad Source via a certificate issued by its officer, the number of Systems sold or leased in a given year.

7.3   Books and Records, Audit

Nordion agrees to maintain accurate books and records describing all activities under this Agreement in sufficient detail to enable the amounts payable hereunder to be determined.

## ARTICLE VIII - CONFIDENTIALITY

8.1   Confidentiality and Exceptions

Rad Source and Nordion acknowledge that the content of the transactions contemplated herein, the Technical Information, the business affairs and operations of the other, and such other information which has been marked Confidential or otherwise provided in confidence ("Confidential Information") which it receives or otherwise learns during the term of this Agreement, is valuable property of the party providing such information.   The parties acknowledge the need to preserve such confidentiality and secrecy of such Confidential Information and agree that, both during the term of this Agreement and after termination or expiration of this Agreement, it shall not disclose such Confidential Information. This obligation of confidentiality shall not apply to information:

a)   that was public knowledge at the date of execution of this Agreement or which became such during the term of this Agreement through no fault or action on the part of the receiving party;

b)   is already in the receiving party's possession at the time of disclosure thereof as evidenced by the receiving party;

c)   is received from a third party having no obligation of confidentiality to the disclosing party;

d)   confidential information which is disclosed with the written consent of the other party,



12

  e)  is required to be disclosed due to judicial or regulatory process or licensing application, or

  f)  is independently developed by recipient without reference or access to the Confidential Information.

**8.2**  Non-Use After Termination

Subject to the terms and conditions of this Agreement and the exceptions in sections 8.1, and 8.3, neither party shall use or disclose the other party's Confidential Information after termination or expiration of this Agreement, which Confidential Information shall, on request, be returned to the party who owns the information.

**8.3**  Authorized Disclosure

Each party may disclose the other's Confidential Information to the extent such disclosure is reasonably necessary for prosecuting or defending litigation, complying with applicable government laws or regulations, provided that if a party is compelled by law or regulation to make any such disclosure of the other party's Confidential Information, it will, give reasonable notice to the other party of such disclosure requirement. Nordion shall not knowingly transmit Rad Source's Confidential Information to any of its employees, agents, advisors or contractors other than to its employees, agents, advisors or contractors to whom knowledge of the Confidential Information is reasonably necessary in order to permit the manufacture of the System and for the purpose of sale, regulatory licensing, use, maintenance, servicing and operation of the System, and provided further that such agents, advisors or contractors (except for the regulatory licensing authority) to whom the Confidential Information is disclosed, shall have entered into an Agreement with Nordion protecting the confidentiality of the Confidential Information to the same extent as set out in this Agreement.

**8.4**  Survival

The provisions of this section shall survive the expiration or termination of this Agreement.

### ARTICLE IX- PROTECTION OF TECHNOLOGY

**9.1**  Patent Infringements By Third Parties

  (a)  Rad Source shall be solely responsible for taking all actions, legal or otherwise, which, in the judgment of Rad Source, are reasonably calculated to terminate infringements by third parties of the Patents within the Territory, to the extent related to the System. The type and conduct of



13

such actions shall be solely and reasonably governed by Rad Source. Nordion agrees to fully co-operate with Rad Source and to not interfere with any of the actions taken by Rad Source.

(b)     Nordion shall have the right to be kept informed of the status and progress of all Patent infringement actions instituted by Rad Source.  Rad Source shall bear the cost and expense of such patent infringement actions.

(c)     If Rad Source does not institute a Patent infringement action within one hundred twenty (120) days after first learning of the third party infringement or receiving notice of such third party infringement from Nordion, whichever occurs first, then Nordion, at its own expense, may institute a Patent infringement action with respect thereto.  Rad Source shall have the right to be kept informed of the status and progress of all Patent infringement actions instituted by Nordion pursuant to this Agreement.

(d)     Any recoveries or settlement fees received from suits or settlements involving alleged or actual third party infringement of the Patents instituted and carried by Rad Source shall be first be used to repay Rad Source any outstanding costs and expenses incurred in prosecuting such suits or settling such claims, and any excess shall then be shared equally by Rad Source and Nordion.  Any recoveries or settlement fees received from suits or settlements involving alleged or actual third party infringement of the Patents instituted and carried by Nordion under section 9.1 (c) shall belong to Nordion.

9.2     Rad Source Name in Suit.

Where, in the judgment of Nordion, it is necessary to use Rad Source's name to prosecute or defend an action asserting third party infringement of the Patents and/or invalidity of the Patents, Rad Source agrees to allow Nordion to so use the name of Rad Source.

## ARTICLE X -     INDEMNIFICATION

10.1    Rad Source Intellectual Property Indemnity

Rad Source shall indemnify, defend, and hold Nordion, its directors, officers and employees, and its Sublicensees, harmless from and against any liabilities, claims, damages and expenses (including reasonable attorneys fees) which Nordion or its Sublicensees may be required to pay in any judgment, claim or action arising out of any proceeding instituted by or on behalf of a third party upon a claim that the Use of the Licensed Technology or the System infringes any patent, copyright or any other proprietary or intellectual property right of a third party.  Nordion shall



14

promptly notify Rad Source of any suit or action wherein any of Nordion or its Sublicensees is named as a party, and which directly or indirectly relate to the Use of the Licensed Technology or the System.

Rad Source shall have sole and exclusive control of the defense, including the choice of legal counsel. Nordion may not settle, nor compromise any such legal action without the written consent of Rad Source. If Rad Source does not defend against any such action, Nordion may defend against such action and Rad Source shall in addition to the indemnification provisions above reimburse Nordion (and/or Nordion may offset such expenses against other amounts payable to Rad Source) for its legal fees (including attorneys fees) and costs and expenses, incurred in connection with such defense. This indemnity shall survive expiration or termination of this Agreement.

10.2    Rad Source General Indemnity

Rad Source shall indemnify, defend and hold Nordion, its directors, officers and employees, harmless from any against any liabilities, claims, damages and expenses (including reasonable attorneys fees) which Nordion may be compelled to pay in any judgment claim or action resulting from any proceeding instituted by or on behalf of a third party arising out of (a) the design of the System (except to the extent attributable to the redesign or modification of the System by Nordion) during the period of five (5) years from the Closing Date; (b) Rad Source's breach of any of its obligations, representations or warranties hereunder; (c) Rad Source's, its agents or contractors service of the System;(d) Rad Source's negligent acts or omissions or (e) a System sold or otherwise disposed of by Rad Source prior to the Closing Date. Nordion shall provide Rad Source with written notice of any such legal action promptly after Nordion first learns of such claim. Rad Source shall have sole and exclusive control of the defence of any such legal action including the choice of any legal counsel. Nordion may not settle nor compromise any such legal action without the written consent of Rad Source. This indemnity shall survive expiration or termination of this Agreement.

10.3    Nordion Intellectual Property Indemnity

Nordion shall indemnify, defend and hold Rad Source, its directors, officers and employees, harmless from any against any liabilities, claims, damages and expenses (including reasonable attorneys fees) which Rad Source may be compelled to pay in any judgment claim or action arising out of any proceeding instituted by or on behalf of a third party, to the extent that the modifications or redesign by Nordion of (i) the Licensed Technology or (ii) the System, infringes any patent, copyright, or any other proprietary or intellectual property rights of a third party. Rad Source shall provide Nordion with written notice of any such legal action promptly after Rad Source first learns of such claim. Nordion shall have sole and exclusive control of the defence of any such legal action including the choice of any legal counsel. Rad Source may not settle nor compromise any



15

such legal action without the written consent of Nordion. This indemnity shall survive expiration or termination of this Agreement.

10.4    Nordion General Indemnity

Nordion shall indemnify, defend and hold Rad Source, its directors, officers and employees, harmless from any against any liabilities, claims, damages and expenses (including reasonable attorneys fees) which Rad Source may be compelled to pay in any judgment claim or action resulting from any proceeding instituted by or on behalf of a third party arising out of (a) Nordion's manufacture, distribution, promotion, marketing, sale, leasing and service of the System; (b) Nordion's breach of any of its obligations, representations or warranties hereunder; or (c) Nordion's negligent acts or omissions. Rad Source shall provide Nordion with written notice of any such legal action promptly after Rad Source first learns of such claim. Nordion shall have sole and exclusive control of the defence of any such legal action including the choice of any legal counsel. Rad Source may not settle nor compromise any such legal action without the written consent of Nordion. This indemnity shall survive expiration or termination of this Agreement.

## ARTICLE XI - REPRESENTATIONS and WARRANTIES

11.1    Rad Source Representation and Warranty

Rad Source represents and warrants to Nordion that as at the time of entering into this Agreement and as at the Closing Date:

(a)    It has full right, power and authority to enter into this Agreement and has taken all corporate or other action necessary to consummate the transactions contemplated hereby, including obtaining any required consent or approval from its directors and stockholders, and there is no impediment which could inhibit its ability to perform the terms and conditions imposed by this Agreement.

(b)    There is no action or proceeding pending or insofar as Rad Source knows or ought to have known, threatened against Rad Source before any court, administrative agency, or other tribunal which might have an adverse material affect on its business.

(c)    It is the owner of the Licensed Technology free and clear of all liens, claims and encumbrances and has the right to grant the license rights to Nordion as set out in this Agreement.



16

(d)     It has not received any notice of adverse claim or infringement of any patent or misappropriation of trade secrets in connection with the Use of the Licensed Technology or the System.

(e)     The Licensed Technology and System do not and will not to Rad Source's best information and belief, infringe any patents, copyright, or other industrial or intellectual property rights of third parties and the Patents are in good standing, will be maintained in good standing and all maintenance fees have and will be paid by Rad Source.

(f)     The Licensed Technology hereunder represents all rights of Rad Source with respect to the technologies required for the manufacture, design, and Use of the System.

(g)     There have been no written notices, citations or decisions by any governmental or regulatory body that the System is defective or fails to meet any applicable standards promulgated by any such governmental or regulatory body. Other than the recall of the System with regard to cooling in 2001, there have been no recalls, field notifications or seizures ordered or, to Rad Source's knowledge, threatened by any such governmental or regulatory body with respect to the System. Rad Source has not received a warning letter from the FDA or any similar notice from any similar foreign governmental authority. Rad Source has provided to Nordion access to all correspondence in Rad Source's possession received from the FDA with respect to the System.

(h)     The System design, performance and function meet the specifications set out in Schedule A, and that Rad Source is not aware of any material problems with the System design, performance or function which would prevent the System from meeting the specifications.

(i)     The System has not been the subject of any third party product liability claim, notice or action.

(j)     Rad Source has obtained, in all countries where the System has been installed, all applicable material licenses, registrations, approvals, clearances and authorizations required by local, state or federal agencies (including without limitation the FDA) in such countries regulating the safety, effectiveness and market clearance of the System currently or previously installed in such countries. Rad Source has identified and made available for examination by Nordion all information relating to regulation of the System, including licenses, registrations, approvals, permits, device listing, inspections, recalls and product actions, audits and ongoing field tests and clinical studies.

(k)     Rad Source has good and marketable title to the Inventory free and clear of any and all claims, liens, encumbrances and security interests



17

whatsoever. The Inventory will consist of items of a quantity and quality usable and saleable with or for the System in the ordinary course of business, and meet applicable specifications, is of merchantable quality and is fit for the particular purpose for which it is intended.

(l)     The service agreements provided or to be provided by Rad Source to Nordion pursuant to Section 6.2 represent all the current Rad Source customer service agreements with respect to the System as at the Closing Date and that the information contained in the System unit history file(s) (at the time it is provided) is true and correct.

(m)     That as of the Closing Date, all of the customer quotes, quote validity periods, correspondence and customer lists will be provided to Nordion pursuant to Section 6.1 and are complete, true and correct.

11.2    Nordion Representation and Warranty

Nordion represents and warrants to Rad Source that as at the time of entering into this Agreement and as at the Closing Date:

(a)     It has full right, power and authority to enter into this Agreement, and there is no impediment, which would inhibit its ability to perform the terms and conditions imposed on it by this Agreement.

(b)     There is no action or proceeding pending or insofar as Nordion knows or ought to know, threatened against Nordion before any court, administrative agency or other tribunal which might have an adverse material affect on its business.

## ARTICLE XII - LICENSE TERM

12.1    Term

The term of the license grant (Article 3.1) shall commence on the Closing Date and unless terminated earlier pursuant to this Agreement, shall remain in full force and effect until   the expiration or invalidity of the last to expire of the Patents, after which Nordion shall be free to Use the Licensed Technology, the System and single power supply version of the System, in the  Territory, without further obligations to Rad Source.

12.2    Default

This Agreement may be terminated by a party in the event of material breach by the other party of the terms and conditions hereof, provided however the nonbreaching party shall first give to the breaching party written notice of the



18

intended termination of this Agreement specifying the reason therefore (a "Breach Notice"). Upon receipt of such Breach Notice, the breaching party shall remedy such breach within forty-five (45) days of the receipt of such notice, failing which the non-breaching party may terminate this Agreement, without prejudice to any other rights or remedies which may be available in law or otherwise.

12.3   Default Non Payment

In the event Nordion fails to pay any amount due and owing to Rad Source when it is due hereunder, and following such failure of payment should Nordion fail to pay such amounts within twenty (20) days after receiving written notice of default from Rad Source, then this Agreement may, in addition to any other rights or remedies, be terminated by Rad Source giving written notice of termination to Nordion. Termination shall not relieve Nordion from payment of any amounts that may otherwise be due and payable.

12.4   Nordion to Cease Practice

(a)   Nordion agrees that if this Agreement is terminated by Rad Source pursuant to Sections 12.2, 12.3 or 12.5, the licensed rights granted shall terminate and Nordion shall immediately discontinue Use of the Licensed Technology. Notwithstanding anything to the contrary, in the event of termination of this Agreement Nordion shall be entitled to continue Use of the Licensed Technology for the limited purpose of servicing the System under existing service agreements then in effect.

(b)   Notwithstanding the foregoing, Nordion shall have the right, during the nine (9) month period immediately following such date of termination, to complete manufacturing or submanufacturing operations in progress with respect to the System, and the single power supply version of the System in the course of being manufactured and shall be entitled to promote, market and sell such system(s) and any other such system(s) in inventory, in accordance with the terms and conditions of this Agreement including payment of applicable amounts due and payable.

12.5   Bankruptcy

Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall automatically terminate upon Nordion filing a petition in bankruptcy, being adjudicated a bankrupt or filing a petition or otherwise seeking relief under or pursuant to any bankruptcy, insolvency or reorganization statute or proceeding, or if a petition in bankruptcy is filed against it which is not dismissed within ninety (90) days or proceedings are taken to liquidate its assets by a state or administrative body.



19

All rights and licenses granted under or pursuant to this Agreement by Rad Source to Nordion are, and shall otherwise be deemed to be, for purposes of the U.S. Bankruptcy Code (the "Code"), including Section 365(n) thereof, licenses of rights to "intellectual property" as defined under Section 101(56) of the Code. The parties agree that Nordion, as a licensee of such rights under this Agreement, shall retain and may fully exercise all of its rights and elections under the Code. In particular and without limitation, in the event of rejection of this Agreement by a bankruptcy trustee, Nordion hereby elects, pursuant to the Code to retain all rights granted to it under this Agreement to the extent permitted by law. The parties further agree that, in the event of the commencement of a bankruptcy proceeding by or against Rad Source under the Code, Nordion shall be entitled to a complete duplicate of (or complete access to, as appropriate) any such intellectual property and all embodiments of such intellectual property, and same, if not already in its possession, shall be promptly delivered to Nordion (i) upon any such commencement of a bankruptcy proceeding upon written request therefore by Nordion, unless Rad Source elects to continue to perform all of its obligations under this Agreement, or (ii) if not delivered under (i) above, upon the rejection of this Agreement by or on behalf of Rad Source upon written request therefore by Nordion.

12.6    Termination for Infringement

In the event an adverse settlement be entered into by Rad Source or a judgement be rendered against Rad Source or Nordion, for reason of infringement of a third party patent by the Licensed Technology, the System or a portion thereof, which adversely and materially impacts the ability to Use the Licensed Technology or the System, Nordion shall have the right to terminate this Agreement, upon thirty (30) days prior written notice to Rad Source.  In the event of such termination, Rad Source shall, determined based on the number of System units sold or leased by Nordion as at the date of termination, reimburse to Nordion that percentage of payments made by Nordion as at the date of termination, the whole in accordance with Schedule C.  The foregoing payment shall be made to Nordion within thirty (30) days of termination.

## ARTICLE XIII - MISCELLANEOUS

13.1    No Consequential Damages

Neither party shall be liable to the other under any circumstances, for any indirect, special, consequential or incidental damages.

13.2    Force Majeure

Neither Nordion nor Rad Source shall be liable for damages or failure to perform or delay in performing its obligations under this Agreement if such delay or

20

failure to perform is due an event of Force Majeure. Force Majeure shall include any reason beyond the commercially reasonable control of such party including but not limited to an act of God, flood, power failure, fire, explosion, causality or accident, war (declared or undeclared) revolution, civil commotion, acts of public enemies, blockade or embargo, or a proclamation of any government, failure of suppliers to provide equipment or machinery, interruption or delay in transportation, strike or labour dispute. In the event of Force Majeure, the affected party shall promptly notify the other party and shall exert commercially reasonable efforts to eliminate, cure or overcome such event and to resume performance of its obligations.

13.3   Notices

All reports, approvals, requests, demands and notices or any other communications required or permitted by this Agreement to be given to a party shall be in writing and shall be deemed to be duly given if personally delivered or sent by registered mail or facsimile, to the party concerned at its address set forth below, or at such other address as a party may specify by notice to the other party hereunder.

|              |                                                |
|--------------|------------------------------------------------|
| NORDION:     | 447 March Road                                 |
|              | Ottawa, ON, Canada                             |
|              | K2K 1X8                                        |
|              | Att: Senior Vice-President, Ion Technologies   |
|              |                                                |
| RAD SOURCE:  | 20283 State Road 7, Suite 107                  |
|              | Boca Raton, Florida, U.S.A.                    |
|              | 33498                                          |
|              | Att: President                                 |

Any communication that is sent by pre-paid registered mail shall, subject to the following, be conclusively deemed to have been received on the fifth (5th) business day following the mailing thereof, and if delivered or sent by facsimile, shall be conclusively deemed to have been received at the time of delivery of successful transmission. At the time any notice is sent by facsimile the party giving such notice shall concurrently mail a copy of such notice to the other party in accordance with the provisions of this paragraph. Notwithstanding the foregoing provisions with respect to mailing, in the event that it maybe reasonably anticipated that, due to any strike, lockout, or similar event involving an interruption in postal service, communication will be received by the addressee later than the tenth (10th) business day following the mailing date, then the mailing of any such communication as aforesaid shall not be an effective means of sending the same, but rather any communication must then be sent by an alternative means of transportation which may be reasonably anticipated will



21

cause the communication to be received reasonably expeditiously by the addressee.

13.4    Headings

The headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

13.5    Severability

If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any party. Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in a mutually acceptable manner in order that the transactions contemplated hereby be consummated as originally contemplated to the greatest extent possible.

13.6    Independent Contractors

The parties hereto are independent contractors engaged in the operation of their own respective businesses. Neither party is, or is to be considered as, the agent or employee of the other for any purpose whatsoever. Neither party has the authority to enter into contracts or assume any obligations for the other party or make any warranties or representations on behalf of the other party. Nothing in this Agreement shall be construed to establish a relationship of a partnership or joint venture between the parties.

13.7    Entire Agreement

This Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, with respect to the subject matter hereof.

13.8    Public Communications

During the first year of this Agreement, Rad Source shall cooperate with Nordion in the timing and content of any public communications and Rad Source will not without first obtaining the approval of Nordion make any public announcement directly or indirectly, with respect to the subject matter and content of this Agreement and any relationship between the parties. In the event a party is required to publicly disclose such information pursuant to securities law or otherwise such party shall provide reasonable notice to the other party and consult the other party prior to any such disclosure in order that the content disclosed be



22

purged by the other party of confidential, proprietary or commercially sensitive information.

13.9    Assignment

This Agreement shall inure to the benefit of and shall be binding upon the heirs, successors and permitted assigns of the parties. Neither Nordion nor Rad Source may assign any of its rights or delegate any of its obligations under this Agreement without the express written consent of the other party, such consent not to be unreasonably withheld; provided that (i) either party may assign any of its rights or delegate any of its obligations under this Agreement, in whole or in part, to any of its Affiliates, without consent of the other party, but without relieving the delegating party from the responsibility for performance of any of such obligations and (ii) either party may assign its rights and delegate its duties and obligations (in whole and not in part) under this Agreement to an entity which acquires all, or substantially all, of its assets or business, without the consent of the other party, provided that such assignee duly and effectively assumes all of the obligations of the assigning party hereby by instrument satisfactory to the other party. Any assignment in violation of the provisions of this section shall be void.

13.10    Amendment, Waiver

This Agreement may not be amended or modified except by an instrument in writing signed by Rad Source and Nordion and referencing this Agreement. Waiver of any term or condition of this Agreement shall only be effective if in writing and shall not be construed as a waiver of any subsequent breach or waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.

13.11    Counterparts

This Agreement may be executed in one or more counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same document.

13.12    Survival

The parties agree that notwithstanding anything in the Agreement to the contrary that those provisions of this Agreement which by their nature survive termination or expiration of this Agreement shall do so to the extent required thereby for the full observation and performance by any and all of the parties hereto.



23

13.13 Governing Law

This Agreement shall be governed and construed in accordance with the laws of the State of Florida, USA, without reference to its principles on conflicts of laws. Place of closing shall be in the State of Florida. The application of the United Nations Convention for the International Sale of Goods is expressly excluded.

IN WITNESS WHEREOF this Agreement has been duly executed by the parties hereto as of the date first above written.

MDS NORDION, a division of MDS (Canada) Inc.

By: _G. Ashfield_
Name: Gord Ashfield
Title: Vice President

RAD SOURCE TECHNOLOGIES, INC.

By: _Randol E. Kirk_
Name: RANDOL E KIRK
Title: PRESIDENT

#58623 v1 - License Agreement/Rad Source/Clean Copy

24

## SCHEDULE A

### LICENSED TECHNOLOGY

**System current design:**

All drawings and documents required to manufacture, install, service and maintain the System including: Patent information:

1.  U.S. Patent No. 6,389,099
2.  U.S. Patent No 6,212,255
3.  U.S. Patent Application No. 101244-209

Validation and test:

1.  Validation documentation for the System
2.  Test reports supporting the System validation

Drawings of the System including:

1.  All mechanical and electrical component detailed drawings suitable for manufacture. This includes but is not limited to:
    Frame components and weldments
    Cooling system components, fittings, brackets and plumbing details
    Components including molded plastic parts used to locate the canister
    Assembly details for the boron carbide sections
    Door and hinge details
    Metal covers and attachments
    Chamber formed, cast and welded components
    Lead shielding details
    Mounting brackets and alignment details for the x-ray tubes
    All mounting details for electrical and mechanical components
    All wiring harness details including wire specs and connectors
    Interlocks and attachments
    Lists of hardware such as nuts, bolts and screws
    Surface finish details such as paint or plating
    General assembly and sub-assembly drawings
2.  Schematics and wiring drawings
3.  All label drawings meeting the requirements of FDA and US Federal Code CFR 1020.40 as noted below
4.  Livingston drawings of the System including, but not limited to, those on the attached Nordion Drawing list C1560001-001.

Specifications:

1.  Manufacturer's specifications for major purchased components including x-ray tubes, power supplies, high voltage cables and control circuit boards.
2.  Specifications for other purchased items such as electrical components, cooling system components
3.  Specifications for special materials including dielectric grease
4.  Specifications for the System
5.  Specification data sheets for the System
6.  Specifications for materials used in the anti-scatter shield
7.  Specifications of test equipment used including dosimetry equipment

25

Manuals:

1.  User manuals meeting the requirements of FDA Code of Federal Regulations 21CFR 801.1 and 801.5 and US Code of Federal regulations CFR 1020.40
2.  Service manuals meeting the requirements of FDA Code of Federal Regulations 21CFR 801.1 and 801.5 and US Code of Federal regulations CFR 1020.40
3.  Installation and Troubleshooting manuals

Procedures:

1.  Quality Assurance procedures including unit test procedures including functional, electrical safety and dosimetry tests for final test at manufacture
2.  Installation test procedures including functional, electrical safety and dosimetry tests
3.  Routine scheduled maintenance procedures including dosimetry tests.
4.  Procedures for special processes unique to the System owned by Rad Source

**<u>Single Power Supply Version of the System</u>:**
All drawings and documents required to manufacture, install, service and maintain the System as designed as set out in Schedule B.;

DRAWING LIST C1560001 - 001

**MDS Nordion**

TITLE

DRAWING LIST
LIVINGSTON PRODUCTS
INC.

DWG NC C1560001-001

SHEET   1   OF   11   ISSUE   A

| | DRAWN | DATE |
| --- | --- | --- |
| | CHECKED | DATE |
| | PROJECT ENG | DATE |
| | PRODUCT ENG | DATE |

THIS DRAWING IS THE PROPERTY OF MDS NORDION AND IS
SUBMITTED FOR CONSIDERATION ON THE UNDERSTANDING THAT
THERE SHALL BE NO EXPLOITATION OF ANY INFORMATION
CONTAINED HEREIN EXCEPT WITH THE SPECIFIC WRITTEN
AGREEMENT OF MDS NORDION.

ISSUE STATUS
OF SHEETS

ISS | SHT | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25

ISS. | DESCRIPTION | DATE | ENG

REVISIONS

| TITLE | NUMBER | SIZE | # SHEETS |
|---|---|---|---|
| PUCK CASE – INNER – MOLDED PART | 1042 | D | 2 |
| REAR BRACKET – LEFT | 1045 | B | 1 |
| OUTER HOUSING | 10010 | C | 1 |
| COVER | 10011 | C | 1 |
| CROSS BEAM 1.5X1.5X15.5 | 10187 | B | 1 |
| SQUARE TUBING | 10188 | B | 1 |
| SQUARE TUBING | 10189 | B | 1 |
| RECTANGULAR TUBING | 10192 | B | 1 |
| RECTANGULAR TUBING | 10192 | B | 1 |
| RECTANGULAR TUBING | 10193 | B | 1 |
| RECTANGULAR TUBING | 10193 | B | 1 |
| DOOR STOP ROD | 10194 | A | 1 |
| DOOR STOP UPPER PLATE | 1-195 | A | 1 |
| DOOR STOP PLATE | 10196 | A | 1 |
| DOOR STOP – TH – D ROD | 10197 | A | 1 |
| ACTIVATOR ARM | 10198 | A | 1 |
| ACTIVATOR PIVOT BLOCK | 10199 | A | 1 |
| ACTIVATOR ASSEMBLY | 10200 | A | 1 |
| 220 VAC FAN HARNESS | 10210-C | A | 1 |
| 3-BAG CANNISTER HOLDER ASSEMBLY | 10220 | A | 1 |
| RADIATION WARNING LABEL | 10221 | A | 1 |
| ACCESS RESTRICTION LABEL | 10222 | A | 1 |
| TOP HEAVY LABEL | 10223 | A | 1 |
| SHOCK HAZARD LABEL | 10224 | A | 1 |
| READ INSTRUCTION LABEL | 10225 | A | 1 |
| SAFETY INTERLOCK LABEL | 10226 | A | 1 |
| RECONNECTION REQUIRED LABEL | 10227 | A | 1 |
| VOLTAGE WARNING LABEL | 10228 | A | 1 |
| X-RAY WARNING LABEL | 10229 | A | 1 |
| CANNISTER SWITCH BOX | 10234 | B | 1 |
| CANNISTER SWITCH COVER | 10235 | A | 1 |

**MDS Nordion**

| DRAWING LIST LIVINGSTON PRODUCTS INC. | DWG. NO. | C-156001-001 | | |
|---|---|---|---|---|
| | SHEET | 2 | OF | 11 | ISSUE | A |

| TITLE | NUMBER | SIZE | # SHEETS |
|---|---|---|---|
| CANNISTER SWTICH ASSEMBLY | 10236 | A | 1 |
| DOOR STOP BUMPER | 102137 | A | 1 |
| CANNISTER RING BASE | 10238 | C | 1 |
| CANNISTER RING BASE | 10239 | C | 1 |
| CANNISTER RING EAR PLATE | 10240 | A | 1 |
| REFLECTOR BLOCK | 10241 | A | 1 |
| PUCK CASE ASSEMBLY | 10242 | C | 1 |
| ELECTRIC PANEL | 10282 | D | 1 |
| BEZEL | 9221 | D | 1 |
| TOP FRONT PANEL | 9226 | D | 1 |
| MIDDLE FRONT PANEL | 9227 | D | 1 |
| LOWER FRONT PANEL | 9228 | D | 1 |
| BACK PANEL | 9544 | D | 1 |
| FRAME ASSEMBLY & ATTACHMENTS | 7121 | D | 2 |
| DOOR BEZEL | 7125 | D | 1 |
| COVER | 7126 | B | 1 |
| STOP PLATE | 7127 | A | 1 |
| DISPLAY COVER | 7128 | B | 1 |
| DISPLAY PLATE | 7129 | C | 1 |
| POWER SUPPLY PLATE | 7144 | A | 1 |
| LEFT DRUM BRACKET | 7343 | B | 1 |
| RIGHT DRUM BRACKET | 7344 | B | 1 |
| CONDUIT BRACKET | 7349 | A | 1 |
| FRONT BRACKET | 7350 | B | 1 |
| REAR BRACKET RIGHT | 7352 | B | 1 |
| DRUM BRACKET SHORT | 7353 | B | 1 |
| DOOR HANDLE | 7359 | A | 1 |
| LEAD DOOR | 7411 | C | 1 |
| SIDE PANEL RIGHT | 7470 | D | 1 |
| FRONT PANEL | 7471 | D | 1 |
| BACK PANEL ASSEMBLY | 7472 | D | 1 |

**MDS Nordion**

| DRAWING LIST LIVINGSTON PRODUCTS INC. | DWG. NO. | C156001-001 | | |
|---|---|---|---|---|
| | SHEET | 3 | OF | 11 | ISSUE | A |

| TITLE | NUMBER | SIZE | # SHEETS |
|---|---|---|---|
| TOP PANEL ASSEMBLY | 7473 | D | 1 |
| SIDE PANEL – LEFT | 7474 | D | 1 |
| SWITCH SIDES | 7670 | A | 1 |
| SWITCH CONTACT | 7671 | A | 1 |
| LATCH | 7672 | B | 1 |
| CONTAINER ASSEMBLY | 7673 | C | 1 |
| CONTAINER BODY | 7674 | C | 1 |
| CONTAINER COVER | 7675 | C | 1 |
| CONTACT HOLDER | 7676 | B | 1 |
| SWITCH COVER | 7677 | A | 1 |
| SWITCH COVER | 7678 | A | 1 |
| SWITCH BASE | 7679 | A | 1 |
| COVER RIM MOLD ASSEMBLY | 7680 | C | 1 |
| BASE PLATE RIM | 7681 | C | 1 |
| RAIL 1 LONG | 7682 | B | 1 |
| RAIL 1 SHORT | 7683 | B | 1 |
| RAIL 2 LONG | 7684 | B | 1 |
| RAIL 2 SHORT | 7685 | B | 1 |
| ACCESS PANEL ASSEMBLY | 7686 | D | 1 |
| LEAD RIM | 7687 | D | 1 |
| TUBE MOUNTING PLATE TOP TUBE | 7688 | B | 1 |
| TUBE FLANGE MODIFICATION | 7690 | B | 1 |
| TUBE MOUNTING PLATE BOTTOM TUBE | 7691 | B | 1 |
| BASE PLATE | 7692 | D | 1 |
| RAIL A | 7693 | B | 1 |
| RAIL A SHORT | 7694 | B | 1 |
| RAIL B | 7695 | B | 1 |
| RAIL B SHORT | 7696 | B | 1 |
| RAIL C | 7697 | B | 1 |
| RAIL C SHORT | 7698 | B | 1 |
| RAIL D | 7699 | B | 1 |
| RAIL D SHORT | | | |

**MDS Nordion**

DRAWING LIST
LIVINGSTON PRODUCTS INC.

| DWG. NO. | C156001-001 | | |
|---|---|---|---|
| SHEET | 4 | OF | 11 | ISSUE | A |

| TITLE | NUMBER | SIZE | # SHEETS |
|---|---|---|---|
| COVER SEAL MOLD ASSEMBLY | 7700 | D | 1 |
| COVER SEAL | 7701 | D | 1 |
| WATER TANK BRACKET | 7704 | B | 1 |
| FRAME SIDE | 7705 | B | 1 |
| REINFORCEMENT FERRULE | 7706 | B | 1 |
| STEEL ENCLOSURE COVER | 7709 | D | 1 |
| STEEL ENCLOSURE DRUM – SHAPE | 7710 | D | 2 |
| TOP LEAD COVER | 7711 | D | 1 |
| BOTTOM LEAD COVER | 7712 | D | 1 |
| COVER BRACKET | 7715 | A | 1 |
| EXTERIOR DOOR – ALUMINUM | 7716 | C | 1 |
| DOOR SUPPORT | 7717 | A | 1 |
| EXTERNAL DOOR ARM | 7718 | C | 1 |
| HINGE | 7719 | A | 1 |
| EXTERNAL DOOR ASSEMBLY | 7720 | C | 2 |
| SHAFT | 7721 | A | 1 |
| GUIDE PIECE | 7722 | A | 1 |
| CONNECT PLATE | 7723 | A | 1 |
| SHAFT SHORT | 7731 | A | 1 |
| DOOR ARM | 7732 | B | 1 |
| DOOR BRACKET | 7733 | B | 1 |
| TRAY ARM – RIGHT | 7734 | B | 1 |
| TRAY ARM – LEFT | 7735 | B | 1 |
| CANNISTER RING | 7736 | B | 1 |
| ARM SUPPORT ASSEMBLY | 7737 | B | 1 |
| SQUARE TUBING SUPPORT | 7738 | B | 1 |
| HINGE BRACKET | 7739 | B | 1 |
| INTERNAL DOOR ASSEMBLY | 7740 | D | 1 |
| BUSHING HOLDER | 7741 | A | 1 |
| CONTACT HOLDER COVER | 7751 | A | 1 |
| PROTECTION COVER | 7752 | B | 1 |
| DOOR SKIRT | 7754 | B | 1 |

DRAWING LIST
LIVINGSTON PRODUCTS INC.

DWG NO. C156001-001

SHEET 5 OF 11   ISSUE A

MDS Nordion

| TITLE | NUMBER | SIZE | # SHEETS |
|---|---|---|---|
| SWITCH PIN | 7757 | A | 1 |
| SWITCH HOUSING | 7758 | B | 1 |
| PANEL BRACKET | 7760 | A | 1 |
| COOLING DIAGRAM | 7761 | B | 1 |
| COOLING SYSTEM BRACKET | 7762 | B | 1 |
| INTERLOCK BRACKET | 7763 | B | 1 |
| INTERLOCK BRACKET | 7763 | B | 1 |
| INTERLOCK CONDUIT BRACKET | 7770 | A | 1 |
| REINFORCEMENT PLATE | 7773 | B | 1 |
| COVER SEAT ASSEMBLY | 7774 | C | 1 |
| COVER SEAT LONG SIDE | 7775 | C | 1 |
| COVER SEAT SHORT SIDE | 7776 | B | 1 |
| EXTERIOR DOOR – ALUMINUM | 7716 | C | 1 |
| DOOR SUPPORT | 7717 | A | 1 |
| EXTERNAL DOOR ARM | 7718 | C | 1 |
| HINGE | 7719 | A | 1 |
| EXTERNAL DOOR ASSEMBLY | 7720 | C | 2 |
| SHAFT | 7721 | A | 1 |
| GUIDE PIECE | 7722 | A | 1 |
| CONNECT PLATE | 7723 | A | 1 |
| SHAFT SHORT | 7731 | A | 1 |
| DOOR ARM | 7732 | B | 1 |
| DOOR BRACKET | 7733 | B | 1 |
| TRAY ARM – RIGHT | 7734 | B | 1 |
| TRAY ARM – LEFT | 7735 | B | 1 |
| CANNISTER RING | 7736 | B | 1 |
| ARM SUPPORT ASSEMBLY | 7737 | B | 1 |
| SQUARE TUBING SUPPORT | 7738 | B | 1 |
| HINGE BRACKET | 7739 | B | 1 |
| INTERNAL DOOR ASSEMBLY | 7740 | D | 1 |
| BUSHING HOLDER | 7741 | A | 1 |
| CONTACT HOLDER COVER | 7751 | B | 1 |

**MDS Nordion**

| DRAWING LIST LIVINGSTON PRODUCT'S INC. | DWG. NO. | C 156001-001 | | | | |
|---|---|---|---|---|---|---|
| | SHEET | 6 | OF | 11 | ISSUE | A |

| TITLE | NUMBER | SIZE | # SHEETS |
|---|---|---|---|
| PROTECTION COVER | 7752 | B | 1 |
| DOOR SKIRT | 7754 | B | 1 |
| SWITCH PIN | 7757 | A | 1 |
| SWITCH HOUSING | 7758 | B | 1 |
| PANEL BRACKET | 7760 | A | 1 |
| COOLING DIAGRAM | 7761 | B | 1 |
| COOLING SYSTEM BRACKET | 7762 | B | 1 |
| INTERLOCK BRACKET | 7763 | B | 1 |
| INTERLOCK BRACKET | 7763 | B | 1 |
| INTERLOCK CONDUIT BRACKET | 7770 | A | 1 |
| REINFORCEMENT PLATE | 7773 | B | 1 |
| COVER SEAT ASSEMBLY | 7774 | C | 1 |
| COVER SEAT LONG SIDE | 7775 | C | 1 |
| COVER SEAT SHORT SIDE | 7776 | B | 1 |
| COMET 150 TUBE MOUNT ASSEMBLY | 7777 | B | 1 |
| SIDE PIECE | 7778 | B | 1 |
| END PIECE | 7779 | B | 1 |
| TOP HOLDER | 7780 | B | 1 |
| CROSS BAR | 7781 | B | 1 |
| FRAME SIDE LEFT | 7782 | B | 1 |
| SUPPORT FRAME ASSEMBLY | 7783 | D | 1 |
| ANGLE SUPPORT | 7787 | B | 1 |
| ELECTRIC PANEL | 7788 | D | 1 |
| POWER CORD BOX | 7789 | D | 1 |
| BACK PLATE | 7790 | C | 1 |
| CIRCUIT BREAKER BOX MODIFICATION | 7791 | C | 1 |
| TOP COVER LOCK BRACKET | 7792 | B | 1 |
| FAN BRACKET | 7793 | B | 1 |
| PANEL HOLDER | 7794 | A | 1 |
| BOTTOM PLATE | 7796 | D | 1 |
| CONTROL PANEL BEZEL | 7809 | D | 1 |
| TOP BRACKET | 7819 | B | 1 |

DRAWING LIST
LIVINGSTON PRODUCTS INC.

DWG. NO. C156001-001

SHEET 7 OF 11 ISSUE A

MDS Nordion

| TITLE | NUMBER | SIZE | # SHEETS |
|---|---|---|---|
| BEZEL BRACKET | 7821 | B | 1 |
| SILK SCREEN ART WORK | 7926 | C | 1 |
| PANEL BRACKET | 7934 | B | 1 |
| DOOR MOLD ASSEMBLY & LEAD DOOR | 7940 | D | 1 |
| DOOR LEAD SHOULDER | 7945 | B | 1 |
| X-RAY TUBE ASSEMBLY | 7963 | C | 1 |
| SQUARE TUBING | 7964 | B | 1 |
| SHORT BEAM | 7966 | B | 1 |
| BACK POST | 7968 | B | 1 |
| CROSS BEAM 1.5X1.5X15.5 | 7970 | B | 1 |
| CROSS BEAM 1.5X1.5X15.5 | 7970 | B | 1 |
| ELECTRICAL DIAGRAM | 7971 | C | 1 |
| POST LOCK | 7975 | A | 1 |
| SUPPORT BRACKET – TRAVEL SWITCH | 7978 | A | 1 |
| POWER CONTROLS PANEL | 7989 | B | 1 |
| POWER CONTROLS BEZEL | 7990 | B | 1 |
| LEAD ELBOW | 8079 | B | 1 |
| MAIN 220 VAC BREAKER BOX ASSEMBLY | 8263 | A | 1 |
| MAIN POWER CONDUIT ASSEMBLY | 8264 | A | 1 |
| MAIN INTERLOCK SWITCH | 8267 | A | 1 |
| SUB-PANEL LAYOUT | 8268 | A | 1 |
| FLOW SWITCH ASSEMBLY | 8270 | A | 1 |
| POWER SUPPLIES WIRING | 8271 | A | 1 |
| TOP & BOTTOM POWER SUPPLY WIRING | 8272 | A | 1 |
| CONTRACTOR # 1 & INCOMING POWER LAYOUT | 8273 | A | 1 |
| CONTRACTOR #2 LAYOUT | 8274 | A | 1 |
| 24 VDC POWER SUPPLY LAYOUT | 8275 | A | 1 |
| RELAY ASSEMBLY LAYOUT | 8276 | A | 1 |
| START/STOP GENERATOR HARNESS | 8277 | A | 1 |
| POWER RESET BOX ASSEMBLY | 8278 | A | 1 |
| KEY/LED/GENERATOR HARNESS | 8279 | A | 1 |
| BACK PANEL SWITCH HARNESS | 8280 | A | 1 |

**MDS Nordion**

| DRAWING LIST LIVINGSTON PRODUCTS INC. | DWG. NO. C156001-001 |
|---|---|
| | SHEET 8 OF 11   ISSUE A |

| TITLE | NUMBER | SIZE | # SHEETS |
|---|---|---|---|
| COOLING SYSTEM HARNESS | 8281 | A | 1 |
| INTERFACE HARNESS | 8282 | A | 1 |
| POWER RESET HARNESS | 8283 | A | 1 |
| INTERFACE HARNESS LAYOUT | 8284 | A | 1 |
| POWER RESET HARNESS | 8285 | A | 1 |
| COOLING PUMP HARNESS ASSEMBLY | 8286 | A | 1 |
| KEY/LED/GENERATOR HARNESS ASSEMBLY | 8287 | A | 1 |
| BACK PANEL SWITCH HARNESS | 8288 | A | 1 |
| DOOR INTERLOCK CABLE ASSEMBLY | 8299 | A | 1 |
| COOLING SYSTEM HARNESS | 8300 | B | 1 |
| BLOOD IRRADIATOR RS-3000 GEN. ASSEMBLY | 8301 | D | 1 |
| COOLING INSTALLATION | 8303 | C | 1 |
| UNIT LABELING | 8356 | B | 1 |
| TRAY PLATE FOR MOLDED CANNISTER | 8367 | C | 1 |
| ENFORCEMENT FERULE | 8368 | B | 1 |
| DOOR FERULE | 8369 | B | 1 |
| TRAY ARM | 8370 | B | 1 |
| TRAY ASSEMBLY | 8371 | C | 1 |
| MIDDLE FRONT PANEL | 8372 | D | 1 |
| LOWER FRONT PANEL | 8373 | D | 1 |
| UPPER FRONT PANEL | 8374 | D | 1 |
| TRAY ARM HARNESS ASSEMBLY | 8375 | A | 1 |
| MIDDLE PANEL BRACKET | 8394 | B | 1 |
| COOLING SYSTEM WIRING ASSEMBLY | 8450 | B | 1 |
| POWER SUPPLY WIRES EXTENSION | 8455 | A | 1 |
| START/STOP GENERATOR ASSEMBLY | 8456 | A | 1 |
| 24 VDC SOLID STATE RELAY HARNESS | 8470 | A | 1 |
| RELAY CIRCUIT BOARD | 8471 | A | 1 |
| TUBE MOUNTING PLATE | 8492 | B | 1 |
| LOWER FRONT PANEL HOLDER | 8496 | A | 1 |
| LEAD ENCLOSURE COVER | 8537 | D | 1 |
| LEFT SIDE LEAD LINER | 8539 | D | 1 |



| | DWG. NO. | | | |
|---|---|---|---|---|
| DRAWING LIST LIVINGSTON PRODUCTS INC. | C156001-001 | | | ISSUE   A |
| | SHEET   9 | OF   11 | | |

| TITLE | NUMBER | SIZE | # SHEETS |
|---|---|---|---|
| RIGHT SIDE LEAD LINER | 8540 | D | 1 |
| LEAD LINER ACCESS PANEL | 8541 | D | 1 |
| POWER SUPPLY CLEAR PLASTIC COVER | 8587 | A | 1 |
| CIRCUIT BOARD ASSEMBLY & GROUNDING | 8604 | A | 1 |
| TUBE GROUNDING WIRE | 8685 | A | 1 |
| CONTROLLER BD. GROUNDING WIRE | 8767 | A | 1 |
| INSTALLING TERMINAL BLOCK | 8829 | A | 1 |
| INTERLOCK SWITCH ASSEMBLY | 8830 | A | 1 |
| DIN RAIL LAYOUT | 8831 | A | 1 |
| PLASTIC WIRE DUCT ASSEMBLY | 8832 | A | 1 |
| KEYLED HARNESS | 8833 | A | 1 |
| KEYLED GENERATOR ASSEMBLY | 8986 | A | 1 |
| LEAD BOLT SHIELD | 9031 | B | 1 |
| PUCK CASE – OUTER MOLDED PART | 9040 | D | 2 |
| PUCK CASE – INNER MOLDED PART | 9042 | D | 2 |
| ACCESS PANEL – STEEL | 9096 | D | 1 |
| HINGE DOOR | 9208 | D | 1 |
| HINGE BODY | 9209 | B | 1 |
| HINGE SPACER | 9210 | B | 1 |
| HINGE BODY | 9211 | B | 1 |
| EXTERNAL DOOR ASSEMBLY | 9212 | C | 1 |
| EXTERNAL DOOR ALUMINUM | 9213 | C | 1 |
| PUCK BRACKET | 9214 | B | 1 |
| PUCK BRACKET | 9214 | B | 1 |
| CANNISTER RING ASSEMBLY | 9216 | D | 1 |
| DOOR – STEEL | 9220 | D | 1 |
| FRONT POST – LEFT | 9222 | C | 1 |
| FRONT POST – RIGHT | 9223 | C | 1 |
| FRONT POST – RIGHT | 9223 | C | 1 |
| FRAME ASSEMBLY & ATTACHMENTS | 9224 | D | 2 |
| FINAL ASSEMBLY | 9225 | D | 1 |
| RECTANGULAR TUBING | 9230/9231 | B | 1 |

**MDS Nordion**

| DRAWING LIST | | DWG. NO. | | | | |
|---|---|---|---|---|---|---|
| LIVINGSTON PRODUCTS INC. | | C156001-001 | | | | |
| | | SHEET | 10 | OF | 11 | ISSUE | A |

| TITLE | NUMBER | SIZE | # SHEETS |
|---|---|---|---|
| X-RAY TUBE ASSEMBLY | 9232 | C | 1 |
| STEEL ENCLOSURE TUBE & ATTACHMENTS | 9233 | D | 2 |
| FRONT LEAD LINER | 9234 | D | 1 |
| SHAFT DOOR | 9238 | B | 1 |
| LINER – INNER DOOR | 9243 | B | 1 |
| CONTROL PANEL BEZEL | 9244 | D | 1 |
| DOOR STOP PLATE | 9280 | D | 1 |
| TUBE ASSEMBLY | 9284 | D | 1 |
| CANNISTER ASSEMBLY | 9286 | D | 1 |
| SIDE PIECE | 9287 | B | 1 |
| END PIECE | 9288 | B | 1 |
| TOP HOLDER | 9289 | B | 1 |
| CROSS BAR | 9290 | B | 1 |
| HINGE BRACKET OUTER | 9353 | B | 1 |
| DOOR STOP ASSEMBLY | 9355 | B | 1 |
| DOOR STOP ASSEMBLY | 9355 | B | 1 |
| LOWER FRONT PANEL ASSEMBLY | 9529 | D | 1 |
| MIDDLE FRONT PANEL ASSEMBLY | 9530 | D | 1 |
| TOP FRONT PANEL ASSEMBLY | 9531 | D | 1 |
| TOP PANEL | 9543 | D | 1 |
| COOLING SYSTEM SUPPORT BRACKET | 9878 | B | 1 |

#59201 v1 - Schedule Drawing List/Livingston & Radisource Agreement

| DRAWING LIST LIVINGSTON PRODUCTS INC. | DWG. NO. | C-156001-001 | | | |
|---|---|---|---|---|---|
| MDS Nordion | SHEET | 11 | OF | 11 | ISSUE A |

26

## SCHEDULE B

### SPECIFICATIONS OF THE SINGLE POWER SUPPLY VERSION OF THE SYSTEM

Rad Source – Single Power Supply Version of the System ("Single PS unit") Specifications

Description:
The Single PS unit shall be based on the design of the current System, 2000 series serial number product. To the maximum extent practical, it shall re-use components from the current System. The Single PS unit would be fitted with a single  power supply with controls that will operate one x-ray tube, then the other tube, to provide equivalent dose uniformity. The overall time would be increased to approximately double that of the dual power supply design.

1.1.1.1   General Requirements:

The Single PS unit is to be used for the irradiation of blood and blood products (packaged in transfusion bags) for the prevention of Graft Verses Host Disease following United States of America, Food and Drug Administration (FDA) guidelines.

Detailed specifications are attached as IN/TS 1949 GR1.

The Single PS Unit Cost:
The Single PS unit t will be designed such that the cost is similiar to the current System, less the cost of one power supply, with the addition of the cost of modifications to control the single power supply.

X-ray Blood Irradiator (Single Power Supply)
Product Specification


IN/TS 1949 GR1 (P1)



# 1. INTRODUCTION

## 1.1 Scope

The purpose of this document is to specify the product system requirements of the Blood Irradiator unit at the system level, with emphasis on critical parameters and performance criteria.

## 1.2 Definitions

This document does not contain any special or unique definitions.

## 1.3 Intended Use

The Blood Irradiator is to be used for the irradiation of blood and blood products (packaged in transfusion bags) for the prevention of Graft Verses Host Disease following United States of America, Food and Drug Administration (FDA) guidelines.

This document assumes that the radiation exposure parameters, for the treatment of blood and blood products to reduce the risk of Graft Versus Host Disease, are defined by the medical community and are available to support the design of the Blood Irradiator.

The requirements are intended to ensure that the Blood Irradiator:

- delivers the intended dose at a specified target area in a sample canister;
- delivers the radiation in accordance with defined parameters to irradiate three (300 mL standard size filled as per normal use) transfusion bags with a central dose of 25 Gy (2500 rad) and an minimum dose of no less than 15 Gy (1500 rad) in a time period of up to 10 minutes, and
- delivers the radiation without causing unnecessary risk to the operator, other persons, or the immediate environment.

# 2. SPECIFICATIONS

## 2.1 Functional Requirements

### 2.1.1 Design Criteria

#### 2.1.1.1 Life

The Blood Irradiator should be designed with the objective of being maintainable for 40,000 exposure cycles without replacement of major components (i.e. power supplies and tubes), as per Reliability Specifications (2.7).

#### 2.1.1.2 Regulatory Requirements

The Blood Irradiator shall comply with the applicable regulations and recommendations of the following agencies:

- 21 CFR 1020.40, Code of Federal Regulations, Title 21 Food and Drugs, Performance Standards for Ionizing Radiation Emitting Products, Cabinet X-ray Systems. Published by the government of the Unites States of America.

### 2.1.2  Basic Feature

#### 2.1.2.1  Major Components

The Blood Irradiator shall of consist one cabinet containing two (2) X-ray tubes, one (1) power supply, radiation shielding, control electronics, cooling assemblies, exterior door to the radiation chamber, and operator controls.

#### 2.1.2.2  Blood Product Exposure

The RS-3000 Blood Irradiator shall contain an irradiation chamber and related design provisions that allow up to three standard blood transfusion bags (normally 300 mL size, partially filled with the blood as per regular use) to be positioned in the radiation field such that when the blood/blood products are irradiated to a central dose of 25 Gy (2500 rad) a minimum dose to the product is no less than 15 Gy (1500 rad)

#### 2.1.2.3  Exposure Timing

The Blood Irradiator shall contain timer circuitry within the control electronics that will allow the exposure time to be adjusted. Adjustable components in the timer circuitry shall be secured behind a lock panel to ensure that only authorized personnel make adjustments.

#### 2.1.2.4  Floor Loading

The customer site will require suitable floor loading capability to support the Blood Irradiator's weight. The manufacturer's recommended floor loading is not to be less than 975 kg/m$^2$ (200 psf).

### 2.1.3  Accessories

The Blood Irradiator is not intended to operate with accessories.

### 2.1.4  Dimensions and Weights

The Blood Irradiator weight shall not exceed 585 kg (1, 293 lb.) excluding transport packaging or containers.

The Blood Irradiator dimensions shall not exceed:

| Cabinet: | Height: | 156 cm (61.25") |
| | Width: | 114 cm (44.63") |
| | Depth: | 56 cm (21.75") |
| Sample Canister: | Diameter: | 15 cm (6") |
| | Depth: | 10 cm (4") |
| | Volume: | 1.5 l (52 ounces) |

The length of the electrical service cabling and the cooling water service tubing shall not be more than 1.5 m (59").

## 2.2  Performance Requirements

### 2.2.1  Mechanical

The irradiation chamber, the external door to the radiation chamber positioning mechanism, the sample canister holder and sample canister must collectively have a mechanical tolerance such that the geometry of the canister volume irradiation can be reproduced within ± 2 mm so the blood transfusion bag can be positioned properly for exposure leading to the radiation dose delivered to the product as specified in Blood Product Exposure (2.1.2.2).

2.2.2   Electrical

The exposure timing circuitry contained in the Blood Irradiator control electronics must have suitable tolerances to ensure that the product exposure time is within acceptable limits to obtain the absorbed dose specified in Blood Product Exposure (2.1.2.2) over the operating temperatures specified in Environmental Conditions (2.5).

2.2.3   Temperature

The Blood Irradiator should have a cooling system that will allow blood and blood product specimens to be irradiated at a rate of 5 irradiations per hour for an 8 hour period while operating in an environment specified in Environmental Conditions (2.5).

The Blood Irradiator shall have it's cooling system operate for addition period of time, which is adjustable up to 10 minutes, after the operator has turned off the power system.

## 2.3   Power System Requirements

2.3.1   Power Supplies

All power supplies within the Blood Irradiator shall be connected to one AC Mains source point.

See Technical Interface Requirements, Electrical Service, (2.6.1) for AC Mains specification.

2.3.2   Operator Controls

The operator shall be able to turn on and turn off the power system using controls that are not integrated into a control and indicator panel used to control blood and blood products irradiation.

The panel used to control the power system must have, as a minimum, the following controls and indicators:

- Main Power On Switch: This switch shall be a momentary push button switch, which is green in color. In the event of a power failure, this switch must be pressed to reset.

- Main Power Off Switch: This switch shall be a momentary push button switch, which is red in color. This switch shall disconnect the incoming electrical supply.

- Main Power On Indicator: The indicator shall be a lamp or an Light Emitting Diode indicator which is red in color. The indicator shall remain illuminated when the unit is connected to the incoming power source. See Safety Requirements, Indicators (2.9).

- Circuit Breaker: The cabinet shall be equipped a circuit breaker to allow the operator to disconnect the Blood Irradiator from the AC Mains.

## 2.4   Control System Requirements

2.4.1   Modes of Operation

The Blood Irradiator should have two operating modes, a warm up cycle and a irradiation cycle.

The warm up cycle shall be the first mode of operation each time the unit is powered up from a cold state. This mode of operation will be used to prepare the unit for irradiation of blood and blood products. It shall not be possible to perform irradiation cycles without performing the warm up cycle.

The irradiation cycle will be the mode of operation after the warm up cycle has been completed. This mode will be used to irradiate blood and blood products.

2.4.2   Operator Controls and Indicators

The operator shall be able to control irradiation of blood and blood products using controls that are in a separate control and indicator panel. This control panel shall contain only controls and indicators related to machine operation and machine status.

The operator control panel must have, as a minimum, the following controls and indicators.

- for X-Ray Radiation Control:

  - Key-switch: The operator control panel shall have a two-position key-switch. One key position shall be the locked position and the other shall be the unlocked position. When the key-switch is in the locked position, other controls to on the operator control panel shall be inoperative. When the key-switch is in the unlocked position, other controls to on the operator control panel shall be active.

  - X-Ray On Push Button Switch: This switch shall be a momentary push button switch, which is red in color. When pressed, this switch shall only turn the X-ray source on if the key-switch is in the unlocked position. This switch shall be inactive with the key-switch is in the locked position

  - X-Ray Off Push Button Switch: This switch shall be a momentary push button switch, which is green in color. This switch shall only turn the X-ray source off when pushed if the key-switch is in the unlocked position. This switch shall be inactive with the key-switch is in the locked position

  - X-Ray ON Indicator Light: On the operator control panel adjacent to the X-Ray On Push Button Switch and the X-Ray Off Push Button Switch there shall be a X-Ray On lamp type light indicator which is red in color. The indicator shall be illuminated whenever the X-ray source is on. All other times, the indicator shall be extinguished. See Safety Requirements, Indicators (2.9).

  - X-Ray ON LED Indicator: On the operator control panel there shall be a secondary X-Ray On Light Emitting Diode type light indicator which is red in color. The indicator shall be illuminated whenever the X-ray source is on. All other times, the indicator shall be extinguished. The control circuitry for this indicator shall be independent of the control circuitry for the X-Ray ON Indicator Light.

- for Mode of Operation:

  - Warm-up Cycle Indicator: On the operator control panel there shall be Warm-up Cycle Light Emitting Diode type light indicator which is red in color. The indicator shall be illuminated whenever the Blood Irradiator is operating the in Warm-up Cycle. All other times, the indicator shall be extinguished.

  - Cycle Status LED Bar Indicator: On the operator control panel there shall be Irradiation Cycle progress Light Emitting Diode bar style light indicator which is red in color. During an irradiation cycle, the indicator shall be illuminating each segment of the bar indicator as the cycle progresses through time from Start to Complete At the end of an irradiation cycle, all segments of the bar indicator shall remain illuminated until the sample canister is removed.

  - Irradiation Cycle Complete Audible Indicator: At the end of an irradiation cycle, an audible indicator shall sound (a beep) and repeat every 30 to 40 seconds until the radiation chamber exterior door is opened.

- for Machine Status:

  - HV Power Supply Fault Indicator: On the operator control panel there shall be at least one HV Power Supply Fault Indicator Light Emitting Diode type light indicator which is red in color. This indicator shall be illuminated whenever the Blood Irradiator HV Power system operating parameters are not within designed nominal limited. All other times, the indicator shall be extinguished.

- Tube Arc Fault Indicator: On the operator control panel there shall be at least one Tube Arc Fault Indicator Light Emitting Diode type light indicator which is red in color. This indicator shall be illuminated whenever the Blood Irradiator X-ray tube(s) have entered into an arc fault condition. All other times, the indicator shall be extinguished.

- for Interlock Indicators:

  - Flow Indicator: On the operator control panel there shall be a Flow Light Emitting Diode type light indicator, which is red in color. This indicator shall be illuminated whenever flow of the cooling water is within designed nominal operating limits. All other times, this indicator shall be extinguished. See Safety Requirements, Interlock, Cooling Water Flow (2.9.6.2).

  - Door Indicator: On the operator control panel there shall be a Door Light Emitting Diode type light indicator, which is red in color. This indicator shall be illuminated whenever radiation chamber exterior door is in the closed position. All other times, this indicator shall be extinguished. See Safety Requirements, Interlock, Radiation Chamber Exterior Door Closed (2.9.6.5).

  - Canister Indicator: On the operator control panel there shall be a Canister Light Emitting Diode type light indicator, which is red in color. This indicator shall be illuminated whenever a sample canister is installed in the radiation chamber. All other times, this indicator shall be extinguished. See Safety Requirements, Interlock, and Sample Canister Installed (2.9.6.6).

The Blood Irradiator shall have an audible indicator that will sound when an irradiation cycle has completed.

## 2.5   Environmental Requirements

The Blood Irradiator should be designed for operation in an ambient temperature between 15 °C and 35 °C (59 °F and 95 °F) and a non-condensing relative humidity not exceeding 70%.

The Blood Irradiator shall be designed for transportation and storage in temperature between -40 °C and 70 °C (-40 °F and 158 °F), relative humidity between 5% and 90%, and pressure between 50 kPa and 106 kPa (0.49 to 1.05 atmospheres).

## 2.6   Technical Interface Requirements

### 2.6.1   Electrical Service

The Blood Irradiator shall be designed to operate from a power source of:

- 190 to 254 VAC

- single phase,

- 60 Hz,

- 40 A maximum.

The Blood Irradiator shall be designed to operate using a 3-wire, 6 gauge Power Cable rated at 300V.

### 2.6.2   Cooling Water Service

The Blood Irradiator shall be designed to operate using cooling water from a municipal source providing normal water pressure at 345 kPa (50 PSI) with a flow rate of 5 litres per minute (1.32 US Gallons/minute).

Water quality is recommended as being potable with a temperature between 10°C and 30°C (50 °F and 86 °F).

2.6.3    External Connections

Connection points that are easily accessible shall be provided for connection of external (customer supplied) equipment including the following:

- Electrical Input: 190 to 254 VAC, 60 A, single phase, breaker box
- Water Input: 9.5mm (3/8") Male compression fitting,
- Water Output: 9.5mm (3/8") Female compression fitting,

## 2.7    Reliability Requirements

The Blood Irradiator should be designed with the objective of being maintainable for 40,000 exposure cycles without replacement of major components with scheduled maintenance as specified in the Operator's and Service Manuals, and replacement of parts subject to normal wear-out or deterioration.

## 2.8    Manufacturing Requirements

2.8.1    Electrical Manufacturing Standards

The electrical assemblies and components shall be manufactured in accordance with procedure and guidelines that comply with Good Manufacturing Practices (GMP) as defined by 21 CFR 820 Code of Federal Regulations, Title 21 Food and Drugs, Quality System Regulation.

2.8.2    Manufacturing Handling Requirements

The manufacturing handling of assemblies and components shall be in accordance with procedure and guidelines that comply with Good Manufacturing Practices (GMP) as defined by 21 CFR 820 Code of Federal Regulations, Title 21 Food and Drugs, Quality System Regulation.

2.8.3    Special Handling Requirements

Blood Irradiator shall not require any special handling requirements other than the electrical manufacturing and manufacturing handling requirements (2.8.1 and 2.8.2).

## 2.9    Safety Requirements

2.9.1    Protection from Electrical Supply

The Blood Irradiator cabinet shall not have any open portals or air vents that would allow human contact with any electrical potential. Access to electrical test points shall have protective covers that require the use of a special tool to gain access.

The Blood Irradiator cabinet shall contain an electrical circuit breaker connected to the AC Mains input. This circuit breaker, when tripped, shall remove electrical power from the unit. This circuit breaker shall also be easily accessible to the operator.

2.9.2    Protection from Radiation Exposure

The Blood Irradiator cabinet shall contain sufficient radiation shielding material to comply with 21 CFR 1020.40 Code of Federal Regulations, Title 21 Food and Drugs, Performance Standards for Ionizing Radiation Emitting Products, Cabinet X-ray Systems.

The Blood Irradiator shall not permit irradiation to occur when the exterior door the radiation chamber is not locked in the closed position.

2.9.3    Protection from Contamination

In the event that a blood transfusion bag fails by leaking, the Blood Irradiator sample canister shall be leak proof in a manner that limits any contamination to the inside of the canister



2.9.4   Electrical Disconnect

The Blood Irradiator shall be connected to a customer supplied Electrical Disconnect panel during installation.

2.9.5   Indicators

The Blood Irradiator shall have a red Power On indicator which shall be illuminated whenever AC Main power is on.

The Blood Irradiator shall also have a red X-ray On indicator which shall be illuminated whenever X-ray radiation is being generated.

2.9.6   Interlocks

When an interlock becomes activated, the irradiation cycle shall be either be prevented or interrupted. If an irradiation cycle was interrupted by an interlock and the interlock condition is cleared, it shall be possible for the operator to resume the irradiation cycle by pressing the X-Ray On push button. The operator shall also be permitted to terminate an irradiation cycle by pressing the X-Ray Off push button.

2.9.7   Access Panels

In support of the safety requirement for the Protection from Electrical Supply (2.9.1), all Blood Irradiator cabinet access panels shall have safety interlock switches that prevents turning on high voltage power circuits when the protective covers have been removed.

Access panel to the irradiation cycle time adjustment device shall have a key lock. The key for this lock shall be different than the key for any other lock or key-switch on the unit.

2.9.8   Cooling Water Flow

The Blood Irradiator shall have an interlock that detects whether the cooling water flow rate is adequate for proper operation. This interlock shall shut off power to the X-ray tubes if cooling water flow rate is not adequate.

2.9.9   Over Temperature

The Blood Irradiator shall have interlock that detects whether the operating temperature has reached the maximum safe temperature. This interlock shall prevent irradiation if the cooling systems fail to maintain temperature below the maximum safe temperature. This interlock shall permit the cooling system to continue operating during interlock condition to allow the unit to return to nominal operating temperature.

2.9.10   X-ray Tube Current Fault

The Blood Irradiator shall have an interlock that detects whether the current flow to the X-ray tubes are outside normal operating limits. This interlock shall prevent irradiation if current flow to the X-ray tubes is not correct.

2.9.11   Radiation Chamber Exterior Door Closed

In support of the safety requirement for the Protection from Radiation Exposure (2.9.2), the external door to the radiation chamber shall have two (2) independent safety interlock switches that prevents turning on high voltage power circuits when the door is not locked in the closed position.

2.9.12   Sample Canister Installed

The Blood Irradiator shall have an interlock that detects whether the sample canister is installed or removed. This interlock shall prevent irradiation if the canister is removed. This interlock shall require the sample canister to be removed and then installed after each irradiation cycle. Note this interlock shall not prevent warm-up operations. When the sample canister is installed, radiation exposure shall be permitted.

2.10   Software

The Blood Irradiator shall not employ software or firmware in programmable electronic devices.

2.11   Service and Drawings

All the required service information and technical notes concerning the Blood Irradiator shall be provided to the customer in the form of an Installation and Troubleshooting Manual.

All routine maintenance and cleaning information for the Blood Irradiator shall be provided in the Operator's manual

2.12   Drawings

The drawing package for the Blood Irradiator shall include, as a minimum, schematics for electrical power systems, control electronics and operator controls and indicators.

#59202 v1 - Schedule B Attachment / Rad Source Agreement



27

## SCHEDULE C

### REIMBURSEMENT OF PAYMENTS (Section 12.6)

| Number Of System Units Sold Or Leased | Percentage Of Reimbursement Of Amounts Paid By Nordion, Pursuant To Section 12.6 |
|---|---|
| ≤ 10 | 90% |
| 11 - 20 | 80% |
| 21 - 30 | 70% |
| 31 - 40 | 60% |
| 41 - 50 | 50% |
| 51 - 60 | 40% |
| 61 - 70 | 30% |
| 71 - 80 | 20% |
| 81 - 90 | 10% |
| ≥ 91 | 0% |



*K 08292(*

FEB 1 7 2009

# RAD SOURCE TECHNOLOGIES, INC.

6825 Shiloh Road East, Ste. B-2
Alpharetta, GA 30005
(770) 887-8669 email: info@radsource.com

**510(k) Summary**

Owner:

Rad Source Technologies, Inc.
6825 Shiloh Road East, Ste. B-2
Alpharetta, GA 30005
(770) 887-8669

Contact:

Randy Kirk, President

Device:

Trade name – RS 3400 Rad Source X-ray Blood Irradiator
Common name – Blood Irradiator
Classification name – N/A

Predicate Device:

RS 3000 Shielded Cabinet X-ray Radiation Source. 510(k) number K974210.

Description of Device:

The RS 3400 Rad Source X-ray Blood Irradiator consists of a shielded enclosure
containing one x-ray tube capable of emitting radiation in a 360 degree output around its
cylindrical design, a power supply and controller. A carousel capable of holding 5
cylindrical containers rotates those cylinders around the cylindrical x-ray tube radiation
source causing the blood products contained therein to be irradiated.

Intended Us of the Device:

The RS 3400 Rad Source X-ray Blood Irradiator is intended for the irradiation of blood or
blood products packaged in transfusion bags in accordance with "Recommendations
Regarding License Amendments and Procedures for Gamma Irradiation of Blood
Products" (22 July 1993 memorandum from Acting Director Office of Blood Research and
Review, Center of Biologics Evaluation and Research, FDA to all registered blood

Exhibit 2

establishments) when irradiation to reduce the risk of Graft Versus Host Disease is indicated. This document is attached in Section 21 - Other.

<u>Summary of Technological Characteristics of Device Submitted and Predicate Device:</u>

The RS 3400 Rad Source X-ray Blood Irradiator is substantially equivalent to the RS 3000 Shielded Cabinet X-ray Radiation Source (K974210). Both are indicated for the irradiation of blood and blood products to reduce the risk of transfusion associated graft-versus-host disease in recipients at risk of this complication. The primary technological characteristic of both machines is the controlled production of X-ray radiation.

| Characteristic | Submitted Device RS 3400 | Predicate Device RS 3000 |
|---|---|---|
| Source | 150kVdc x-rays, .45 mm Cu filter, hvl app. $H_2O$ cooled | 160kVdc x-rays, .38 mm Cu filter, hvl app. 4 cm $H_2O$ |
| Dose Rate | >5 Gy/minute | 3 Gy/minute |
| Max/Min dose ratio: | <1.3 | < 1.3 |
| Sample holder: | Multiple holders in rotation around source, each canister fixes maximum irradiated volume | Fixed, presents maximum width, minimum depth |
| Radiation safety: | Pb shielding, interlocks | Pb shielding, interlocks |
| Federal Regulatory Environment | Requires 510(k). Must comply with 21 CFR 1020.4 | Requires 510(k). Must comply with 21 CFR 1020.4 |

<u>Non-Clinical Performance Data Used in Determining Substantial Equivalence:</u>

The submitted device is indicated for the irradiation of blood and therefore the tests performed include measuring the radiation field resulting within the rotating containers when a blood product (using water as a sample) is contained within the rotating containers. The measured dose and field result in producing the necessary radiation to support the Indications for Use substantially equivalent to the predicate device.

<u>Clinical Performance Data Used in Determining Substantial Equivalence:</u>

None.

<u>Conclusions Drawn from the Non-Clinical Tests:</u>

Based on the Non-Clinical tests performed, it is concluded that the Submitted Device is as safe, as effective, and performs as well as or better than the predicate device.