UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
CASE NO. 09-61652-CIV-GOLD/GOODMAN

MDS (CANADA), INC., BEST
THERATRONICS, LTD., and
BEST MEDICAL INTERNATIONAL, INC.,

      Plaintiffs,

v.

RAD SOURCE TECHNOLOGIES, INC.,

      Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING NON-JURY TRIAL

THIS CAUSE is before the Court in the above-captioned matter, which came on for a ten-day, non-jury trial beginning April 5, 2011 and concluding April 20, 2011.  *See* **[ECF Nos. 320-326, 328-330]**.  A total of twelve witnesses were sworn and testified, and the testimony of two witnesses was introduced by deposition.  Counsel presented opening statements and closing arguments with respect to the first two phases of the trial, as described more fully *infra*.  Pursuant to a Pretrial Conference held on March 10, 2011, this matter was intended to be tried in three phases:  Phase I – Liability, Phase II – Technical/Patent, and Phase III – Damages.  *See* **[ECF No. 315]**.  Upon the conclusion of Phases I and II,[1] I determined that Phase III was unnecessary because based on the evidence presented during Phases I and II, no party was entitled to any damages in this action.  **[ECF No. 330]**.[2]

_____

[1] On April 19, 2011, Plaintiffs presented a brief "rebuttal case" on Phase I.  *See* **[ECF No. 329]**.

[2] Since Phase III was unnecessary, I need not address Defendant's motions *in limine* with respect to Plaintiffs' witnesses for Phase III, Glenn Newman and Paul Moses.  **[ECF Nos. 153, 162]**.

On April 20, 2011, upon the conclusion of the bench trial, I entered a Preliminary Order to provide definitive rulings on disputed matters as addressed by the parties' operative pleadings.   **[ECF No. 330]**.   Entry of the Preliminary Order enabled the parties to proceed with the right of first negotiation pursuant to Article 3.8 of the License Agreement, with the instant detailed Findings of Fact and Conclusions of Law to follow. *Id.*  On August 12, 2011, the mediator filed a report indicating that the parties reached an impasse.   **[ECF No. 347]**.   Based on the fact that the parties did not reach a resolution following the mediation—the purpose of which was for the parties to engage in the right of first negotiation—I now enter the instant Findings of Fact and Conclusions of Law pursuant to Fed. R. Civ. P. 52(a).

## I.   FINDINGS OF FACT[3]

### A.   Introduction

1.     This case is before the Court upon Plaintiffs' Third Amended Complaint **[ECF No. 286]** and Rad Source's counterclaim for declaratory judgment, or reformation of contract in the alternative **[ECF No. 290]**.[4]  This case centers upon a written agreement (the "License Agreement") to license patents and technology for devices that irradiate blood.  **[ECF No. 286-1]**.

2.     Blood irradiation is the process of eliminating pathogens and other microbes in blood to, *inter alia*, reduce the risk of Graft Versus Host Disease (a common

---

[3] To the extent factual findings appear under the "Conclusions of Law" heading or *vice versa*, the pertinent facts or conclusions shall be construed appropriately and shall not be constrained by the heading under which they appear.

[4] *See infra* § II.B for a detailed description of the parties' claims.

complication of bone marrow transplants) for the purposes of transfusion.  4/5/11 Tr. [5] at 65:6-9.

3.     In the License Agreement, Defendant Rad Source Technologies, Inc. ("Defendant" or "Rad Source") licensed rights to MDS Nordion, a division of Plaintiff MDS (Canada) Inc. ("MDS" or "Nordion") to, *inter alia*, manufacture and sell a blood irradiator system known as the RS 3000.[6]

4.     Essentially, what is at stake in this case is the parties' rights to develop, market, and sell certain blood irradiation devices including the RS 3000 and RS 3400.

5.     Since the crux of this case lies in the interpretation of the parties' License Agreement entered into on August 20, 2003 **[ECF No. 286-1]**, a significant portion of the instant Findings of Fact and Conclusions of Law analyzes various provisions of the License Agreement referred to as "Articles" or "Sections."  *See generally infra* §§ II.F-N.

6.     In particular, interpretation of the following three Articles of the License Agreement—and their relation to each other—is at issue:

(1)   3.1 – Grant of License
(2)   5.3 – non-compete provision
(3)   3.8 – right of first negotiation

7.     To provide a useful overview of this case, I begin with key documents and relevant witnesses.  The critical written agreements in this case are:

(1)   August 20, 2003 License Agreement ("License Agreement")
          between Nordion and Rad Source
(2)   2008 Sublicense Agreement ("Sublicense Agreement")
          between Nordion and Best

---

[5] References to official trial transcripts indicate the date of trial followed by "Tr." and the page/line.  *See* **[ECF Nos. 332-341]**.

[6] To the extent the RS 3000 is now referred to as the Raycell or Raycell Mk2, I collectively refer to them as the "RS 3000" for consistency and clarity.

(3) May 2008 Asset Purchase Agreement ("Asset Purchase Agreement")
         between Nordion and Best

Relevant <u>witnesses</u> in this case are:

(1) Neil Gotfrit – Nordion Associate General Counsel
(2) Randol Kirk – Rad Source Chief Executive Officer
(3) Carolin Vandenberg – Nordion Former Director of Marketing
(4) Shawn Weingast – Best Medical General Counsel
(5) Phil Larabie – Nordion Vice President and Business Development Officer
(6) Paul Moses – Best Theratronics Director of Global Sales, Service and Marketing
(7) Will Hartman – Rad Source Chief Financial Officer and Executive Vice President,
(8) Gord Ashfield – Nordion Former Vice President

The following <u>expert witnesses</u> testified on behalf of the parties:

(1) Dr. Jon Roberts – Plaintiffs (patents)
(2) Stephen Szeglin, MS – Plaintiffs (physicist)
(3) David Mullis – Defendant (FDA 510(k) process)
(4) Dr. Roberto Uribe – Defendant (patents)

8.     In addition to the License Agreement, this case involves Rad Source's development of an x-ray blood irradiator known as the RS 3400. Accordingly, a significant portion of the instant Findings of Fact and Conclusions of Law discusses whether the RS 3400 "embodies in whole or in part the Patents" in the License Agreement. Plaintiffs' position is that because the RS 3400 embodies the Patents, Plaintiffs hold the exclusive right and license to, *inter alia*, manufacture and sell the RS 3400. Conversely, Rad Source argues that the RS 3400 does not embody the Patents and therefore Rad Source can continue to develop and market the RS 3400.

9.     A third critical subject matter in this case is the effect of a Sublicense Agreement between Plaintiffs MDS (Canada), Inc., Best Theratronics, Ltd., and Best Medical International, Inc.'s (collectively "Plaintiffs") on all parties' rights and obligations under the License Agreement.

10.     Finally, a technical/patent analysis of the RS 3400 and the Patents at issue in the License Agreement comprises the last aspect of this case.

**B.     Procedural history**

**1.     Preliminary injunction**

11.     On October 15, 2009, Plaintiffs brought this action and simultaneously filed an Emergency Motion seeking a temporary restraining order and preliminary injunction ("Emergency Motion").  **[ECF No. 2]**.  The basis for Plaintiffs' Emergency Motion was because Rad Source intended to promote and market the RS 3400 at the American Association of Blood Banks ("AABB") Annual Meeting on October 24, 2009 which—according to Plaintiffs—violated the non-compete provision (Article 5.3) in the License Agreement. **[ECF No. 2, p. 2]**; *see also id.* at ¶ 7.

12.     On October 21, 2009, I held an evidentiary hearing on Plaintiffs' Emergency Motion where the parties had the opportunity to present arguments and examine witnesses.  *See* **[ECF No. 36]**.  On October 22, 2009, I issued an Interim Order, ordering Rad Source "to immediately refrain from exhibiting, distributing, promoting, marketing, selling, or leasing—whether directly or indirectly—the RS 3400 blood irradiation device or a substantial equivalent" until a subsequent evidentiary hearing and subject to the terms of a Final Order to be issued following the subsequent evidentiary hearing. **[ECF No. 37]**.

13.     On October 24, 2009, I held a subsequent hearing on Plaintiffs' Emergency Motion.  *See* **[ECF No. 39]**.  On October 27, 2009, I issued a Preliminary Order on Plaintiffs' Emergency Motion for Preliminary Injunction Setting Forth Findings of Fact and Conclusions of Law ("October 27, 2009 Order").  **[ECF No. 40]**.  By this

order, I granted Plaintiffs' Emergency Motion, concluding that entry of a preliminary injunction was appropriate upon making various findings of fact and conclusions of law for the limited purpose of deciding Plaintiffs' Emergency Motion. **[ECF No. 40]**. This order also preliminarily enjoined Rad Source from "directly or indirectly exhibiting, promoting, marketing, selling or leasing the RS 3400 or any other blood or blood product irradiation device or technology" pending a further order following a hearing on the injunction's scope and bond. **[ECF No. 40, p. 18]**.

14.   On October 29, 2009, I held a hearing on the scope of the injunction and issuance of bond. *See* **[ECF No. 44]**. On November 4, 2009, I issued a Supplemental Order Setting Injunction Bond and Clarifying Scope of Preliminary Injunction ("November 4, 2009 Order"). **[ECF No. 48]**. By this order, I modified the scope of the preliminary injunction entered in my October 27, 2009 Order **[ECF No. 40]** as follows:

> Defendant Rad Source and its agents, directors, employees, officers, affiliates, attorneys, and all others in active concert or participation with any of them are hereby PRELIMINARILY ENJOINED from directly or indirectly designing, developing, promoting, manufacturing, distributing, marketing, selling, leasing, providing service for, or providing maintenance for the RS 3400 blood irradiation technology, device, or any substantial equivalent and shall not carry on any other activities which compete in any way with the blood irradiation business (including the irradiation of blood and blood products) carried on by Plaintiff MDS directly or through its sublicensees, Plaintiffs Best Theratronics and Best Medical.   This injunction shall remain in full force and effect until further Order of this Court or until September 26, 2010, whichever comes first.

**[ECF No. 48]**.

15.   On December 21, 2010, through an omnibus order, I denied Rad Source's Motion for Partial Summary Judgment; Rad Source's Second Motion for Partial Summary Judgment; and Plaintiff's Motion for Summary Judgment. **[ECF No. 265]**.

## 2.    __Preliminary Order following trial__

16.    On April 20, 2011, upon the conclusion of the trial, I entered a Preliminary Order to provide definitive rulings on disputed matters as addressed by the parties' current pleadings and therefore, to enable the parties to proceed with the right of first negotiation pursuant to Article 3.8 of the License Agreement, pending the completion of the instant detailed Findings of Fact and Conclusions of Law.  **[ECF No. 330]**.

17.    By entry of the Preliminary Order, I determined the following:

(1)    Defendant's RS 3400 is not subject to Section 3.1 of the License Agreement and Defendant may market the RS 3400 which may compete as against the RS 3000, as modified by Plaintiffs, subject to the right of first negotiation set forth in Section 3.8;

(2)    the License Agreement remains in full force and effect through its termination date, and Plaintiffs have full rights and benefits as to the RS 3000 as modified (now known as the Raycell Mk2);

(3)    pursuant to Section 3.8, Defendant shall provide to Plaintiffs a right of first negotiation for the RS 3400 in accordance with the provisions of that section;

(4)    the parties shall participate in mediation with regard to Section 3.8, with Plaintiffs and Defendant to equally bear the costs of mediation;

(5)    the non-compete provision of the License Agreement in Section 5.3 is no longer in effect having expired by its own terms on September 26, 2010;

(6)    Plaintiffs shall bear the cost of preparing the transcripts in this matter, which payment shall be due ten days after the transcripts are filed of record; and

(7)    neither party shall recover damages from the other.  **[ECF No. 330]**.

18.    The Preliminary Order was not intended to constitute an appealable final order or judgment, as I reserved to enter the instant detailed Findings of Fact and Conclusions of Law.  *See* **[ECF No. 330]**.

19.    On August 12, 2011, the mediator filed a report indicating that the parties reached an impasse.  **[ECF No. 347]**.  On September 27, 2011, the parties filed a Joint

Status Report indicating the same, as well as detailing:  Rad Source's production of documents to Plaintiffs; Plaintiffs' visit to Rad Source's manufacturing facility in Georgia on May 31, 2011; Best Medical's written counter-proposal to Rad Source's May 19, 2011 proposal; the parties' exchange of correspondence; and the Mediator's Report indicating that the parties reached an impasse.  **[ECF No. 349]**.

## C.    <u>Parties</u>

20.    Plaintiff MDS (Canada) Inc., now known as Nordion (Canada), Inc. ("Nordion" or "MDS") is a corporation organized under the laws of Canada, with its principal place of business located in the province of Ontario.  Joint Pretrial Statement ("J.P.S.") **[ECF No. 310]** ¶ 1; *see also* 4/5/11 Tr. at 65:12-21.  Nordion is a niche health science company operating in the areas of detection, prevention, and diagnosis of disease.  4/5/11 Tr. at 65:23-24.

21.    Plaintiff Best Theratronics, Ltd. ("Best Theratronics") is a corporation organized under the laws of Canada, with its principal place of business located in the province of Ontario.  J.P.S. ¶ 2.

22.    Plaintiff Best Medical International, Inc. ("Best Medical") is a corporation organized under the laws of the Commonwealth of Virginia and has its principal place of business located in the Commonwealth of Virginia.  J.P.S. ¶ 3.

23.    Defendant Rad Source Technologies, Inc. ("Rad Source") is a corporation organized under the laws of Florida, with its principal place of business in the state of Georgia.  J.P.S. ¶ 4.  Rad Source specializes in research and development of irradiation technologies, and it participated in developing technology contained in the RS 3000 blood irradiation device and the device itself.  J.P.S. ¶¶ 5-6.  Rad Source's President

and CEO, Randol E. Kirk, has spent many years developing irradiation technology that utilizes x-rays as a replacement for radioactive isotope irradiation technology.   J.P.S. ¶ 7; 4/6/11 Tr. at 6:21-5.

**D.   RS 3000**

24.     In the late 1990's, Rad Source developed certain technology and its first product, a device for x-ray blood irradiation known as the RS 3000.  J.P.S. ¶ 8; 4/6/11 Tr. at 8:19-24.  The RS 3000 was unique in the United States blood irradiation market because it utilized an x-ray source of irradiation as opposed to traditional isotope-based irradiation.  J.P.S. ¶ 9.  In taking the RS 3000 to market, Mr. Kirk applied to the Food and Drug Administration ("FDA") for marketing clearance through an FDA 510(k) application.  Defense Exhibit ("D.E.") DX.

25.     In 1998, the FDA granted Rad Source's 510(k) application for the RS 3000 and deemed it "substantially equivalent" to a gamma-source blood irradiation device.  D.E. N.  Rad Source manufactured and sold the RS 3000 for approximately one year in its initial form in 1999 as a one-blood bag device, then changed the volume of blood it could accommodate to two to three bags by 2001.  4/6/11 Tr. at 11:4-20; 4/11/11 Tr. at 169:5-16.

26.     Rad Source sold the RS 3000 until August 2003 at an average sales price of approximately $110,000 to $120,000.  4/11/11 Tr. at 169:17-22; J.P.S. ¶ 10.  Mr. Kirk described Rad Source' success in its marketing and sale of the RS 3000 as "moderate[.]"   4/6/11 Tr. at 12:7-9.   Prior to licensing the RS 3000 to MDS who marketed and sold the RS 3000 on behalf of Rad Source, Rad Source conducted all marketing and sales of the RS 3000 itself through marketing materials and attending

trade shows.  4/11/11 Tr. at 168:5-16.

**E.**   **Patents**

27.   In connection with the RS 3000 device, Rad Source obtained three patents granted by the United States Patent and Trademark Office:  U.S. Patent Nos. 6,212,255 ("255 Patent"); 6,489,099 ("'099 Patent"); and 6,614,876 ("'876 Patent"). Joint Exhibit ("J.E.") 2, 36, 37; J.P.S. ¶ 46.  These three patents are the patents subject to the License Agreement.  J.P.S. ¶ 52; 4/6/11 Tr. at 9:17-20; 4/19/11 Tr. at 33:14-16.[7]

28.   Mr. Kirk was one of the inventors of the RS 3000 and the '255 Patent associated with the RS 3000 was issued in Mr. Kirk's name.  4/6/11 Tr. at 8:25-9:5; 9:15-16; 4/19/11 Tr. at 33:17-18; J.E. 3.

29.   The file wrapper[8] for the '255 Patent indicates that it is a utility patent application transmittal which describes an invention that performs a function; in this case, the function was to irradiate blood and provide a uniform dose of x-ray beam irradiation to a bag of blood.   4/19/11 Tr. at 34:24-25; 35:12-14; 36:6-8; 36:12-15; 36:23-25.

---

[7] The '255, '099, and '876 Patents issued from United States Patent Application Nos. 09/383,226; 09/709,896; 10/244,209 filed on August 8, 1999; November 13, 2000; and September 16, 2002, respectively.  J.P.S. ¶¶ 47-49.

[8] A "file wrapper" is the record in the Patent Office of the complete patent prosecution history, from the time the application was filed through the time the patent was issued. 4/13/11 Tr. at 73:15-19.   A file wrapper contains the entire range of documents associated from start to finish, including the patent application, declarations of the inventor, Patent Office's reaction to the patent application, claims that were filed, any interaction with the examiner after an office action, documents relating to the claims and why they were allowed, and ultimately the patent itself in most cases.  4/13/11 Tr. at 73:15-74:4.

### F.   Long tube technology

30.     In the late 1990s, Mr. Kirk began working on a different type of technology to generate high doses of x-ray radiation for replacing isotope devices.   J.E. 38, 39. This technology, known as the long tube, consists of a cylindrical anode with an electron emitter centered through its entire length to generate a field of x-rays in three dimensions.   J.E. 38, 39.   The technology was a long tube capable of creating a field of irradiation.   4/11/11 Tr. at 176:19-24.   Two patents were issued related to the long tube technology:   U.S. Patent No. 7,346,147 and U.S. Patent No. 7,515,686.   J.E. 38, 39.[9]

### G.   Rad Source seeks larger platform for RS 3000

31.     Rad Source first became acquainted with MDS when Mr. Kirk contacted MDS in the late 1990s to discuss the RS 3000, but MDS was not interested at that time. 4/11/11 Tr. at 170:1-8.   MDS was the largest company in the world for irradiation applications and products as far as Rad Source knew.   4/11/11 Tr. at 175:10-12.

32.     In 2002, after sales of the RS 3000 increased, MDS approached Rad Source to see if a partnership would be possible.   4/11/11 Tr. at 170:9-171:3.   At that time, Rad Source desired to launch the RS 3000 globally, but had limited funding to do so.   4/11/11 Tr. at 171:4-15.   Moreover, Rad Source's resources were tied up in pursuing further development of x-ray technologies, including the long tube technology. 4/11/11 Tr. at 171:16-172:4.

---

[9] Patent Nos. 7,346,147 and 7,515,686 issued from United States Patent Application Nos. 11/190,985 and 11/800,394 filed on July 27, 2005 and May 5, 2007, respectively. J.P.S. ¶ 51.

33.     Rad Source knew of MDS' global presence in the field of irradiation equipment because MDS sold gamma-source blood irradiators and a variety of other irradiation products to a worldwide market.  4/11/11 Tr. at 171:4-25.  At the same time, MDS had no knowledge or focus on x-ray technology.  4/11/11 Tr. at 175:16-18. Hence, Rad Source believed that a partnership with MDS was a good fit and mutually beneficial at the time of signing the License Agreement.  4/11/11 Tr. at 175:1-4. Moreover, this partnership would provide Rad Source with necessary funding to further develop x-ray irradiation technologies, *i.e.*, long tube technology, that it could potentially license to MDS through separate license agreements.  4/11/11 Tr. at 175:19-25.

## H.     Negotiations leading up to License Agreement

34.     On or about August 20, 2003, Rad Source entered into the License Agreement with Nordion.  J.P.S. ¶ 11; *see also* 4/5/11 Tr. at 65:16-66:1; Joint Exhibit ("J.E.") 1;  **[ECF No. 286-1]**.   Rad Source and Nordion negotiated the License Agreement for approximately one year to 16 months prior to execution.  J.P.S. ¶ 14; 4/5/11 Tr. at 66:4-5; 4/6/11 Tr. at 16:2-4; 4/11/11 Tr. at 173:23-25.

35.     Craig Hunter, vice president of business development and strategic growth at MDS, and Gordon Ashfield, Nordion's associate general counsel, handled most of these negotiations on behalf of MDS.  4/5/11 Tr. at 63:17-64:2; 68:16-21; 4/11/11 Tr. at 173:8-13; *see also* D.E. A.  Mr. Kirk and Will Hartman, Rad Source's Chief Financial Officer and Executive Vice President, negotiated on behalf of Rad Source. 4/11/11 Tr. at 172:14-19.  Mr. Hartman was the lead negotiator for Rad Source.  4/11/11 Tr. at 173:18-22.

36.     The parties participated in telephone conference calls and exchanged correspondence during the negotiation of the License Agreement, including executing a non-binding letter of intent.  4/5/11 Tr. at 70:6-9; D.E. Z.

37.     Mr. Gotfrit participated in drafting and negotiating the License Agreement. 4/5/11 Tr. at 64:4-7.  Within the last two days of the negotiations before the License Agreement was actually signed and closed, Rad Source retained counsel, Tom Luken. 4/5/11 Tr. at 68:25-69:5; 4/11/11 Tr. at 172:20-173:7.  Mr. Ashfield and Mr. Kirk signed the License Agreement on behalf of MDS and Rad Source, respectively.  J.E. 1; J.P.S. ¶ 54.

## 1.     Long tube technology not part of License Agreement

38.     The License Agreement was not for purposes of MDS acquiring a license to Rad Source's long tube technology.   J.E. 1.   During negotiations of the License Agreement, Rad Source advised MDS of the long tube technology and its potential. 4/11/11 Tr. at 177:13-16.  MDS expressed interest in the long tube technology in the future.  4/11/11 Tr. at 177:25-178:2.

39.     For these reasons, Article 3.8 regarding the right of first negotiation was included because the parties contemplated Rad Source developing the future long tube technology.  4/11/11 Tr. at 178:3-11.  The purpose of Article 3.8 was to preclude Rad Source from selling the long tube technology without first offering it to MDS.  4/11/11 Tr. at 178:12-17.

40.     While the parties were in negotiations for the License Agreement, Rad Source was developing the long tube technology which was a different approach that what was ultimately in the RS 3000.  4/6/11 Tr. at 53:13-19.  In late 2002, Rad Source

demonstrated a prototype of the long tube technology to Nordion representatives. 4/6/11 Tr. at 53:20-23.  Rad Source had discussions with Nordion even before the License Agreement was signed relative to the long tube technology such that when it was adequately developed, Rad Source would be interested in selling it to Nordion, hence the purpose of the right of first refusal.  4/6/11 Tr. at 54:19-55-2.

41.     Mr. Kirk's goal was to have a global company such as MDS sell Rad Source's product which would then be under MDS' exclusive license.  4/6/11 Tr. at 55:12-16.  Another goal was to eventually sell the long tube technology to MDS who would be in a position to use its global context to sell the long tube technology.  4/6/11 Tr. at 55:17-23.  Accordingly, before the License Agreement was signed, Rad Source was already working on the long tube technology and had showed it to Nordion.  4/6/11 Tr. at 54:4-8.

### 3.     Rad Source and Nordion enter into the License Agreement

42.     MDS drafted the initial draft of the License Agreement.   J.P.S. ¶ 12; 4/11/11 Tr. at 176-1-3.  The closing date for the License Agreement, defined in Article 1.3 as the date Nordion received 510(k) clearance from the FDA to market and sell the System in the United States, was September 26, 2003.  J.P.S. ¶ 13; J.E. 1. On or about September 26, 2003, Nordion began to market and sell the RS 3000, which became known as the Raycell.  J.P.S. ¶ 16.

43.     Mr. Hartman testified that after the parties entered into the License Agreement, the relationship between Rad Source and MDS was very good and the parties were "always very open with each other."  4/11/11 Tr. at 177:3-10.

4.     **Compensation under the License Agreement**

44.     Under Article VI of the License Agreement, MDS paid Rad Source approximately $1.7 million as compensation and royalties over a period of approximately four years from the date the parties signed the agreement.  J.P.S. ¶ 17; 4/6/11 Tr. at 30:14-16; 4/19/11 Tr. at 48:14-16.  While the term of the license granted under the License Agreement extended from the Closing Date (September 26, 2003) until the last to expire of the patents (2022), Rad Source agreed to only receive compensation for the first four years of the agreement (with the potential for compensation in Year 5).  J.E. 1.

45.     Article 7 of the License Agreement, titled Compensation, provided for the following payments to Rad Source:

(i)     $500,000 within five (5) working days of the Closing Date;
(ii)    $400,000 during the first year following the Closing Date;
(iii)   $400,000 during the second year following the Closing Date;
(iv)    $11,250 per System sold, up to a maximum of $225,000 during the third year following the Closing Date;
(v)     $9,000 per System sold, up to a maximum of $225,000 during the fourth year following the Closing Date;
(vi)    During the first five years after the Closing Date, $5,000 for each System sold in excess of 40 Systems sold.

J.E. 1.

46.     Revenues derived from sales of Raycells were approximately two to three million dollars in gross revenues per year.  4/6/11 Tr. at 124:6-11.

47.     Rad Source's interest in the number of blood irradiator units sold by Nordion was as follows:  Article 7.1 of the License Agreement regarding compensation required Nordion to pay $500,000 to Rad Source within five days of entering into the License Agreement and $400,000 within the first year regarding of the number of units

sold.  4/5/11 Tr. at 82:8-16; J.E. 1.  However, payments for years three and four were tied to the sale of blood irradiators and Rad Source had an interest for five years from the date of closing, *i.e.*, if Nordion sold an excess of 40 units in the United States in any given year, Rad Source would receive $5,000.  4/5/11 Tr. at 82:24-83:12.

48.    After year five of the License Agreement, Rad Source had no interest in the number of units sold under the terms of the agreement.  4/5/11 Tr. at 83:25-84:3. The License Agreement provided for no payments to Rad Source from the end of Year 5 through the term of the license that expired in 2022.  J.E. 1.  In addition, after the license expired in 2022, Nordion was free to use the Licensed Technology without any further obligation or payment to Rad Source.  J.E. 1.

I.     **July 2007 visit to Rad Source**

49.    In June 2007, Rad Source employees saw MDS employees at a conference where Rad Source indicated that it would be a good time for MDS to begin reviewing the long tube technology because Rad Source had been developing, and had confidence in, the technology.  4/11/11 Tr. at 179:7-16.

50.    In July 2007, at the invitation of Rad Source, former MDS employee Carolin Vandenberg[10] visited Rad Source's new facilities outside of Atlanta with two other MDS representatives.     J.P.S.  ¶ 19; 4/5/11 Tr. at 121:16-19; 121:21-22; 133:24-134:4; 4/11/11 Tr. at 180:2-4.  Ms. Vandenberg repeatedly insisted that the purpose of this visit was <u>not</u> to examine Rad Source's long tube technology or determine whether MDS sought to license it.  4/5/11 Tr. at 134:5-8; 134:21-135:4;

---

[10] Ms. Vandenberg was previously employed by MDS/Nordion as Director of Global Marketing for Medical Devices until December 2007.   J.P.S. ¶ 18; 4/5/11 Tr. at 116:8-17; 117:2-3; 129:4-6.  Ms. Vandenberg entered into a confidentiality agreement with MDS before her employment terminated and received a severance package. 4/5/11 Tr. at 155:8-18.

139:1-6; 143:12-13.

51.    Ms. Vandenberg received an e-mail from an individual in MDS' procurement department, which is responsible for purchasing different components used to build products, which stated the following:

> Good afternoon.  Just a heads-up.  If MDS is planning to enter into some discussions with Rad Source, given § 3.8, we should be very clear in writing of our intentions.   There may be an assumption from the agreement that technical discussions are the initiation of future business from which we will have a short duration to make some important business decisions.

> 4/5/11 Tr. at 137:3-11; D.E. BA.

Ms. Vandenberg responded to the e-mail, stating in relevant part:  "We are clear on our contractual obligation limitations and will enter into any discussions with Rad Source in that context."  4/5/11 Tr. at 137:14-17; D.E. BA.

52.    Prior to the visit, MDS/Nordion and Rad Source signed and executed a confidentiality agreement requested on behalf of and drafted by Nordion/MDS.  4/5/11 Tr. at 122:23-25; 139:7-10; 140:2-5; 141:3-7; 141:22-142:1; 144:4-6; 4/11/11 Tr. at 180:5-9; D.E. B (confidentiality agreement dated July 26, 2007, signed by Kevin Brooks, MDS Nordion Vice President of Global Marketing, and Mr. Kirk).

53.    The confidentiality agreement contains a clause that states:  "Whereas each of the parties, for their mutual benefit, desire that certain information be disclosed to the other in order for the parties to discuss companies x-ray technology for the purpose of potential joint ventures or in-license of technology, (the Arrangement)." 4/5/11 Tr. at 142:7-14; D.E. B.

54. In stark contrast to Ms. Vandenberg's testimony, the testimony of other individuals demonstrates that Rad Source showed MDS the devices and spoke in-depth regarding the long tube technology and whether it had any application in blood irradiation.  4/11/11 Tr. at 181:8-10; 181:11-12; 181:16-18.

55. The day after Ms. Vandenberg visited Rad Source's facility, Ms. Vandenberg sent Messrs. Kirk and Hartman a "thank you" e-mail dated August 1, 2007, carbon copying the MDS employees who accompanied Ms. Vandenberg on the visit. 4/5/11 Tr. at 145:1-4; 145:13-15; 146:10-13; 158:21-129:10; 4/6/11 Tr. at 70:14-19; 4/11/11 Tr. at 181:19-182:17; D.E. C.  The e-mail states, in relevant part:

> "Thank you for the opportunity to meet at your facility in Alpharetta yesterday and for your generous hospitality.  Our discussions helped us understand your long-tube strategy and vision of its marketability in SIT, biologics and blood applications.  We share your opinion that x-ray technology has a future in the blood irradiation market and let's continue our open and honest dialogue in this arena." and   "Please extend our thanks to Phil for the product demonstrations[.]"

4/5/11 Tr. at 145:16-146:4; 146:15-18; 159:11-18; 4/6/11 Tr. at 70:24-25; 70:6-8; D.E. C.

56. Rad Source had additional contact with MDS in September 2007 when Mr. Kirk e-mailed Ms. Vandenberg regarding news of the dangers of radioactive isotopes in the marketplace, which would be viewed as an opportunity for x-ray technology. 4/11/11 Tr. at 182:18-183:5.

57. On October 10, 2007, Ms. Vandenberg received an e-mail from Mr. Kirk referencing an article which highlighted the need for isotope replacements.  149:1-5; 149:9-16; J.E. 5.  The e-mail from Mr. Kirk also stated, in relevant part: "we here at Rad Source feel it is time to prepare for the coming demand and for the potential competition

that could gravitate to a market of that size.  One question is what strategy maximizes company value process.  It is time to begin some definitive discussions if you wish to work with us; otherwise, we need to prepare for the future in some other manner." 4/5/11 Tr. at 149:24-150:5; J.E. 5.

58.     Ms. Vandenberg's response to Mr. Kirk's e-mail states, in part, "Nordion recognizes the opportunity ahead of us and potential demand from the market.  Your email is timely as it is our intent to continue our discussions and would now like to loop in our folks in business development.  In preparation for the discussion, can you provide me with a company profile, with some level of financials, if possible, that I can forward to them and few key individuals on our senior management team?  Can you provide your availability over the next few weeks?"   4/5/11 Tr. at 150:18-151:2; 4/11/11 Tr. at 183:13-184:8.

59.     On October 25, 2007, Mr. Hartman responded by sending Ms. Vandenberg a summary profile of Rad Source, which he prepared specifically for her request.  4/5/11 Tr. at 154:3-24; 4/11/11 Tr. at 184:9-11; 185:1-9; D.E. D; J.E. 6.

60.     Mr. Hartman never heard back from Ms. Vandenberg regarding the long tube technology following this correspondence and eventually discovered—upon Nordion's request for consent to assignment—that MDS was negotiating to sell its business. 4/11/11 Tr. at 185:10-23.

## J.     2007-08 Asset Purchase Agreement

61.     On November 29, 2007, MDS and Best Medical executed an "Asset Purchase Agreement" for the sale of MDS' External Beam Therapy and Self Contained Irradiator business to Best Medical for approximately $15 million ("Asset Purchase

Agreement").   J.P.S. ¶ 20; 4/5/11 Tr. at 189:8-10; *see also* D.E. BQ (Securities and Exchange Commission ("SEC") filing).   In May 2008, Nordion and Best Medical closed on the Asset Purchase Agreement.   J.P.S. ¶ 26.   In an SEC filing, MDS stated that on November 29, 2007, MDS had signed an agreement with Best Medical Inc. to divest MDS' external beam therapy and self-contained irradiator product lines.   J.P.S. ¶ 21.

62.   As a condition to closing on the Asset Purchase Agreement, MDS executed a Non-Competition Agreement with Best Medical and agreed for "a period of 7 years" to not "directly or indirectly, develop, manufacture, market or sell . . . Cesium-137 based blood irradiators, x-ray based blood irradiators, other technology based blood irradiators, and related products and services."   J.P.S. ¶ 30.   When the Asset Purchase Agreement closed, 155 MDS employees transitioned to Best Theratronics, and the MDS "Theratronics building" and a parcel of land were turned over to Best Medical.   D.E. E.

63.   Section 2.1 of the Asset Purchase Agreement, titled "Purchase and Sale," states that Best Medical is purchasing the "Assets" and "Business" from MDS.   D.E. E. Section 1.1(i) of that agreement defines "Business" to include the "Self-Contained Irradiator business currently carried on by [MDS] as more particularly described in Schedule F," and, under Schedule F, includes the "[c]omplete . . . Raycell line of products . . . ."   D.E. E.   Section 1.1(d)(xii) of that agreement defines "Assets" to include "the Intellectual Property;" Section 1.1(gg) defines "Intellectual Property" to include "trade-marks, copyrights, patents, licenses and agreements described in Schedule D." D.E. E.   Schedule D to the Asset Purchase Agreement specifically includes the License Agreement.   D.E. E.

**K.**     **2007 Nordion request for Rad Source's consent to assignment**

64.     In correspondence dated December 14, 2007, Nordion requested that Rad Source consent to an assignment of the License Agreement from Nordion to Best Medical.  4/5/11 Tr. at 173:8-15; 4/6/11 Tr. at 79:20-25; 80:7-16; J.E. 7; J.P.S. ¶ 22.  At this time, Nordion had made all the payments due to Rad Source under the License Agreement.  4/5/11 Tr. at 177:2-8.

65.     MDS stated in its one-page letter that it had "recently entered into an agreement with Best Medical International, Inc. ("Best") pursuant to which MDS Nordion will sell to Best its External Beam Therapy and Self Contained Irradiator business."  4/5/11 Tr. at 173:16-23; 174:6-8; J.E. 7.   This letter marked the first time that Rad Source learned that MDS intended to exit the blood irradiation market.  4/11/11 Tr. at 186:3-6; J.E. 7.  Though the Asset Purchase Agreement had already been signed, it had not yet closed, and Nordion did not seek Rad Source's consent prior to signing the Asset Purchase Agreement.  4/5/11 Tr. at 174:9-17.

66.     Rad Source described the correspondence as "shocking" because MDS had recently visited Rad Source's facility and Rad Source had just sent Ms. Vandenberg the requested profile of Rad Source.   4/11/11 Tr. at 186:12-15.   Subsequent investigation by Rad Source also revealed that Best Medical may have an x-ray product division, which concerned Rad Source.  4/11/11 Tr. at 188:17-24.

**1.**     **January 22, 2008 correspondence from Rad Source to MDS**

67.     On January 22, 2008, Rad Source responded to the December 14, 2007 correspondence by stating that the assignment would not be in Rad Source's best

economic or business interest and requested all documents with respect to the Nordion/Best transaction.   J.P.S. ¶ 23; 4/5/11 Tr. at 177:18-175:1; 175:12; 179:3-4; 4/6/11 Tr. at 81:5-21; 93:21; 4/11/11 Tr. at 187:7-10; J.E. 8.  Rad Source stated that it does "not believe that such an assignment would be in the best economic or business interest of Rad Source, so [it] decline[s] to consent to or to agree to such an assignment," but that Rad Source did "not want to foreclose further discussions, so [it] would appreciate receipt of copies of all documents pertaining to the [MDS]-Best transaction," and that after it "had an opportunity to review those documents, [it would] respond promptly if Rad Source ha[d] a different view of the requested assignment." J.E. 8.

68.   Rad Source did not agree to assignment and requested documents because it had no idea of the nature of the Nordion/Best transaction, how Rad Source would be affected by it, what assets were being transferred, and the identity of Best because Best was not in the same industry as Rad Source.  4/11/11 Tr. at 187:14-23; 188:3-11.

69.   Nordion did not provide the documents with respect to the Nordion/Best transaction, *i.e.*, the Asset Purchase Agreement, because the purchase and sale had not closed and to do so during the interim period would be a "significant detriment" because Nordion was a public company and the Asset Purchase Agreement contained matters broader than merely the License Agreement.  4/5/11 Tr. at 178:3-179:2.

**2.    January 28, 2008 conference call**

70.   On January 28, 2008, Phil Larabie (Nordion's Vice President of Business Development), Mr. Gotfrit, Mr. Hartman of Rad Source, and Rad Source's counsel, Tom

Steele, participated in a telephone conference to discuss Nordion's request for Rad Source's consent to assignment of the License Agreement from Nordion to Best.  J.P.S. ¶ 24; 4/5/11 Tr. at 180:4-22; 4/6/11 Tr. at 81:22-82:11; 4/11/11 Tr. at 189:19-190:9. Prior to this conference call, Rad Source did not know Mr. Larabie's identity.  4/11/11 Tr. at 190:10-14.

71.    During the conversation, MDS informed Rad Source that it would sublicense the License Agreement to Best if Rad Source would not consent to an assignment.  4/5/11 Tr. at 180:2-3; 4/11/11 Tr. at 192:21-193:3.  Rad Source objected that MDS had a right to sublicense the License Agreement to Best.  4/11/11 Tr. at 193:4-5.  Upon the conclusion of the call, Rad Source maintained its refusal to consent to an assignment of the License Agreement from Nordion to Best.  J.P.S. ¶ 25.

### 3.    Call from Best to Rad Source

72.    Within a month of the January 28, 2008 conference call, the owner of Best, identified as Krish,[11] called Mr. Kirk.  4/11/11 Tr. at 196:1-7.  Mr. Suthanthiran indicated that he wanted to arrange a meeting with Messrs. Hartman and Kirk.  4/11/11 Tr. at 196:25-3.  Mr. Suthanthiran also told Mr. Kirk that Best was closing on the Nordion deal that week.  4/6/11 Tr. at 90:18-22; 92:11-13.

73.    However, Rad Source never heard from Mr. Suthanthiran again and no meeting was ever arranged.  4/11/11 Tr. at 197:4-7.  During the call, Mr. Kirk never said anything to Mr. Suthanthiran about Rad Source refusing to consent to the assignment or any objection Rad Source had to the Nordion/Best transaction.  4/6/11 Tr. at 92:17-22. Mr. Kirk never voiced his concerns regarding Best, nor did he request documents, even

---

[11]   Krishnan Suthanthiran is the sole shareholder and founder of Best Medical International and Best Theratronics.  4/6/11 Tr. at 145:15-20.

in spite of Rad Source's concern that it did not know anything about Best.  4/6/11 Tr. at 92:23-93:4; 93:10-12.

**L.**      **April 30, 2008 Sublicense Agreement**

74.      On April 30, 2008, Nordion, Best Medical, and Best Theratronics entered into an agreement titled "Sublicense Agreement" (the "Sublicense Agreement").  4/5/11 Tr. at 184:10-13; 184:19-23; J.E. 10; J.P.S. ¶ 27.   Paragraph E of the Sublicense Agreement provides that "MDS, Best Medical and Best Theratronics have agreed that MDS will grant to Best Theratronics an exclusive right and sublicense to the licensed technology for the system and for the single power supply version of the system as opposed to assigning the license agreement to Best Theratronics in accordance with and subject to the Asset Purchase Agreement."  4/5/11 Tr. at 190:7-16; J.E. 10.

75.      Article 2.1 of the Sublicense Agreement, titled "Grant of Sublicense," represents Nordion's sublicense of the same rights it had under its license which were the exclusive right to use the Licensed Technology and the System.  4/5/11 Tr. at 192:8-18.  In Section 2.1, MDS granted Best Theratronics a worldwide license to "Use the Licensed Technology for the [RS 3000] System . . . and for the single power supply version of the System," which is identical to the license grant that MDS received from Rad Source under the License Agreement.  J.E. 10.   In the Sublicense Agreement, Plaintiffs acknowledged that the "Licensed Technology," which was licensed from Rad Source to MDS under the License Agreement, "comprises part of the Assets as defined in the Asset Purchase Agreement . . . ."  J.E. 10.

24

76.    Under Section 2.3 of the Sublicense Agreement, Best Theratronics assumed all obligations that MDS had under the License Agreement.   J.E. 10.   Both Best Medical and Best Theratronics acknowledged in Section 2.3 that "the obligations of MDS under the License Agreement . . . constitute Assumed Obligations within the meaning of the Asset Purchase Agreement and have been assumed by Best Medical and Best Theratronics."   J.E. 10.

77.    Under Sections 2.3 and 2.6 of the Sublicense Agreement, Best Theratronics agreed to fully indemnify MDS in connection with a breach of the License Agreement by Rad Source or Best Theratronics.   4/6/11 Tr. at 111:11-17; J.E. 10.

78.    Under Section 2.5 of the Sublicense Agreement, Plaintiffs agreed that MDS "shall not be required to make any payments to Rad Source" under the License Agreement unless and until MDS has received the required payment from Best Theratronics.   4/6/11 Tr. at 111:4-10; J.E. 10.

**M.    MDS exits blood irradiation business through Asset Purchase Agreement**

79.    A press release dated November 29, 2007 noted that MDS "signed an agreement with [Best Medical] to divest its . . . self-contained irradiator product lines." D.E. F.   MDS' president, Steve West, was quoted in this press release as stating:   "By divesting these product lines, we can direct all of our energy and resources on becoming a leading innovator in the exciting and growing field of molecular medicine." D.E. F.

80.    Best Theratronics and MDS co-signed notices stating that "on April 30, 2008, MDS Canada, Inc. conveyed and transferred to Best Theratronics, Limited, all of MDS' right, title and interest in and to the . . . Self-contained irradiator business."   4/6/11

Tr. at 118:10-16; D.E. CF; CG.

81.    Mr. Gotfrit signed a confirmation of transfer of the External Beam Therapy and self-contained irradiator business which stated:

> We hereby notify you and confirm to you that on April 30, 2008, MDS Canada, MDS conveyed and transfers to Best Theratronics all of MDS's right, title and interest in and to the External Beam Therapy and self-contained irradiator business, being the subject matter of Best Theratronics' application for permits or licenses with your organization.

> 4/6/11 Tr. at 116:19-17:4; D.E. CG.

82.    MDS is not presently developing, manufacturing, marketing or selling any x-ray irradiators.  J.P.S. ¶ 29.

## N.    Rad Source learns that MDS/Best deal closed, but takes no action

83.    In May or June 2008, Rad Source learned that the MDS/Best transaction had closed through an article, MDS press release, and public filings.  4/11/11 Tr. at 197:17-25; 200:4-15; 201:5-8; D.E. F, G.[12]  Despite Rad Source's concern that Best now had Rad Source's technology, Rad Source did not send a default notice to MDS because Rad Source "believed it would be futile" and that legal action would be expensive and time consuming.  4/11/11 Tr. at 207:4-16.[13]

---

[12] However, Mr. Kirk also testified that he knew that Best was using the Licensed Technology to manufacture, market, and sell the Raycell as early as April 2008.  4/6/11 Tr. at 101:24-102:2.

[13] The purpose of Article 12.2 of the License Agreement, entitled "Default," was so that in the event of a material breach, the nonbreaching party could provide notice to the other party of a breach and provide the opportunity to remedy.  4/5/11 Tr. at 172:3-11. Pursuant to Article 12.2, the:

84.    Rad Source never contacted Nordion or Best to regarding Best's use and possession of the Licensed Technology.  4/6/11 Tr. at 97:3-15; 102:3-7.  Mr. Kirk conceded that Rad Source did nothing in response to the knowledge that Best and Nordion had closed their deal.  4/6/11 Tr. at 102:8-10.  According to Mr. Kirk, Rad Source did not think it was very important that Best had the Licensed Technology based on the patents in Mr. Kirk's name or that Best was manufacturing, marketing, and selling the Raycell because Rad Source was a small company and could not afford to "provoke[] a lawsuit."  4/6/11 Tr. at 97:23-98:20.

85.    Eventually, Rad Source sent a default notice and notice of termination to MDS after Rad Source received notice of the instant litigation.  4/11/11 Tr. at 217:9-11; 217:16; D.E. I; J.E. 28.

**O.    RS 3400**

86.    In approximately August 2008, Rad Source began developing a new blood irradiation device, the RS 3400.  4/6/11 Tr. at 43:21-24; 4/11/11 Tr. at 208:11-21; D.E. H.  The RS 3400 was intended to be a blood irradiation device.  4/6/11 Tr. at 69:4-6.  At least by August 19, 2008, Rad Source was designing and developing the RS 3400 to reduce the risk of Graft Versus Host Disease or other blood borne

---

"Agreement may be terminated by a party in the event of a material breach by the other party of the terms and conditions hereof, provided, however the nonbreaching party shall first give to the breaching party written notice of the intended termination of this Agreement specifying the reason therefore (a "Breach Notice").  Upon receipt of such Breach Notice, the breaching party shall remedy such breach within forty-five days of the receipt of such notice, failing which the non-breaching party may terminate this Agreement without prejudice to any other rights or remedies which may be available at law or otherwise."

J.E. 1.

pathogens.  4/6/11 Tr. at 31:2-5; 43:21:24; D.E. H.

87.    On or about September 26, 2008, Rad Source submitted an FDA 510(k) application (Application K082921) seeking approval to market a blood irradiation device, assigning RS 3400 as the name for the proposed device.  J.P.S. ¶ 34; 4/6/11 Tr. at 30:23-31:1.  On September 29, 2008, at a Nuclear Regulatory Commission hearing, Rad Source announced that it had filed the 510(k) application for its new x-ray blood irradiator.  J.P.S. ¶ 35.  On February 17, 2009, the FDA issued a clearance letter in response to Rad Source's 510(k) application.  J.P.S. ¶ 36; 4/11/11 Tr. at 211:3-9.

88.    Rad Source has not completed its design and development of the RS 3400.  J.P.S. ¶ 33.  Rad Source has not sold a single RS 3400.  J.P.S. ¶ 41.  The expected selling price for the RS 3400 is approximately $180,000.  4/11/11 Tr. at 210:4-5.

P.    **Rad Source markets the RS 3400**

89.    In September 2009, Rad Source began to market the RS 3400.  4/11/11 Tr. at 211:13-17.  On September 9, 2009, Rad Source announced the new RS 3400 on its website, stating that it was "a direct medical upgrade of the Rad Source RS 2400 research and industrial irradiator" and that the RS 3400 would be ready for delivery to purchasers in the first quarter of 2010.  J.P.S. ¶ 37; J.E. 15.

90.    Potential customers interested in the RS 3400 contacted Rad Source, and Rad Source discussed the RS 3400 with some of those customers.  J.P.S. ¶ 38.  In the fall of 2009, Rad Source submitted written quotes to two potential customers for purchase of an RS 3400, representing that the new device could be delivered by March 30, 2010.  J.P.S. ¶ 39; 4/11/11 Tr. at 211:18-22.

91.    Rad Source placed a statement in a commercial advertisement for the October 2009 American Association of Blood Banks ("AABB") annual trade show, the largest and most important trade show in the blood irradiation industry, announcing that Rad Source had a new x-ray blood irradiator for sale and arranged to have a booth at the trade show.  J.P.S. ¶ 40.  Due to the entry of the injunction in this case, Rad Source did not attend or set up its booth at the trade show.  J.P.S. ¶ 40.

92.    In response to Plaintiffs' September 30, 2009 Cease and Desist letter demanding that Rad Source cease design, marketing, and promotion of the RS 3400 by letter dated October 2, 2009, Rad Source notified Nordion under Article 12 of the License Agreement, for the first time, that Rad Source considered Nordion to be in breach of the License Agreement.  P.E. 69.  1.  On October 8, 2009, Nordion responded to Rad Source's October 2, 2009 notice asserted that the notification was insufficient to constitute notice under Article 12 of the License Agreement.  P.E. 69.  On October 15, 2009, Plaintiffs filed the instant suit.  J.P.S. ¶ 43.

**Q.   Expiration of '255 Patent**

93.    Plaintiffs contend that Rad Source breached Articles 3.7 and 11.1(e) of the License Agreement by failing to maintain the '255 Patent in good standing and failing to pay all prosecution, processing, and maintenance fees with respect to that patent.  *See* **[ECF No. 286]**.

94.    Article 3.7, titled "Maintenance Fees," states:

Until termination or expiration of this Agreement, Rad Source shall be responsible for prosecuting and maintaining the Patents in good standing and shall be responsible for the payment of all prosecution, processing and maintenance fees with respect to the Patents. Within thirty (30) days following each due date of such maintenance fees, Rad Source shall provide to [MDS] written notice of having paid the Patent maintenance

fees. In the event it is determined that any such fees are outstanding, Rad Source shall make immediate arrangements for payment failing which [MDS] may pay such fees and, in addition to any other remedies it may have, may deduct the amount of such fees, and associated costs (including reasonable attorney's fees) from any amounts owing by [MDS] pursuant to this Agreement. Rad Source shall provide [MDS] an update on the status of Patent prosecution as requested by [MDS] from time to time.

Section 11.1(e), titled "Rad Source Representation and Warranty," states:

Rad Source represents and warrants to [MDS] that as at the time of entering into this Agreement and as at the Closing Date:

. . .

(e)     The Licensed Technology and System do not and will not to Rad Source's best information and belief, infringe any patents, copyright, or other industrial or intellectual property rights of third parties and the Patents are in good standing, will be maintained in good standing and all maintenance fees have and will be paid by Rad Source.

95.     Article 3.7 required Rad Source to provide to Nordion written notice of having paid the patent maintenance fees within 30 days following each due date of such maintenance fees.  4/5/11 Tr. at 107:1-5; J.E. 1.  Further, pursuant to Article 3.7, if any patent maintenance fees remained outstanding, "Rad Source shall make immediate arrangement for payment, failing which Nordion may pay such fees."  4/5/11 Tr. at 107:6-8; J.E. 1.

96.     In February 2010, Plaintiffs discovered that the '255 Patent had expired in May 2005 due to Rad Source's failure to pay the required maintenance fees.  J.E. 1, 18; Plaintiffs' Exhibit ("P.E.") 1.  MDS never received any notice from Rad Source that any of the patents referred to in the License Agreement had expired for failure to make the payments.  4/5/11 Tr. at 107:19-23.

97.     Rad Source first became aware that the '255 Patent expired after the instant litigation began in 2010.  4/11/11 Tr. at 224:6-8.  In April 2010, Rad Source filed a petition to reinstate the '255 Patent with the United States Patent and Trademark Office, which was denied.  J.P.S. ¶ 53; J.E. 1, 18; P.E. 56.

## R.     January 2011 termination notice

98.     In January 2011, Rad Source sent a termination notice to Nordion asserting that Rad Source considered the License Agreement to be terminated.  4/5/11 Tr. at 198:14-23; J.E. 28; P.E. 63; 64.  Rad Source also sent "cease and desist" letters to Best Medical and Best Theratronics demanding that they cease marketing and promoting the Raycell and Mk2.  4/6/11 Tr. at 180:20-24; P.E. 63; 64.  By that time, Best Theratronics was manufacturing, marketing and selling the Raycell for over 2.5 years since May 1, 2008.  4/6/11 Tr. at 181:14-19.

99.     Nordion, Best Medical, and Best Theratronics responded to Rad Source's correspondence by letter dated January 18, 2011, disputing Rad Source's "Improper Notice of Termination" by pointing out, *inter alia*, Rad Source's waiver of any right to attempt to terminate the License Agreement based on information actually known to Rad Source two years earlier.  J.P.S. ¶ 45; P.E. 69.

## S.     License Agreement

I now address specific provisions of the License Agreement at issue in this case.

### 1.     Article 3.1 – Grant of License

100.    Article 3.1, titled "Grant of License," states in full:

As of the Closing Date, Rad Source hereby grants to [MDS], and [MDS] accepts, for the term of the license as set out in Section 12.1, subject to the second sentence of this Section 3.1, an exclusive right and license (transferable, with the right to grant sublicenses to third parties

("Sublicensees") on such terms as are consistent with this Agreement to Use the Licensed Technology for the System (including as modified by [MDS]) and for the single power supply version of the System, in the Territory.

The foregoing grant of exclusivity is made subject to Rad Source's retention of the right to use the Licensed Technology to develop, manufacture or have manufactured, distribute, promote, market, sell, lease and service products other than the System and single power supply version of the System, in the Territory.

For the avoidance of doubt, Rad Source's retained right to use the Licensed Technology (as set out in the preceding sentence) shall not, during the term of the license, in the Territory, include the right, directly or indirectly, to develop, manufacture or to have manufactured, distribute, promote, market, sell or lease a medical device for blood or blood product irradiation, which is used or useable to reduce the risk of Graft Versus Host Disease or other blood borne pathogen, and which embodies, in whole or in part, the Patents.

J.E. 1.[14]

The term "Use" is defined in Section 1.12 as:

"Use" in connection with the Licensed Technology and the System shall mean the right to enjoy, copy, commercialize and exploit as well as manufacture, have manufactured, assemble, and use, the apparatus, machinery and all devices embodied in the Licensed Technology and the System and putting it into practice and to distribute, promote, market, sell, lease and service and/or otherwise provide the services of the apparatus, machine(s) or devices forming the System.

J.E. 1.

101.    Article 1.6 defines "Licensed Technology" as "the Patent(s), and Technical Information as set out in Schedule A."  4/5/11 Tr. at 86:15-23; 4/6/11 Tr. at 63:19-22; J.E. 1.

---

[14] For ease of reviewing the entirety of Article 3.1, each sentence is separated by a space although the actual License Agreement contains each of the three sentences in one paragraph.

102.   Article 1.8 defines "Patents" as "U.S. Patent Nos. 6,389,099 and 6,212,255 and United States patent pending application No. 101244-209 (including divisional applications thereof), including such patents as are filed in the Territory."  J.E. 1; 4/6/11 Tr. at 138:14-22; *see also* 4/6/11 Tr. at 139:13-21 ("[The Court]:  Is it not correct that the definition of 'patents'' is tied directly to the definition of system, that is, the system, which means the . . . RS 3000, is that which is included in the patents as defined?  A:  Yes.  [The Court]:  That's what was intended?  A:  Yes.  [The Court]:  Not something else?  A:  Right.").

103.   Article 1.9 defines "System" as "the Rad Source RS 3000 x-ray blood irradiation system, including modifications thereto, exploited and/or marketed by Rad Source as at the Closing Date."  J.E. 1.

104.   Article 3.1 includes the right to grant sublicenses to third parties as such terms are consistent with the License Agreement to use the Licensed Technology for the System.  4/5/11 Tr. at 163:8-18.

105.   Unlike Article 13.9 requiring consent to assignment, there is no requirement that Rad Source consent to a sublicense.  4/5/11 Tr. at 171:10-15.

**2.      Article 5.3 – non-compete provision**

106.   Article 5.3 of the License Agreement is the non-compete provision which defines the prohibited competitive activities –designing, promoting, manufacturing, selling or leasing, or carrying out any other activities which compete with the blood irradiation business of Nordion.  4/5/11 Tr. at 100:21-25.

107.   Article 5.3 provides:

Subject to the terms and conditions of this Agreement, for a period of seven (7) years from the Closing Date, Rad Source, its respective officers

and its Affiliates shall not, directly or indirectly, within the Territory design, promote, manufacture, sell, lease or carry on any other activities, which compete in any way with the blood irradiation business (including irradiation of blood and blood products) carried on by [MDS], including with respect to the System.

Subject to section 6.2, Rad Source, its respective offices and its Affiliates, shall not, for a period of seven (7) years from the Closing Date, directly or indirectly, within the Territory, provide service or maintenance of the System (or the System as modified by [MDS]) to third parties, or provide servicing or maintenance to any product, system or components thereof to third parties, which compete with the System.

J.E. 1.

108.   The non-compete period under Section 5.3 ended on September 26, 2010.  J.P.S. ¶ 55; 4/6/11 Tr. at 32:7-8.  Rad Source started to design, develop, and promote the RS 3400 prior to September 26, 2010.  4/6/11 Tr. at 32:24-33:4; 33:14-16; 103:5-7.

### 3.   <u>Article 3.8 – right of first negotiation</u>

109.   Article 3.8 of the License Agreement regarding the right of first negotiation was included because Nordion was interested in the technologies that Rad Source was developing, *i.e.*, long tube technology, and sought a right of first negotiation to those technologies.  4/5/11 Tr. at 109:15-20; 4/6/11 Tr. at 57:23-58:8.

110.   Article 3.8 states:

During the term of this Agreement, Rad Source hereby provides to [MDS] a right of first negotiation for the right to acquire from Rad Source, by license or otherwise, the right to use all other irradiation application technology developed by Rad Source. Such negotiations may be initiated by either party and shall endure for a period of one hundred and twenty (120) days. If the parties fail to reach an agreement with respect to the terms and conditions of license within the aforementioned one hundred and twenty (120)) day period, Rad Source shall be free to negotiate with such third parties as it deems fit, provided that the terms and conditions offered to such third parties shall be no less favourable to Rad Source than those last offered to [MDS] pursuant to this Section 3.8.

J.E. 1.

111.    Nordion had the right of first negotiation with respect to all other irradiation application technology developed by Rad Source.  4/6/11 Tr. at 105:22-106:1.

112.    On October 22, 2009, Rad Source sent a letter to Nordion purporting to offer to negotiate the rights to the RS 3400.  P.E. 42.  Rad Source's letter includes no reference to the meetings during the summer of 2007.  P.E. 42.  In response to Rad Source's offer, Nordion asked Rad Source to provide documentation necessary to assess the RS 3400, as well as any other irradiation application technologies developed by Rad Source, and to determine whether Nordion wished to enter negotiations for that technology.  P.E. 44.

### 4.    Article 8.1 – confidentiality

113.    Article  8.1  of  the  License  Agreement,  titled  "Confidentiality  and Exceptions," states in pertinent part:

> Rad Source and [MDS] acknowledge that the content of the transactions contemplated herein, the Technical Information, the business affairs and operations of the other, and such other information which has been marked Confidential or otherwise provided in confidence ("Confidential Information") which it receives or otherwise learns during the term of this Agreement, is valuable property of the party providing such information. The parties acknowledge the need to preserve such confidentiality and secrecy of such Confidential Information and agree that, both during the term of this Agreement and after termination or expiration of this Agreement, it shall not disclose such Confidential Information.  This obligation of confidentiality shall not apply to information:
>
> . . .
>
> d)  confidential information which is disclosed with the written consent of the other party,

J.E. 1.

5.    **Article 13.9 – Assignment**

114.   Article 13.9 of the License Agreement, titled "Assignment," requires that either party seeking assignment to request express written consent from the other party. 4/5/11 Tr. at 161:14-23; 4/6/11 Tr. at 79:17-19; 108:6-9; J.E. 1.  Article 13.9 states:

> This Agreement shall inure to the benefit of and shall be binding upon the heirs, successors and permitted assigns of the parties. Neither [MDS] nor Rad Source may assign any of its rights or delegate any of its obligations under this Agreement without the express written consent of the other party, such consent not to be unreasonably withheld; provided that (i) either party may assign any of its rights or delegate any of its obligations under this Agreement, in whole or in part, to any of its Affiliates, without consent of the other party, but without relieving the delegating party from the responsibility for performance of any of such obligations and (ii) either party may assign its rights and delegate its duties and obligations (in whole and not in part) under this Agreement to an entity which acquires all, or substantially all, of its assets or business, without the consent of the other party, provided that such assignee duly and effectively assumes all of the obligations of the assigning party hereby by instrument satisfactory to the other party. Any assignment in violation of the provisions of this section shall be void.

> J.E. 1.

T.    **Claim 6 of the '255 Patent**[15]

115.   I now address facts regarding the patent/technical analysis in Phase II. The preamble of Claim 6 of the '255 Patent characterizes the "transfusion blood bag" as "said bag being in the form of a rectangular box-like container."  J.E. 2; D.E. K.  The term "transfusion blood bag" is referred to in the body of the claim in clause b), where it states "said bag."  J.E. 2.  There is no other transfusion blood bag referred to in the claim, other than the transfusion blood bag, being in the form of the rectangular box-like container.  J.E. 2; D.E. K.

---

[15] It is uncontested that only Claim 6 of the '255 Patent is at issue.  *See infra* § II.P.  Claim 6 refers to "transfusion bag blood," but it is undisputed that this is a grammatical error that it should be read as "transfusion blood bag."  J.E. 2.

116.   The '255 Patent provides a number of places where the position of the blood bag relative to the X-ray tubes is discussed.  J.E. 2.  These sections disclose a canister as the "means for positioning" the blood bag.  J.E. 2; D.E. K.  The structures of a "means for positioning" disclosed in the '255 Patent are a canister, a container, a cylinder, and those structures limiting the blood bag to the form of a rectangular box-like container.  J.E. 2; D.E. K.

117.   Figure 4 of the '255 Patent shows a "blood plasma bag (20) is positioned to be irradiated by a single X-ray tube (15A).  In this embodiment, the plasma bag (20) is mounted in a vertical orientation, that is its longest length is vertical and its 4 cm thickness is positioned vertically as contrasted to the horizontal orientation of the bag 20 shown in Figs. 1-3."  J.E. 2; D.E. K.

118.   Figure 2 of the '255 Patent shows an embodiment of the canister where the canister is a cylinder.  J.E. 2; D.E. K.  The depiction of the blood bag (20) in Figure 4 is in the shape of a rectangular box-like container.  J.E. 2; D.E. K.  Figures 1 and 3 of the '255 Patent show a "chamber (19) which is adapted to receive a canister or container (18) for the blood plasma bag."  J.E. 2; D.E. K.

119.   The '255 Patent specification states, "the X-ray beam output port of tube 15 is designed to provide a relatively wide X-ray beam of 40-50 degrees in order to provide a beam with a sufficiently large diameter to fully cover the can[n]ister 18 and the included bag 20, as will be discussed."  J.E. 2; D.E. K.  This use of beam describes a "cone of irradiation" which is capable of "covering a vertical area" as described in the '255 Patent.  J.E. 2; D.E. K.

120.    Figures 1, 3, and 4 reveal that the blood bag is vertical (figure 4) or horizontal (figure 1 and 3) relative to central axis of the X-ray beam.  J.E. 2; D.E. K.  The only place the word "vertical" is used in the specification other than in Claim 6 is in the section of the specification discussing Figure 4, which represents an embodiment of Claim 6.  J.E. 2; D.E. K.  This section states "the plasma bag 20 is mounted in a vertical orientation, that is its longest length is vertical and its 4 cm thickness is positioned vertically as contrasted to the horizontal orientation of the bag 20 shown in FIGS 1-3."  J.E. 2; D.E. K.

121.    Figure 4 shows a depiction of a rectangular box.  J.E. 2; D.E. K.  When describing Figure 4, the support is labeled as "rotatable support 28" and is shown holding up the blood bag and rectangular box-like container.  J.E. 2; D.E. K.

122.    Claim 6 of the '255 Patent describes an embodiment where one x-ray tube is used instead of two.  4/19/11 Tr. at 38:23-25.

123.    Dr. Uribe interpreted the directional x-ray tube as part of Claim 6 of the '255 Patent, noting that it is a different kind of tube than the long tube in the RS 3400 because the directional x-ray tube emits a cone of x-rays.  4/19/11 Tr. at 7:7-16; 8:5-11.

124.    The cone of x-rays is defined by the window in the jacket placed over the tube, as well as the size of the dot where electrons hit the target material, making the physics related to the x-rays different than that of a long tube.  4/19/11 Tr. at 8:15-23; 9:8-12; 15:5-6; 17:11-13.

125.    The directional x-ray tube defined in this '255 Patent emits x-ray beams.  4/19/11 Tr. at 12:9-11.  The x-rays that are emitted by the long tube form a field of x-rays; the long tube does not emit x-ray beams.  4/19/11 Tr. at 12:20-21; 13:5-9.

126.   A difference between the directional x-ray tube and the long tube is the fact that the x-rays generated in a single spot of the cathode, are generated in all directions, which move backward toward the cathode of the x-ray tube and are not absorbed by any piece of material.  4/19/11 Tr. at 12:23-13:4.

127.   Though both the RS 3000 and RS 3400 have a vacuum and a water jacket, the water jacket in the RS 3000 is different from the long tube technology because it involves flow of water past the copper anode and removal of heat through that water.  4/19/11 Tr. at 15:7-24.  Though the water jacket in the directional tube, the RS 3000 tube, and the water jacket in the long tube perform the same purpose to remove heat through that water, they do it through different ways.  4/19/11 Tr. at 16:5-8. In the case of the long tube, the water is in contact with all of the anode; in the RS 3000 x-ray tube, the water is only in contact with the back of the anode.  4/19/11 Tr. at 16:11-25.   Accordingly, in the RS 3400, the x-ray generated by the anode will go through the water, but in the RS 3000, the x-rays will not.  4/19/11 Tr. at 17:3-5.

128.   In the directional x-ray tube, the anode consists of tungsten surrounded by copper, which produces x-rays differently from the production of x-rays from gold, which is the material in the anode of the long x-ray tube and a more efficient producer of x-rays compared to tungsten.  4/19/11 Tr. at 19:10-19.  Therefore, the use of different materials, gold versus tungsten, in the anode makes these tubes different because the efficiency of producing x-rays is different.  4/19/11 Tr. at 19:20-25; 20:3-6.

## II.   <u>CONCLUSIONS OF LAW</u>

**A.   Overview**

In this case, MDS and Rad Source each claim that the other party breached the License Agreement (with respect to the non-compete, right of first negotiation, and sublicense articles); challenge the validity of the License Agreement itself; and seek declaratory judgments with respect to, *inter alia*, whether the RS 3400 embodies the Patents.   During Phase I of the trial, the parties presented evidence regarding the formation of the License Agreement, MDS and Rad Source's performance thereunder, and the opposing claims of breach of the License Agreement.

For the reasons stated *infra*, I DENY Plaintiffs' claims against Rad Source for injunctive relief, breach of contract, unjust enrichment (alternatively pled), and declaratory relief that the RS 3400 embodies the Patents; GRANT Plaintiffs' request for declaratory relief that the License Agreement remains in full force;[16] and GRANT IN

---

[16]  Plaintiffs seek a declaratory judgment in Count I that "[t]he RS 3400 embodies in whole or in part the patents subject to the License Agreement," and therefore, Plaintiffs hold the exclusive right and license to, *inter alia*, manufacture and sell the RS 3400. **[ECF No. 286 ¶ 50]**.   Plaintiffs also seek a permanent injunction enjoining Rad Source from, *inter alia*: (1) developing, manufacturing, and selling a device for blood irradiation that embodies in whole or in part the patents subject to the License Agreement and (2) competing with Plaintiffs' blood irradiation business.   **[ECF No. 286 ¶ 62]**.   Plaintiffs' breach of contract claim is based on allegations that Rad Source breached the License Agreement by developing the RS 3400 in violation of the License Agreement, in addition to failing to maintain one of the patents subject to the License Agreement in good standing.   **[ECF No. 286 ¶¶ 65, 71]**.   Plaintiffs' unjust enrichment claim, which is pled in the alternative, alleges that Rad Source gained an unfair market advantage by designing and manufacturing the RS 3400 prior to the expiration of the non-compete provision in the License Agreement.   **[ECF No. 286 ¶¶ 70, 72]**.   For damages relating to their unjust enrichment claim, Plaintiffs seek Rad Source's profits from the RS 3400.   **[ECF No. 286 ¶ 75]**.   Finally, Plaintiffs seek a declaratory judgment in Count VII that includes a determination that the License Agreement remains in full force and effect and that Plaintiffs are not prohibited from manufacturing or selling blood irradiation systems known as the RS 3000, Raycell, Raycell Mk2, or any derivatives thereof.   **[ECF No. 286 ¶ 81]**.

PART AND DENY IN PART Rad Source's counterclaim for declaratory relief.[17]  Even if I determined that the RS 3400 did embody in whole or in part the Patents, this conclusion would result in an illegal restrictive covenant under Florida law due to the length (until the year 2022) and scope ("Territory" defined as worldwide) of the non-compete provision in Article 5.3.

The most efficient manner of resolving the parties' claims is to first look to the License Agreement to determine the parties' rights and obligations.  In order to resolve whether MDS or Rad Source breached the License Agreement, I must first determine the parties' respective duties under the agreement.  Similarly, to determine whether the parties are entitled to declaratory relief, which is intertwined with the claims of breach, I must also review and interpret the terms of the License Agreement.

Because of the License Agreement's latent ambiguity as to the last sentence of Article 3.1, extrinsic evidence of the parties' formation of the agreement is admissible. Based on the written agreement and parol evidence, I determine that MDS granted to Rad Source in Article 3.1 the right to use the Patents as they related to the System (defined as the RS 3000 and not the RS 3400) because no party foresaw or considered the advent of the RS 3400 allegedly encompassing Claim 6 of the '255 Patent when negotiating and executing the License Agreement.

With the backdrop of the parties' negotiations and intent, this first portion of the

---

[17] I DENY Rad Source's counterclaim for declaratory relief to the extent it seeks a declaration that: (1) Rad Source is excused from further performance of the License Agreement because of MDS' breach; (2) Rad Source offered and MDS rejected the right of first negotiation for the long tube technology in July 2007; and (3) Article 5.3 and the last sentence of Article 3.1 are void and unenforceable restrictive covenants.  I GRANT Rad Source's counterclaim for declaratory relief insofar as Rad Source seeks a declaration that the RS 3400 does not embody the Patents and that the License Agreement does not preclude Rad Source from developing or selling the long tube technology and devices using the long tube technology.

Conclusions of Law analyzes the following three key Articles of the License Agreement, their interrelation, and the parties' obligations thereto:  (i) 3.1 (Grant of License); (ii) 5.3 (non-competition provision); and (iii) 3.8 (Right of First Negotiation).  Because contract interpretation under Florida law requires examination of the License Agreement's three key provisions *in pari materia*, I determine that the non-compete provision of Article 5.3 is valid, but expired by its own terms on September 26, 2010.  Further, looking to Article 3.8, I conclude that Rad Source did not formally offer this right of first negotiation to MDS for the RS 3400 during a July 2007 visit by Nordion representatives to Rad Source's facilities in Georgia.[18]   However, pursuant to my Preliminary Order, Rad Source complied with Article 3.8 by offering the right of first negotiation for the long tube technology to Plaintiffs, which was rejected.

Subsequent to analyzing these three provisions of the License Agreement, I address the issue of Nordion's sublicense to Best.  I determine that Rad Source reasonably withheld consent to Nordion's request to assign its rights in the License Agreement to Best.  At a minimum, Rad Source had no knowledge of Best's ability to market and sell the RS 3000.  However, I find that Rad Source waived and is estopped from any claim that Nordion's sublicense to Best was a material breach of the License Agreement which rendered the agreement ineffective.  Rad Source was fully aware of the sublicense and MDS and Best's reliance on it, yet failed to take any timely action to contest it.

Finally, even though I determine that the RS 3400 is not subject to Article 3.1 based on the language of the License Agreement and parol evidence of the parties'

---

[18] However, the parties have cured this error because Rad Source offered the right of first negotiation in accordance with my Preliminary Order and Article 3.8.  *See infra* § II.N; **[ECF No. 349]**.

negotiations, I nonetheless perform a <u>technical analysis</u> of the RS 3400 and its relation to Claim 6 of the '255 Patent in order to resolve this disputed issue.  Since the final sentence in Article 3.1 precludes Rad Source from developing a blood irradiator that embodied in whole or in part the Patents, the issue is whether the RS 3400 embodies in whole or in part Claim 6 of the '255 Patent.[19]  Based on this portion of the Conclusions of Law, I find that the RS 3400 does not infringe any claims of any Patents subject to the License Agreement, under either a literal infringement or a doctrine of equivalents analysis.  Therefore, the RS 3400 cannot "embody in whole or in part, the Patents" even if I had determined (which I do not) that the "embody" language referred to the long tube technology.

## B.    Requested relief

In order to provide a roadmap for my analysis, I outline the parties' requested relief as discussed *supra* § II.A.  The parties seek declaratory judgment as follows:  in Count I of the Third Amended Complaint, Plaintiffs seek a declaratory judgment that the RS 3400 embodies in whole or in part the Patents; in Count VII, Plaintiffs seek a declaration that the License Agreement remains in full force and effect (Count VII).[20]

---

[19] As discussed further *infra*, the parties agree that the only Patent at issue is the '255 Patent and specifically, Claim 6 of the Patent.

[20] In Count VII of the Third Amended Complaint **[ECF No. 286]**, Plaintiffs seek a declaration that:

(1) Rad Source's purported termination is inconsistent with the terms of the License Agreement and is wrongful;

(2) The cease and desist notices are inconsistent with the terms of the License Agreement and are wrongful;

(3) Rad Source waived its right to terminate the License Agreement;

For the reasons discussed *infra*, I determine that Plaintiffs are not entitled to declaratory judgment on Count I, but are entitled to declaratory judgment with respect to Count VII.

Rad Source's counterclaim seeks declaratory judgment that: (1) MDS breached the License Agreement, excusing Rad Source from further performance under the agreement; (2) Rad Source offered MDS the right of first negotiation for the long tube technology, which MDS rejected; (3) the RS 3400 does not embody in whole or in part the Patents; (4) the License Agreement does not preclude Rad Source from developing or selling the long tube technology and devices using that technology; and (5) Article 5.3 (non-compete provision) and the last sentence of Article 3.1 of the License Agreement are void and unenforceable restrictive covenants. As discussed *infra*, I determine that Rad Source is not entitled to declaratory judgment with respect to parts 1, 2, and 5, but is entitled to declaratory judgment with respect to parts 3 and 4.

In addition to declaratory relief, Plaintiff seeks a permanent injunction (Count IV) enjoining Rad Source from, *inter alia*: (1) developing, manufacturing, and selling a device for blood irradiation that embodies in whole or in part the patents subject to the License Agreement and (2) competing with Plaintiffs' blood irradiation business.

(4) Rad Source waived its right to demand that the Best Plaintiffs cease and desist their commercial activities pertaining to the Licensed Technology, the Raycell or any derivatives thereof;

(5) The License Agreement remains in full force and effect;

(6) Rad Source is precluded from terminating the License Agreement and is precluded from demanding that the Plaintiffs cease and desist or otherwise interfere with their activities pertaining to the Licensed Technology, the Raycell or any derivatives thereof by the doctrine of laches and/or by the doctrine of equitable estoppel; and

(7) The January 5, 2011 notice of termination and the January 5, 2011 cease and desist notices do not prohibit Plaintiffs from marketing, manufacturing, selling, modifying, or servicing the RS 3000, Raycell, Raycell Mk2, or any derivatives thereof and Plaintiffs are entitled to continue those activities."

Plaintiff's breach of contract claim in Count V alleges that Rad Source breached the License Agreement by developing the RS 3400 and failing to maintain the '255 Patent in good standing.   Finally, Plaintiffs' unjust enrichment claim, pled in the alternative in Count VI, alleges that Rad Source gained an unfair market advantage by designing and manufacturing the RS 3400 prior to the expiration of the non-compete provision.   Based on my determinations *infra*, I conclude that Plaintiffs are not entitled to a permanent injunction and their claims for breach of contract and unjust enrichment fail.

## C.   Jurisdiction

I exercise jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1332 because the parties are diverse and the monetary value of the object of the litigation exceeds $75,000, exclusive of interests and costs.   I exercise subject matter jurisdiction over Defendant Rad Source's counterclaim pursuant to 28 U.S.C. § 1367 because the counterclaim for declaratory relief is so related to the claims in this action within the original jurisdiction of the Court that it forms part of the same case or controversy under Article III of the Constitution.

## D.   Declaratory relief

The Declaratory Judgment Act provides that "[i]n a case of actual controversy within its jurisdiction . . . , any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."   28 U.S.C. § 2201(a); *see also* Fed. R. Civ. P. 57 (governing procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201). The "continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future

injury." *Emory v. Peeler*, 756 F.2d 1547, 1551-52 (11th Cir. 1985) (citations omitted). "The granting of relief by declaratory judgment is a matter within the sound discretion of the court." *Emp'r's Liab. Assurance Corp. v. Mitchell*, 211 F.2d 441, 443 (5th Cir. 1954).[21] "However, even where declaratory relief is not requested, the courts may grant such relief where the pleading and proof show it to be appropriate." *Serv. Trades Council v. Walt Disney World Co.*, 2008 U.S. Dist. LEXIS 19122 (M.D. Fla. Mar. 11, 2008) (citing *Turner v. Liverpool Cent. Sch.*, 186 F. Supp. 2d 187, 190 n.5 (N.D. N.Y. 2002)).

Plaintiffs and Defendant request declaratory judgments seeking opposite conclusions, *i.e.*, Plaintiffs seek a declaration that the RS 3400 embodies in whole or in part the Patents (Count I) and Defendant seeks a declaration that the RS 3400 does not embody in whole or in part the Patents; Plaintiffs seek a declaratory judgment that the License Agreement remains in full force and effect (Count VII) and Defendant seeks a declaration that it is excused from further performance under the License Agreement. To the extent the parties' respective requests for declaratory relief seek conflicting results, I GRANT and DENY them accordingly as set forth *infra*. Where I deny declaratory relief,[22] I set forth my reasoning as it applies to each form of requested relief.

---

[21] All cases decided by the United States Court of Appeals for the Fifth Circuit before September 30, 1981 are binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981).

[22] *i.e.*, Rad Source's requests for declarations that Rad Source offered MDS the right of first negotiation for the long tube technology and Article 5.3 (non-compete provision) and the last sentence of Article 3.1 of the License Agreement are void and unenforceable restrictive covenants.

**E.      Applicable law**

Before analyzing specific portions of the License Agreement, I discuss general principles of contract interpretation that guide my analysis.  In particular, I note that I am bound by Florida law in interpreting the License Agreement.  Florida law dictates that I review provisions of a written contract in relation to each other *in pari materia*.  This principle is important for my analysis of how Articles 3.1, 3.8, and 5.3 operate in concert with one another to set forth the parties' rights under the License Agreement.  Finally, I cite Florida law with respect to ambiguities within a written agreement—latent, patent, or intermediate—to discuss why I must consider parol and extrinsic evidence in interpreting the License Agreement.

**1.      General contract interpretation under Florida law**

"Matters that bear upon the execution, validity, interpretation and obligations of a contract are determined, in Florida, by the law of the place where the contract was made, while matters connected with performance are regulated by the law of the place where the contract by its terms may have been provided."  *Hammett v. Am. Bankers Ins. Co. of Fl.*, 203 F.R.D. 690, 700 (S.D. Fla. 2001).  A federal court exercising diversity jurisdiction must apply the choice-of-law rules of the forum state to determine the substantive law to be applied in the case.  *Am. Family Life Assur. Co. v. U.S. Fire Co.*, 885 F.2d 826, 830 (11th Cir. 1989) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co., Inc.*, 313 U.S. 487 (1941)).  Under Florida's choice-of-law rules, courts should respect a choice-of-law provision within a contract, unless the chosen law contravenes Florida public policy.  *Fla. Evergreen Foliage v. E.I. Du Pont De Nemours & Co.,* 135 F. Supp. 2d 1271, 1277 (S.D. Fla. 2001).

47

Here, I construe the License Agreement pursuant to Florida law, as provided for in the express language of Article 13.13 of that agreement. *See* **[ECF No. 286-1]** ("This Agreement shall be governed and construed in accordance with the laws of the State of Florida USA, without reference to its principles on conflicts of laws. Place of closing shall be in the State of Florida. . . ."). I do not find that there is any contravention to Florida public policy by enforcing the agreement's choice of law provision, especially when the parties met in Florida for the purpose of executing the License Agreement and because Rad Source is a corporation organized under the laws of Florida. 4/20/11 Tr. at 69:6-18; 4/23/11 Tr. at 99:9-10; J.P.S. ¶ 4.

Generally, Florida law precludes admission of prior or contemporaneous oral statements which vary or contradict the terms of a written contract which is clear, unambiguous, and fully integrated. *Hazara Enters., Inc. v. Motiva Enters., LLC,* 126 F. Supp. 2d 1365, 1373 (S.D. Fla. 2000). However, where provisions of a contract are ambiguous and unclear on the face of the agreement, courts may consider evidence outside of the plain language in order to determine the intent of the parties at the time of formation of the contract at issue. *Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.*, 253 So. 2d 744, 748 (Fla. 4th DCA 1971). Negotiations prior to or contemporaneous with the execution of a contract are admissible as an aid in contract construction, interpretation and determination of the meaning of the contract so long as that evidence does not vary or contradict the terms of the written contract. Restatement (2d) of Contracts § 214; *see also Nevel v. Monteleone*, 514 So. 2d 383, 384 (Fla. 4th DCA 1987).

Words and phrases in a contract should be given their common and ordinary meanings absent specific contractual definitions or if the fact finder decides that the parties intended the words to have a special meaning. *Murley v. Wiedamann*, 25 So. 3d 27, 29 (Fla. 2d DCA 2009). If the language of a contract is susceptible of two constructions, the contract should not be interpreted in a manner that would make it inequitable, unnatural, or leave one party at the mercy of the other. *Huntington on the Green Condo. v. Lemon Tree I-Condo.*, 874 So. 2d 1, 5 (Fla. 5th DCA 2004). A reasonable interpretation of a contract is preferred to an unreasonable one. *James v. Gulf Life Ins. Co.*, 66 So. 2d 62, 63-64 (Fla. 1953); *Travelers Indem. Co. v. Milgen Dev., Inc.*, 297 So. 2d 845 (Fla. 3d DCA 1974). Any ambiguity in a written agreement must be resolved by interpreting the language against the party who drafted the ambiguous language. *City of Homestead v. Johnson*, 760 So. 2d 80, 84 (Fla. 2000); *Syverson v. Jones*, 10 So. 3d 1123, 1125 (Fla. 1st DCA 2009).

## 2.   *In pari materia*

In reviewing a contract to determine its true meaning, the entire contract must be reviewed as a whole without fragmenting any segment or portion. *Jones v. Warmack*, 967 So. 2d 400, 402 (Fla. 1st DCA 2007). All of the various provisions of a contract must be construed, if it can be reasonably done, as to give effect to each. *Paddock v. Bay Concrete Indus.*, 154 So. 2d 313, 315 (Fla. 2d DCA 1963). If clauses in a contract appear to be repugnant to each other, they must be given such an interpretation and construction as will reconcile them if possible. *Huntington v. Lemon Tree*, 874 So. 2d at 5 (Fla. 5th DCA 2004). I must read the three sections *in pari materia* to effectuate the intent of the parties, and not to rewrite the contract. *See, e.g.*, *A.I.G. Uruguay*

*Compania de Seguros, S.A. v. AAA Cooper Transp.*, 334 F.3d 997, 1010 (11th Cir. 2003) (purpose of courts is not to protect sophisticated business actors from each other and, in the absence of fraud or other sufficient cause for doing so, courts will not reform the contract between such parties).

### 3. Parol evidence

The parol evidence rule is not a rule of evidence, but rather is a substantive rule of law. *See Knabb v. Reconstruction Fin. Corp.*, 197 So. 707, 715 (Fla. 1940). Where a written agreement is unambiguous, the parol evidence rule bars the introduction of extrinsic evidence that would contradict or affect the construction of the document. *See Olive v. Tampa Educ. Cable Consortium*, 723 So. 2d 883, 884 (Fla. 2d DCA 1998); *Polk v. Crittenden*, 537 So. 2d 156, 159-60 (Fla. 5th DCA 1989). However, parol evidence is admissible to prove the elements of an agreement where a writing is ambiguous on its face. *Newbern v. Am. Plasticraft, Inc.*, 721 So. 2d 351, 352 (Fla. 2d DCA 1998); *Hood v. Hood*, 100 So. 2d 422, 426 (Fla. 2d DCA 1958) (permitting parol evidence to explain or clarify terms that are not clear and unambiguous). Parol evidence is not admissible to explain a patent ambiguity; it is admissible to explain only a latent ambiguity. *See Metro Dev. Group, LLC. v. 3D-C & C, Inc.*, 941 So. 2d 11, 13 (Fla. 2d DCA 2006). Parol evidence may not be used to vary or contradict the terms of an agreement, but it may be admitted to clarify the terms used and show the parties' true intent. *Bd. of Trustees of the Internal Improvement Trust Fund v. Lost Tree Village Corp.*, 805 So. 2d 22, 26 (Fla. 4th DCA 2001).

### 4. Latent, patent, or intermediate ambiguity

An ambiguity in a written agreement can be latent, patent, or fall into a third

category known as an intermediate ambiguity.  *See Ace Elec. Supply Co. v. Terra Nova Elec., Inc.*, 288 So. 2d 544, 547 (Fla. 1st DCA 1973).  A patent ambiguity appears on the face of the instrument, arising from defective, obscure, or insensible language.  *Id.*  A latent ambiguity arises "where language employed is clear and intelligible and suggests a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more meanings."  *Id.*; *see also Saenz v. Campos*, 967 So. 2d 1114, 1117 (Fla. 4th DCA 2007).  Florida courts have recognized that if the writing in the contract in question is susceptible of either of the divergent meanings contended for by the parties it presents a latent ambiguity.  *Ocean Reef Club, Inc. v. UOP, Inc.*, 554 F. Supp. 123, 128 (S.D. Fla. 1982) (citing *Atl. & Gulf Props., Inc. v. Palmer*, 109 So. 2d 768 (Fla. 3d DCA 1959)).

A patent ambiguity appears on the face of the instrument and arises from defective, obscure, or insensible language.  *Crown Mgm't Corp. v. Goodman*, 452 So. 2d at 52.  Extrinsic evidence is inadmissible if the ambiguity is patent, because such evidence would, in effect, allow courts to rewrite the contract for the parties by supplying information the parties themselves did not choose to include.  *Emergency Assocs., P.A. v. Sassano*, 664 So. 2d 1000, 1002 (Fla. 2d DCA 1995) (citing *Hunt v. First Nat'l Bank*, 381 So. 2d 1194, 1196 n.1 (Fla. 2d DCA 1980)).  A latent ambiguity exists where a contract fails to specify the parties' rights or duties in certain situations and extrinsic evidence is necessary to interpret possible meanings.  *Forest Hills Utils., Inc. v. Pasco Cnty.*, 536 So. 2d 1117, 1119 (Fla. 2d DCA 1988).  Where there is a latent ambiguity, extrinsic evidence is required because the instrument itself does not provide sufficient

insight into the parties' intent.  *Id.* (citing *Crown Mgm't Corp. v. Goodman*, 452 So. 2d at 49; *Morton v. Morton*, 307 So. 2d 835 (Fla. 3d DCA 1975)).

In *Ace Elec. Supply Co.*, the First District Court of Appeals determined that a written contract contained a third "intermediate ambiguity" category because the ambiguity was arguably both patent and latent.  *Ace Elec. Supply Co.*, 288 So. 2d at 547.  The court treated the intermediate ambiguity as latent, allowing extrinsic evidence. *Id.* (". . . the third category known as an intermediate ambiguity, which it is recommended in law should be treated as a latent ambiguity, permitting admission of extrinsic evidence for its resolution.").  The court further noted that where "the words all are sensible and have a settled meaning, but at the same time consistently admit of two interpretations according to the subject matter in the contemplation of the parties, constitute an intermediate class partaking of the nature both of patent and latent ambiguities, . . . in such case evidence ought to be admitted showing the circumstances under which the contract was made and the subject matter to which the parties refer." *Id.* (citing 22 C.J., Evidence § 1596).

Some Florida state courts have even suggested that characterization of an ambiguity as latent or patent may not have much influence in whether parol evidence is permitted.  *See Bajrangi v. Magnethel Enters., Inc.*, 589 So. 2d 416, 419 n.5 (Fla. 5th DCA 1991) ("The distinction between latent and patent ambiguities in relation to parol evidence appears to be disappearing."); *Crown Mgm't Corp. v. Goodman*, 452 So. 2d at 49, 51-52 ("the growing and better reasoned trend of authority indicates that the introduction of parol evidence to probe the true intent of the parties is proper, irrespective of any technical classification of the type of ambiguity present").  As

discussed in § II.G *infra*, I find that the last sentence of Article 3.1 contains a latent ambiguity or, at a minimum, an intermediate ambiguity, allowing for parol evidence.

### 5. Breach of contract

Both Plaintiffs and Rad Source contend that the other party has materially breached the License Agreement.  See **[ECF Nos. 286, 290]**.  To prevail on a breach of contract claim, a claimant must prove:  (1) the existence of an enforceable contract; (2) a material breach of that contract; and (3) damages resulting directly from the material breach.  *Knowles v. C.I.T. Corp.*, 346 So. 2d 1042, 1043 (Fla. 1st DCA 1977); *Rollins, Inc. v. Butland*, 951 So. 2d 860, 876 (Fla. 2d DCA 2006).  To constitute a material breach, a party's "nonperformance of a contract must be such as to go to the essence of the contract; it must be the type of breach that would discharge the injured party from further contractual duty on his part but a [party's] failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach."  *Atlanta Jet v. Liberty Aircraft Servs., LLC*, 866 So. 2d 148, 150 (Fla. 1st DCA 2004) (citing *Beefy Trail, Inc. v. Beefy King Int'l., Inc.*, 267 So. 2d 853, 857 (Fla. 4th DCA 1972)).

 "Florida contract law recognizes the implied covenant of good faith and fair dealing in every contract."  *Ins. Concepts and Design, Inc. v. Healthplan Servs., Inc.*, 785 So. 2d 1232, 1234 (Fla. 4th DCA 2001).  "This covenant is intended to protect the 'reasonable expectations of the contracting parties in light of their express agreement.'"  *Id.* (citations omitted).  The implied covenant of good faith, however, shall "not be invoked to override the express terms of the agreement between the parties."  *Id.* (citations omitted).

The parties' breach of contract claims are as follows:  Plaintiffs contend that Rad Source breached the following Articles of the License Agreement by taking the following actions:  (1) Article 3.1: developing, promoting, marketing, and selling the RS 3400, which allegedly embodies, in whole or in part, the '255 Patent; (2) Article 3.8: failing to engage in negotiations with MDS for the right to acquire from Rad Source, by license or otherwise, the right to use the long tube technology developed by Rad Source; (3) Article 5.3: developing, designing, manufacturing, promoting, marketing and offering to sell or lease the forthcoming RS 3400 device during a 7-year non-compete period that was to end on September 26, 2010;[23] (4) Article 3.7: failing to maintain the '255 Patent in good standing.

On the other hand, Rad Source argues that Plaintiffs breached the following Articles of the License Agreement by taking the following actions:  (1) Article 8.1: providing Rad Source's Confidential Information, as defined in Article 8.1 of the License Agreement, to Best Medical and Best Theratronics without informing Rad Source or obtaining its consent; and (2) Article 13.9: assigning the License Agreement to Best Medical and Best Theratronics by way of the Asset Purchase Agreement and Sublicense Agreement, without obtaining Rad Source's express written consent.

Prior to discussing whether the parties can prevail on their respective claims regarding breaches of the License Agreement, I first interpret the written agreement to determine whether the parties have breached certain provisions.  In doing so, I also note that only material breaches of the License Agreement are significant insofar as

---

[23] On October 22, 2009 I entered a preliminary injunction against Rad Source as to this claim **[ECF No. 37]**.  The non-compete provision in Article 5.3 expired on its own terms on September 26, 2010.  *See* **[ECF No. 48]**.

proving damages and acting upon the parties' claims for termination of the License Agreement based on alleged breaches.

In analyzing the parties' rights and obligations under the License Agreement, I must give every provision in the License Agreement meaning and effect and reconcile any apparent inconsistencies, if possible.  *See Royal Am. Rlty., Inc.*, 215 So. 2d at 338; *Transp. Rental Sys., Inc.*, 129 So. 2d at 456.  I have looked to other provisions of the License Agreement and its general scope because where one interpretation would lead to an absurd conclusion, such interpretation must be abandoned and an interpretation should be adopted which will be more consistent with reason and probability.  *See Jacobs v. Parodi*, 39 So. 833, 837 (Fla. 1905).  Finally, where the language of the License Agreement is ambiguous or unclear as to Article 3.1, I have considered extrinsic evidence for the purpose of determining the intent of MDS and Rad Source at the time of the formation of the License Agreement.  *See Gulf Cities Gas Corp. v. Tangelo Park Serv. Co.*, 253 So. 2d at 748.  Where such extrinsic evidence involved Articles 3.8 and 5.3, I have considered it only in relation to Article 3.1.

## F.    Relationship between grant of license (Article 3.1), non-compete (Article 5.3), and right of first negotiation (Article 3.8)

Before I begin my analysis of each key provision of the License Agreement, it is helpful to set forth a brief overview of how Articles 3.1, 5.3, and 3.8 interrelate.  Reading the Articles of the License Agreement *in pari materia*, as I must pursuant to Florida law (*see supra* § II.E.2), the following interpretations of the License Agreement apply. Under the non-compete provision (Article 5.3), Rad Source agreed to not design, promote, manufacture, or sell any device that would compete with the blood irradiation business of Nordion in any way for a period of seven years.  After seven years, Rad

Source could compete in the blood irradiation business but—under the Grant of License (Article 3.1)—Rad Source did not have the right to develop, manufacture, distribute, promote, market, or sell any blood irradiator that embodied, in whole or in part, the Patents.  Rad Source had granted the exclusive license to those Patents to Nordion until the year 2022 when the last patent expired.  After seven years, Rad Source could develop, manufacture, distribute, promote, market and sell a blood irradiator that did not embody, in whole or in part, the Patents.  However, where the Patents were not implicated, Rad Source had an obligation (under Article 3.8) to provide Nordion with the right of first negotiation to acquire that irradiation application technology.  I now turn to the meaning of "embodies in whole or in part the Patents" by reviewing Article 3.1.

## G.    Latent ambiguity in License Agreement

I ruled and concluded that the phrase "embodies in whole or in part the Patents" constitutes a latent ambiguity that requires resolution through extrinsic parol evidence. Alternatively, even if it is not a latent ambiguity, the phrase falls within the third "intermediate ambiguity" category which is treated as a latent ambiguity.  I discuss how "embodies in whole or in part the Patents" is alternatively an intermediate ambiguity infra § II.H.

In Article 3.1, the phrase "embodies in whole or in part, the Patents" presents a latent ambiguity which requires introduction of extrinsic evidence of the parties' negotiations.  First, the single meaning suggested by the language is that "Patents" refers to the "Patents" defined in Article 1.8 of the License Agreement as "U.S. Patent Nos. 6,389,099 and 6,212,255 and United States patent pending application No.

56

101244-209 (including divisional applications thereof), including such patents as are filed in the Territory."

However, the parties' dealings with respect to the long tube technology constitute extrinsic evidence raising a need for interpretation among additional meanings—the second prong of a latent ambiguity analysis.  Due to the extrinsic evidence of the potential and forthcoming long tube technology, an issue is raised as to whether the phrase "embodies in whole or in part the Patents" encompasses the RS 3400 in addition to the RS 3000.  When the parties entered into the License Agreement, the long tube technology had not been fully developed by Rad Source and was intended to be a point of return for future negotiations.  The extraneous evidence demonstrates that the parties discussed the long tube technology independent of the Patents and System relating to the RS 3000.  Though the parties had discussed the Patents as they related to the System, they also knew that the long tube technology was in development so the parties reserved—through Article 5.3—a right to negotiate later once the long tube technology was ready for the market.

Article 3.1 of the License Agreement, titled the "Grant of License," contains three sentences.  The first sentence on its face gives the Licensee (MDS) the Exclusive Right to use the Licensed Technology for the System and modifications made by MDS.  The License Agreement defines Licensed Technology as "the Patent(s), and Technical Information as set out in Schedule A.  The Patents are defined as United States Patent Nos. 6,212,255 (the '255 Patent), 6,614,876 (the '876 Patent), 6,389,099 (the '099

patent) obtained by Randol Kirk, as the inventor, and Rad Source, as the assignee.[24] The License Agreement specifically defines the System as "the Rad Source RS 3000 x-ray blood irradiation system, including modifications thereto, exploited and/or marketed by Rad Source as [of] the closing date."

The second sentence of Article 3.1 refers to Rad Source's retention of all rights other than those necessary for making, using, and selling the System.  Article 3.1 goes on to define allegedly "for the avoidance of doubt" Rad Source's "retained right to use the Licensed Technology" as something which "shall not include  . . . a medical device for blood or blood product irradiation, which is used or useable to reduce the risk of Graft Versus Host Disease or other blood borne pathogen, and which *embodies, in whole or in part, the Patents*."   (emphasis added)

If the final sentence of Article 3.1 ended with at ". . . Rad Source's retained right to use the Licensed Technology . . . shall not, . . . include the right, directly or indirectly, to develop, manufacture or to have manufactured, distribute, promote, market, sell or lease a medical device for blood or blood product irradiation, which is used or useable to reduce the risk of Graft Versus Host Disease or other blood borne pathogen," there would be no ambiguity.

> For the avoidance of doubt, Rad Source's retained right to use the Licensed Technology (as set out in the preceding sentence) shall not, during the term of the license, in the Territory, include the right, directly or indirectly, to develop, manufacture or to have manufactured, distribute, promote, market, sell or lease a medical device for blood or blood product irradiation, which is used or useable to reduce the risk of Graft Versus Host Disease or other blood borne pathogen, and which embodies, in whole or in part, the Patents.

---

[24] The License Agreement actually refers to two patents and one United States Patent Application, and does so with an incorrect application.  The parties agree that this application was meant to be the United States Application that matured into United States Patent No. 6,614,876.

However, because the License Agreement contains the phrase "and which embodies, in whole or in part, the Patents," this portion of Article 3.1 contains a latent ambiguity for the reasons described *supra*, and it is necessary to consider the parol evidence surrounding the formation of the License Agreement in order to determine the parties' respective rights and obligations pursuant to the agreement.  Instead of limiting doubt, the third sentence of Article 3.1 actually functioned to create additional doubt in the form of a latent ambiguity regarding the conveyance to MDS and what specifically Rad Source had granted to MDS.

## H.    Intermediate ambiguity in License Agreement

Even if Article 3.1 does not present a latent ambiguity in the License Agreement, it would fall into the third intermediate category requiring that I treat the intermediate ambiguity as a latent ambiguity and admit parol evidence.  As explained *supra* § II.E.4, the court in *Ace Elec. Supply Co.* determined that an ambiguity in a written contract was an intermediate ambiguity where it was arguably both patent and latent, therefore requiring admission of parol evidence.  288 So. 2d at 547.

The two interpretations in this instance are whether the phrase "embodies in whole or in part the Patents" includes both the RS 3000 and the RS 3400 (as Plaintiffs claim), or whether the phrase is limited to solely the RS 3000 (as Rad Source argues). Pursuant to the description of intermediate ambiguity set forth in *Ace Elec. Supply Co.*, Article 3.1 has "sensible words with a settled meaning," *i.e.*, "embodies in whole or in part the Patents."  However, the interpretations of such language can either mean the Patents subject to the System as set forth in Schedule A to the License Agreement, or alternatively—as Plaintiffs suggest—Patents as manifested in both the System

(RS 3000) <u>in addition to the RS 3400</u>.  Thus, even if Article 3.1 does not contain a latent ambiguity, at a minimum, there is an intermediate ambiguity with two possible interpretations which requires consideration of parol evidence.

**I.      Integration or merger clause**

Article 13.7 of the License Agreement states: "[t]his Agreement constitutes the entire agreement of the parties hereto with respect to the subject matter hereof and supersedes all prior agreements and undertakings, both written and oral, with respect to the subject matter hereof."   This is known as an integration or merger clause. Notwithstanding this clause in Article 13.7, it is still permissible to admit parol evidence where there is a latent ambiguity.  *See Johnson Enters. of Jacksonville v. Fpl Group*, 162 F.3d 1290, 1309 (11th Cir. 1998) ("There are, however, several exceptions to the parol evidence rule that permit the introduction of evidence of prior oral agreements even though the final written contract was intended to be integrated.").  In *Johnson Enters.*, the Eleventh Circuit noted two exceptions where parol evidence could be admitted notwithstanding the fact that the written agreement contained an integration or merger clause purporting to represent the parties' entire agreement.  *Id.*  Specifically, the Eleventh Circuit, in reviewing Florida law, stated that <u>even where an agreement contains an integration clause</u>, "parol evidence may be admitted (1) to show that the oral agreement induced the signing of the written contract, or (2) to <u>explain a latent ambiguity in the written contact</u>."  *Id.* (emphasis added).

Accordingly, because I determine that there is a latent ambiguity in Article 3.1, I am not precluded from considering parol evidence due to the merger clause in Article 13.7.  *See also Taminco NV v. Gulf Power Co.*, 2008 U.S. Dist. LEXIS 88469 (N.D. Fla.

Oct. 21, 2008) ("The Agreement contains a merger and integration clause. In addition, the language of the Agreement is clearly written and unambiguous. Under Florida law, when contract terms are clear and unambiguous, court must give effect to plain meaning of such terms.) (citing *Nat'l R.R. Passenger Corp. (Amtrak) v. Rountree Transp. and Rigging, Inc.*, 422 F.3d 1275, 1284 (11th Cir. 2005) and interpreting Florida law).  Thus, I make clear that notwithstanding the merger clause in Article 13.7, I can— and must—consider extrinsic parol evidence in order to clarify the latent ambiguity arising in Article 3.1.

**J.     Article 3.1 – Grant of License**

I first analyze the key provision in the License Agreement, Article 3.1, to determine whether the parties are entitled to declaratory relief with respect to whether the RS 3400 embodies in whole or in part the Patents.  Article 3.1, and specifically the language "embodies in whole or in part, the Patents" in the final sentence of Article 3.1, is the critical language in this case.  Through Article 3.1, Rad Source granted an exclusive, worldwide right and license to "Use" the "Licensed Technology" for the RS 3000 System.  According to Article 1.6 of the License Agreement, the "Licensed Technology" was defined to include "the Patent(s), and Technical Information as set out in Schedule A."  Schedule A of the License Agreement is titled "Licensed Technology" and includes not only the Patents, but also the drawings, specifications, manuals, and procedures for the RS 3000.  Pursuant to Article 1.12 of the License Agreement, Nordion's exclusive right to "Use" the Licensed Technology included "the right to enjoy, copy, commercialize and exploit as well as manufacture . . .  all devices embodied in the Licensed Technology and the System[.]"  Thus, the "Patents" referred to in "embodies in

whole or in part, the Patents" pertains to the Patents at issue in the System.

Although Plaintiffs argue that the grant of license is clear, I agree with Rad Source that the third sentence is ambiguous as to what the phrase "embodies in whole or in part the Patents" actually includes. As described *supra*, because of this latent ambiguity, it is not only permissible, but necessary, to admit and consider parol evidence of the parties' intent in negotiating the License Agreement. This extrinsic evidence may include the circumstances surrounding the parties of the objective of the agreement, any declarations of intent by the parties prior to or contemporaneous with the execution of the agreement, and evidence regarding the parties' interpretation of their actions and dealings. *See* 288 So. 2d at 547. In Phase I of the trial, the parties presented significant evidence regarding Nordion and Rad Source's course of negotiations leading up to the executed License Agreement, which I now consider in interpreting Article 3.1.

### 1.    Parol evidence of parties' intent as to Article 3.1

During Phase I of the trial, the parties presented evidence and testimony regarding their formation of the License Agreement to demonstrate the parties' intent in negotiating and executing the agreement. As discussed in greater detail *infra*, I determine that based on the greater weight of the more credible evidence at trial, a reading of Article 3.1 as Rad Source suggests, *i.e.*, that "embodies in whole or in part the Patents" in Article 3.1 does not refer to the RS 3400, is aligned with the parties' true intentions.

The parties negotiated the License Agreement over the course of approximately 16 months. Though Mr. Gotfrit was the primary <u>drafter</u> of the License Agreement on

behalf of Nordion, he was not significantly involved as a <u>negotiator</u> of the terms of the agreement.  It is clear that Mr. Gotfrit was not a patent attorney and did not even have an understanding of the phrase "embodies in whole or in part the Patents" when he drafted and used such language in Article 3.1.  I determine that although Mr. Gotfrit acted as counsel for Nordion, it is obvious that he was not sufficiently well-versed in patent or technical matters such that he could draft the License Agreement so that it would stand for what Plaintiffs now claim the License Agreement represents.  Though he claimed to be one of the principals who dealt with the business-side matters of the negotiations, Mr. Gotfrit's statement is not supported by the record.

Furthermore, during negotiations, Mr. Gotfrit was primarily dealing and going back and forth in correspondence with Mr. Hartman of Rad Source, a non-lawyer. Mr. Hartman clearly did not understand the full legal implications of the language of the License Agreement and Rad Source only retained counsel—who was unfamiliar with the background negotiations—at the last minute before the parties signed the License Agreement and close the deal.  Mr. Hartman was clearly inexperienced to the extent that he did not understand the legal aspects of what he was dealing with, putting Mr. Hartman at a clear disadvantage against Mr. Gotfrit.  Mr. Hartman relied on personal relationships with the two key Nordion representatives, Mr. Ashfield and Craig Hunter, to negotiate the terms of the License Agreement.  To some extent, Nordion took advantage of Rad Source's situation, but I expressly find that there was no bad faith on the part of Nordion in doing so.  In any event, the evidence at trial demonstrated that on behalf of Nordion, Mr. Gotfrit drafted the agreement, but did not fully participate in negotiations and on behalf of Rad Source, Mr. Hartman—a non-lawyer—negotiated

based on personal relationships without a full understanding of the legal implications of the language in Article 3.1.

"The credibility of a witness is in the province of the factfinder[.]"  *United States v. Copeland*, 20 F.3d 412, 413 (11th Cir. 1994) (citing *United States v. Billue*, 994 F.2d 1562, 1563 (11th Cir. 1993)); *see also McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1240, n.7 (11th Cir. 2003) ("Issues of credibility and the weight afforded to certain evidence are determinations appropriately made by a finder of fact").  Regarding Mr. Gotfrit's testimony, I do not accord his testimony much weight because of the fact that he remains employed by Nordion.  I do not find Mr. Gotfrit's testimony entirely forthcoming and it is clear that Mr. Gotfrit has a need to protect his own self-interests since he is still Nordion's in-house counsel.  Despite his testimony to the contrary, Mr. Gotfrit's primary role was that of an in-house attorney, not a principal.  I accord limited credibility to Mr. Gotfrit's testimony because of MDS' interests in protecting itself in a potential suit by the Best Plaintiffs in the event the sublicense transfer would be considered void pursuant to the License Agreement, *i.e.,* Best would file suit against Nordion because the Best Plaintiffs did not receive what they bargained for and spent $15 million to achieve.  Mr. Gotfrit had significant incentive to protect MDS and seek full protection for the Best Plaintiffs against future long tube technology competition under criticism for not properly drafting the License Agreement to effectuate the intent of Nordion—and eventually Best, through the sublicense.

The primary negotiator for Nordion was Mr. Ashfield, who worked for MDS for approximately 26 years and executed and negotiated the License Agreement on behalf of Nordion with Mr. Hunter.  4/23/11 Tr. at 95:24-96:2; 96:19-21; 98:21-23; 98:24-99:7.

Indeed, Mr. Ashfield testified that he himself "was definitely the front person" with respect to negotiating the License Agreement.  4/23/11 Tr. at 99:16-17.  According to Mr. Ashfield, the purpose of the License Agreement was "[t]o license the RS 3000."  4/23/11 Tr. at 100:6-7.  In a draft license agreement dated June 9, 2003, the term in the third sentence of Article 3.1 was changed from "embodies in whole or in part the licensed technology" to "embodies in whole or in part the patents" in the final version of the License Agreement.  4/5/11 Tr. at 90:18 21; P.E. 106.

In sum, the greater weight of the more credible evidence supports the conclusion that the parties envisioned a long-term relationship, as the last of the Patents was to expire in 2022.   Further, it was apparent at the time of negotiating the License Agreement that the long tube technology was not yet ready for licensing, but Rad Source could develop the technology and when ready, the parties would later revisit this issue to determine whether Nordion would acquire the long tube technology from Rad Source.  As just one example, Mr. Hunter sent correspondence to Rad Source noting that "While we [Nordion] believe that there is a good potential for this product [referring to the long tube technology], it will take some time for us to properly evaluate this and for you to move the product further towards commercialization."   4/11/11 Tr. at 221:8-23; D.E. A.  This correspondence further stated:

> We believe that it is important to try to reach agreement on a final deal as soon as possible and to not to add what could be several months to our discussions by including the new unit in our negotiations. In addition to new applications, we can certainly see a future situation where we would want to incorporate the new tube into a redesigned blood irradiator under some agreement that is financially attractive to both parties.

> 4/11/11 Tr. at 222:1-10; D.E. A.

Mr. Hartman also testified that it was his understanding that MDS did not want to license the long tube at that time in 2003.  4/11/11 Tr. at 222:11-14.  I find Messrs. Ashfield, Hartman, and Hunter's testimony and correspondence to be compelling and credible on this key point.

Given that the license grant in Article 3.1 was limited to the RS 3000 System, and that the compensation and other substantive provisions in the License Agreement were limited and in context to that RS 3000 System, I conclude that the parties intended through the third sentence of Article 3.1 only to clarify that Rad Source was prohibited from developing and marketing a blood irradiation device that infringed upon the license granted to MDS, *i.e.*, a blood irradiation device that was a knock-off of the RS 3000. Testimony from representatives of both Rad Source and MDS confirms that this was the parties' intent behind the third sentence of Article 3.1.  This conclusion is also consistent with the fact that the third sentence was meant only to clarify Rad Source's retained rights under the second sentence, which allowed Rad Source to use the Licensed Technology (including the Patents) for all purposes other than the RS 3000.  Hence, the third sentence of Article 3.1 could not have and was not intended to create any additional obligation upon Rad Source separate and distinct from that set forth in the first two sentences of that provision.  Under this interpretation of the third sentence of Article 3.1, I determine that Plaintiffs have failed to prove that Rad Source breached Article 3.1 of the License Agreement because the proposed RS 3400 device is not the System, nor is it a knock-off of the System.

The parties' negotiations regarding the Patents meant the embodiments of the Patents which included the System that could later be modified pursuant to the terms of

the License Agreement.  Based on this background, it is clear that the parol evidence has shown that the parties intended the license to include the RS 3000 System and modifications made by MDS, as well as Rad Source's agreement to not make "knock offs" of the RS 3000.  As discussed further *infra* § II.J.2, the RS 3400 is not a "knock off" of the RS 3000 and consequently, cannot be considered to be part of the License Agreement subject to Article 3.1.  Even assuming *arguendo* that the phrase "embodies, in whole or in part, the Patents" was intended to mean that Rad Source was prohibited from developing a blood irradiation device that infringed on at least one claim of one patent subject to the License Agreement, the evidence and expert testimony in this case demonstrates, as discussed *infra* § II.P, that Rad Source's proposed RS 3400 does not infringe any claim of any of the patents subject to the License Agreement.  Hence, Plaintiffs have not demonstrated that Rad Source breached Article 3.1 of the License Agreement under this argument either.

### 2.    "Knock-off" of licensed System

A portion of the extrinsic parol evidence that arose during trial dealt with the concept of precluding Rad Source from developing a "knock-off" of the RS 3000 System that would compete with the RS 3000.  This was a critical part of the negotiations as it was one of the key issues that the parties discussed.  Testimony from the individuals that negotiated and signed the License Agreement from both MDS and Rad Source confirms that the third sentence was intended to prohibit Rad Source from developing a knock-off of the licensed system.  The parties agreed that one purpose of the third sentence of Article 3.1 was to preclude Rad Source from using the intellectual property to create a "knockoff" of the System which would compete with the RS 3000.  *See e.g.*,

4/7/11 Tr. at 53:16-22; 4/21/11 Tr. at 21:7-11; 4/11/11 Tr. at 218:3-8; 220:8-10; 4/12/11 Tr. at 76:7-16; 79:19-23; 180:25-181:2.  The "knock off" term came from Nordion during negotiations and discussions and first originated in discussions regarding Article 3.1 from Nordion's representative, Craig Hunter.  4/11/11 Tr. at 218:5-8; 223:11-19.  Rad Source shared the same understanding of the third sentence of Article 3.1 in that it was designed to prevent Rad Source from creating a knock-off of the RS 3000.  4/11/11 Tr. at 223:20-24; 4/12/11 Tr. at 91:13-21.

Based upon drafts of the License Agreement, the language referring to the System or "substantially similar to the System" referred to a "knock-off," which was incorporated into the final version of Article 3.1.  4/12/11 Tr. at 92:17-22.  I find this especially significant in light of established Florida law that any ambiguity in a contract must be construed against the drafting party.  *See Johnson*, 760 So. 2d at 84; *Syverson*, 10 So. 3d at 1125.  "[A] provision in a contract is construed most strongly against its drafter."  *Sol Walker & Co. v. Seaboard Coast Line R. Co.*, 362 So. 2d 45, 49 (Fla. 2d DCA 1978).  In correspondence dated March 24, 2003 from Craig Hunter to Mr. Kirk, there were discussions regarding the third sentence in Article 3.1, wherein Mr. Hunter stated:  "The purpose of this section was to prevent Rad Source from selling a knock-off of the RS 3000 no matter what the target market. It still recognizes that your research irradiator and new tube will be excluded by the definition of the System in Section 1.9."  D.E. 1; *see also* 4/23/11 Tr. at 222:20-223:1.  This correspondence from Nordion indicated that the purpose of this section was to prevent Rad Source from selling a knock-off of the RS 3000.  4/12/11 Tr. at 95:12-16.  The section referred to in the correspondence was a non-compete provision in a draft of the parties' agreement.

4/12/11 Tr. at 95:17-20.   In response to this correspondence, Mr. Hartman sent an

e-mail to Mr. Hunter on March 27, 2003 noting that "[o]f course, our intention is not to

sell directly or indirectly any equipment which competes for blood irradiation or is a

knock-off."  P.E. 104; 4/12/11 Tr. at 99:8-11.

### 3.    Article 3.1 remains valid as to the RS 3000

Article 3.1, and specifically the third sentence, concerns whether Rad Source's

RS 3400 embodied in whole or in part the patents.  Because I determine that the

License Agreement remains in effect as to the RS 3000, with the exception of the

non-compete provision in Article 5.3 which expired by its own terms on September 26,

2010, it is axiomatic that Plaintiffs have the full rights to the RS 3000.  However, as I

discuss in the next section, the RS 3400 is not subject to the License Agreement and

Rad Source has the rights to design, develop, market, and sell the RS 3400 given that it

already provided Plaintiffs with the right of first negotiation pursuant to my Preliminary

Order.

Based on the evidence presented at trial, one thing is clear—no one from

Nordion or Rad Source truly understood the meaning of the phrase "embodied in whole

or in part the patents."   No party envisioned Claim 6 of the '255 Patent in their

discussions and negotiations leading up to the executed License Agreement.   The

parties did not present any testimony or exhibits throughout negotiations of the License

Agreement that detailed the Patents, particularly the '255 Patent or Claim 6.   *See*

4/13/11 Tr. at 33:5-12.  Even Mr. Gotfrit, the drafter of Article 3.1 and in-house counsel

for Nordion at the time, did not even know the meaning of the phrase.  Because of the

latent ambiguity of this phrase and considering evidence of the parties' intent and

negotiations presented at trial, I determine that the intent "embodied in whole or in part" signified that the parties were referring to the patents for the System.  In other words, the meaning of the final sentence of Article 3.1 was that the patents were incorporated as to define the System as it existed on the closing date of the License Agreement.  *See O.N. Jonas Co. v. Badische Corp.*, 706 F.2d 1161, 1165 (11th Cir. 1983) (per curiam) ("an unforeseen and unrealized future contingency at the time of contracting can be resolved by reasonable contracting parties when the contingency occurs without nullifying the contract.").

### 4.      The RS 3400 is not subject to Article 3.1

MDS contends that Rad Source breached Article 3.1 by developing, promoting, marketing, and selling the RS 3400, which MDS argues embodies, in whole or in part, Claim 6 of the '255 Patent, one of the patents subject to the License Agreement.  The grant of license in Article 3.1 stated that Rad Source retained a right to use the Licensed Technology to develop, manufacture, promote, market, and sell products other than the System.  While the third sentence of Article 3.1 is clear that Rad Source's retained right did not include the right to develop a blood irradiator which embodies in whole or in part the Patents, I determine that the allegedly infringing device, RS 3400, does <u>not</u> embody in whole or in part the Patents.  *See infra* § II.P.

Applying Article 3.1 to the RS 3400 as Plaintiffs urge would constitute a <u>restrictive covenant which would be void and unenforceable under Fla. Stat. §§ 542.335 and 542.18</u>.  In essence, Plaintiffs claim that Rad Source would be precluded from developing, manufacturing, marketing, and selling the RS 3400 for the duration of the License Agreement, or until 2022.  This plainly contradicts the parties' intent to revisit

the long tube technology subsequent to entering into the License Agreement in 2003. Furthermore, the 19 year duration (from entry of the License Agreement in 2003 until expiration of the License Agreement in 2022) of this restrictive covenant is, on its face, presumptively unenforceable.   *See* Fla. Stat. § 542.335; *see also Wilkinson v. Manpower, Inc.*, 531 F.2d 712, 716 (5th Cir. 1976) (construing a restrictive covenant of 20 years duration as unreasonable and repugnant to Florida's public policy).

To read into the License Agreement a requirement that Rad Source refrain from developing and selling the RS 3400 for a period of 19 years (from entry of the License Agreement in 2003 until expiration of the License Agreement in 2022), coupled with the fact that the "Territory" was defined as worldwide, would result in an unenforceable restrictive covenant.   A contract cannot be construed to create an illegal result.   *See e.g.*, *Sugar Cane Growers Coop., Inc. v. Pinnock*, 735 So. 2d 530, 538 (Fla. 4th DCA 1999) (declining to interpret a clause in a written contract as one which "would permit the illegal employment of foreign workers beyond the period of employment in the clearance order for domestic workers.").

If Article 3.1 was as broad as Plaintiff claims, there would be no need for the non-compete provision in Article 5.3.  For the reasons discussed *infra*, I determine that the RS 3400 does not fall within Article 3.1 of the License Agreement, irrespective of whether I view this issue with respect to a "knock-off" analysis, considering claims embodied by the licensed System, conducting a literal infringement analysis of Claim 6 of the '255 Patent, or whether I employ a doctrine of equivalents analysis.  *See infra* § II.P.5.  I find that Rad Source did <u>not</u> violate the exclusive license provision of the License Agreement by developing, promoting, marketing, and offering for sale the

RS 3400.  For this reason, Plaintiffs are not entitled to a permanent injunction against Rad Source because Rad Source did not violate the terms of Article 3.1 by developing the RS 3400 which does not embody, in whole or in part, the Patents subject to the License Agreement.  I now turn to the issue of assignment and sublicense.

## K.    Assignment and sublicense

The Sublicense Agreement substantively transferred all rights held by MDS in the technology licensed under the License Agreement to Best Medical and Best Theratronics.  Indeed, it was originally MDS' intent to completely assign and transfer any interest that MDS had in the License Agreement to Best prior to Rad Source's withheld consent.  The provisions of the Sublicense Agreement reveal that MDS attempted to divest itself of all rights and obligations under the License Agreement and, as a practical matter, transfer those rights and obligations to Best Medical and Best Theratronics.

I also determine that MDS breached the License Agreement first by the purported Sublicense Agreement, which was in effect an assignment of Nordion's rights under the License Agreement to Best without express written consent and by providing Best with confidential information without express written consent as required by Article 8.1.  Rad Source's confidential information, which MDS possessed, was valuable property of Rad Source and MDS had an obligation to maintain the confidentiality of that information.  Although MDS agreed not to disclose that information, MDS, in fact, disclosed that information to Best Medical in 2006-07 in connection with the divesture of MDS' blood irradiation business, without notifying Rad Source or obtaining its permission.  However, because Rad Source failed to contest the sublicense or the use

of the confidential information by Best, it has waived, or is otherwise estopped from exercising, any claims that MDS' breach of the License Agreement renders the agreement ineffective.

## 1.   Rad Source reasonably withheld consent to proposed assignment

In order for MDS to establish that Rad Source unreasonably withheld consent to the proposed assignment between MDS and Best, there "must be competent, substantial evidence of circumstances" that establishes Rad Source's refusal as unreasonable. *Popovic v. Fl. Mech. Contractors, Inc.*, 358 So. 2d 880, 885 (Fla. 2d DCA 1978). "The standard to be applied to determine whether consent was unreasonably withheld is that of the reasonably prudent man and that consent is not to be arbitrarily withheld." *Sun. First Nat'l Bank of Orlando v. Grinnell*, 416 So. 2d 829, 834 (Fla. 5th DCA 1982). "Some courts have said that the term 'unreasonable' conveys the same idea as irrational, foolish, unwise, absurd, silly, preposterous, senseless, and stupid. Another court has said that the determination of what is 'unreasonable' is one where, under the evidence presented, there is no room for difference of opinion among reasonable minds." *Id.* (citation omitted). It is Plaintiffs' burden to prove that Rad Source's refusal to consent to MDS' assignment to Best was unreasonable. *First Nationwide Bank v. Fl. Software Servs., Inc.,* 770 F. Supp. 1537, 1542 (M.D. Fla. 1991); *Fernandez v. Vazquez*, 397 So. 2d 1171, 1174-75 (Fla. 3d DCA 1981).

I determine that Plaintiffs have not met their burden to demonstrate that Rad Source unreasonably withheld consent to an assignment of the License Agreement from Nordion to the Best Plaintiffs. Aside from the issue of compensation, Rad Source had—or at least believed it had—a continuing relationship and License Agreement with

Nordion wherein it would eventually execute the right of first negotiation with respect to the proposed RS 3400.  This represented a significant right reserved by Rad Source during negotiations for the License Agreement.  Rad Source's interest at stake was to protect the right of first negotiation because it looked to Nordion to purchase the long tube technology when Rad Source had completed developing it.

However, at the last minute after the deal between Nordion and the Best Plaintiffs was nearly executed, Nordion sought Rad Source's consent to the assignment. Nordion pursued this consent despite Rad Source's lack of understanding of whether Best could meet the parties' intentions with respect to the right of first negotiation.  This represented bad faith on the part of Nordion.  Nordion proffered a charade of expressing interest in Rad Source's long tube technology when in fact Nordion was preparing to sell the company and failed to disclose this until it was nearly a "done deal" with Best. Essentially, Rad Source wanted to protect its interest in selling the new long tube technology to MDS, but all the while, MDS was in the process of negotiating with Best without Rad Source's knowledge.

In light of this background, I determine that it was not unreasonable for Rad Source to take the position that it would not blindly consent to the proposed assignment. This is especially true given that there was a whole new management team at Nordion. *See* 4/5/11 Tr. at 151:24-152:3.  Rad Source sought basic background regarding Best and I find that it was unreasonable for Nordion to represent that this was confidential information that could not be provided to Rad Source.  In a nutshell, Rad Source was blindsided because Nordion was already in negotiations to sell to Best, destroying Rad

Source's reasonable expectations of serious negotiations regarding the long tube technology.

Rad Source and MDS had spent approximately 16 months negotiating the License Agreement and even conducted a site visit to view the long tube technology and when Rad Source was suddenly faced with a request for consent, there was little information known about the Best Plaintiffs.  Mr. Kirk testified that what he had heard of Best was not favorable, and Rad Source also possessed concerns that Best would be a potential competitor of Rad Source in the x-ray technology field.  Put in this position, Rad Source stated that it did not feel that an assignment would be in its best economic or business interests.  It is undisputed that Nordion sent correspondence to Rad Source indicating that it was in the process of closing a deal with Best wherein Nordion would seek to assign its rights in the License Agreement to Best.  Rad Source replied that it required additional information regarding Best.  I find this to be reasonable in light of the fact that Rad Source did not have significant knowledge regarding Best's operations, and what it had heard regarding Best was not favorable.

In sum, Plaintiffs have failed to carry their burden to demonstrate through competent and substantial evidence that Rad Source's refusal to give consent was unreasonable, *i.e.*, arbitrary or irrational.  *See Popovic*, 358 So. 2d at 885; *Grinnell*, 416 So. 2d at 834.  Therefore, I do not find that Rad Source unreasonably withheld consent by requesting additional information from Nordion regarding Best.

### 2.      2008 Sublicense Agreement

Subsequent to the January 2008 conference call between Nordion and Rad Source—wherein I heard conflicting testimony during trial on whether there was an

actual discussion of withholding consent—both parties appeared to have continued on without regard for their obligations under the License Agreement.  Based on the testimony at trial, there is no indication that either party followed up by providing or requesting further information.  Indeed, the deal between Best and Nordion eventually closed—as a Sublicense Agreement—and as Mr. Kirk acknowledged, the president of Best telephoned Mr. Kirk.  I now turn to the Sublicense Agreement.

"[A]n exclusive license may be tantamount to an assignment . . . if it conveys to the licensee all substantial rights to the patent at issue."  *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1340 (Fed. Cir. 2006).  "The initial inquiry for determining whether or not there has been a transfer by the holder of 'property consisting of all substantial rights to a patent' requires consideration of what the holder has left after the transfer.  If he retains any substantial rights to the patent, then he has not transferred the property that comprises all those rights."  *Devlin v. Ingrum*, 928 F.2d 1084, 1094 (11th Cir. 1991) (citations omitted).  In order to determine whether an agreement to transfer rights to a patent amounts to an assignment or a license, courts must review the parties' intention and examine "the substance of what was granted."  *Aspex Eyewear*, 434 F.3d at 1340 (citation omitted); *see also Flexiteek Ams., Inc. v. Plasteak, Inc.*, 626 F. Supp. 2d 1251, 1257-58 (S.D. Fla. 2009) (holding that extrinsic evidence and surrounding circumstances considered to determine whether agreement was assignment).

Rad Source argues that MDS materially breached Article 13.9 of the License Agreement by assigning the License Agreement to Best through the Asset Purchase Agreement and Sublicense Agreement without obtaining Rad Source's express written

consent.  Article 13.9 of the License Agreement provides, "[a]ny assignment in violation of the provisions of this section shall be void."  In Article 3.1 of the License Agreement, Rad Source granted MDS "an exclusive right and license (transferable, with the right to grant <u>sublicenses</u> to third parties ('Sublicensees') on such terms as are consistent with this Agreement[.]"  **[ECF No. 108, pp. 17-18]** (emphasis added).  Article 13.9 of the License Agreement prohibits any party from <u>assigning</u> its rights and obligations under the License Agreement without the other party's consent.

The parties fundamentally disagree whether MDS sublicensed or assigned its rights to the Best Plaintiffs.  MDS argues that it sublicensed its rights to Best and that Rad Source was aware of the Sublicense Agreement, never objected to it, and never asserted that the Sublicense was a breach of the License Agreement.  Rad Source's position is that the 2008 Sublicense Agreement actually constitutes an improper assignment of the License Agreement.  I agree with the aforementioned arguments of the parties.  However, I decline to grant Rad Source's declaratory relief to the extent it seeks a declaration that Rad Source is excused from further performance under the License Agreement because of MDS' breach.  For reasons discussed *infra*, I determine that Rad Source is precluded from asserting that MDS' sublicense to Best constitutes a breach due to waiver.

Further, to read the agreement as Plaintiffs claim would essentially eliminate the requirement of seeking Rad Source's reasonable consent to an assignment.  Article 8.1(d) of the License Agreement concerns confidentiality; specifically, it addresses the requirement of the parties to obtain each other's written consent in order to disclose confidential information.  Because I determine that the License Agreement is still in

effect, Rad Source still maintains a viable right in preserving such information through Article 8.1.   Nordion breached Article 8.1 by providing Rad Source's confidential information, as defined in the License Agreement, to Best without informing Rad Source or obtaining its consent in executing the Sublicense Agreement.   I find this evidence convincing to support my conclusion that Rad Source did not unreasonably consent to the proposed assignment.

Based on the evidence presented at trial, it is apparent that the parties did not intend that the sublicensing rights—in relation to the assignment clause—permit a situation where the License Agreement could be assigned by sublicense if a party reasonable withheld consent to the assignment.   Elsewise, the right of consent to assignment would effectively be written out of the License Agreement.   Irrespective of this, even if Nordion breached the assignment by sublicensing rights to the Best Plaintiffs after Rad Source reasonably withheld consent, Rad Source has waived any rights to this claim because it never took any action with respect to opposing the sublicense vis-à-vis the Asset Purchase Agreement between Nordion and the Best Plaintiffs.

### 3.    Waiver

Waiver is the voluntary and intentional relinquishment or abandonment of a known and existing right or privilege which, except for the waiver, the party would have enjoyed.   *Raymond James Fin. Servs., Inc. v. Saldukas,* 896 So. 2d 707, 711 (Fla. 2005).   Waiver requires: (1) the existence of a right that may be waived, (2) actual or constructive knowledge of the right, and (3) the intention to relinquish the right.   *Husky Rose, Inc. v. All State Ins. Co.*, 19 So. 3d 1085, 1088 (Fla. 4th DCA 2009).   Waiver can

be established through express language or implied by conduct that clearly leads a party to believe that a right has been waived.  *PNC Bank v. Branch Banking and Trust Co.*, 704 F. Supp. 2d 1229, 1239 (M.D. Fla. 2010) (applying Florida law).

Rad Source waived its claim that Nordion breached the License Agreement by improperly assigning the License Agreement or by entering into a sublicense with the Best Plaintiffs.  Rad Source was at all times fully aware that Best was manufacturing and selling the Raycell, yet never notified Nordion of any alleged material breach of the License Agreement, and failed to terminate the License Agreement in accordance with Article 12.2 of the License Agreement.

MDS maintains that it remains in the blood irradiation business by virtue of its sublicense to Best, which it executed because it had not received the requisite express written consent from Rad Source.  Rad Source points to the Securities and Exchange Commission ("SEC") filings of MDS as evidence that MDS divested its self-contained irradiator division and exited the blood irradiation business through the Asset Purchase Agreement.  I find it significant that MDS no longer continues to receives royalties from Best Theratronics; in other words, the number of Raycell units sold by Best Theratronics is irrelevant to MDS because there are no payments from Best to MDS relating to sales of the Raycells.

I disagree with Rad Source's contention that MDS breached the License Agreement which therefore excused Rad Source from further performing its obligations under the License Agreement.  In fact, I determine that the License Agreement remains operative until the expiration of the contract on its own terms, *i.e.*, until the expiration of the final patent in the year 2022.

### 4.     Estoppel

Estoppel exists when:

(1) there was a representation made by the plaintiff to the defendant;
(2) that this representation is contrary to what the plaintiff is asserting in
this lawsuit; (3) and that, by relying upon the plaintiff's representation, the
defendant took certain actions that are at issue in this lawsuit.
Additionally, a representation may take the form of words, acts, or conduct
calculated to convey a misleading impression.

*Flagship Resort Dev. Corp. v. Interval Intern., Inc.*, 28 So. 3d 915, 923 (Fla. 3d

DCA 2010) (citation omitted).  An express representation is not necessary for estoppel;

it is enough that a representation is implied, either from acts, silence, or other conduct.

*Davis v. Evans*, 132 So. 2d 476, 481 (Fla. 1st DCA 1961).

Rad Source is estopped from asserting, as a basis for termination or as an

excuse for its own breaches of contract, that Nordion breached the License Agreement

by improperly assigning or sublicensing the License Agreement to Best.  Rad Source

cannot claim that Nordion's breach excused Rad Source from performing its obligations

under the License Agreement based on Rad Source's silence and inaction after being

notified and/or becoming aware that Best was manufacturing and selling the Raycell.

**L.     Failure to maintain Patents**

Pursuant to Article 3.7 of the License Agreement, Rad Source was obligated to

prosecute and maintain the Patents in good standing and Rad Source was responsible

for paying all prosecution, processing, and maintenance fees with respect to the

Patents.  Rad Source further expressly warranted in Article 11.1(e) that the Patents

subject to the License Agreement would be maintained in good standing and all

maintenance fees would be paid by Rad Source.  Based on the evidence that Rad

Source allowed the '255 Patent to expire in April 2005, I determine that Rad Source did

breach its obligations under the License Agreement in May 2005 by failing to pay the required maintenance fees '255 Patent, which caused the patent to expire.

However, I find that the failure of Rad Source to renew the patent was an immaterial breach of the License Agreement.   Plaintiffs presented no claim that they suffered any loss as a result of the expiration of the '255 Patent, *i.e.*, a third party using the technology within the lapsed patent to create a competing device.   Further, Plaintiffs had a duty to renew the patent in the event that Rad Source did not.   Article 3.7 of the License Agreement expressly provides:

> Until termination or expiration of this Agreement, Rad Source shall be responsible for prosecuting and maintaining the Patents in good standing and shall be responsible for the payment of all prosecution, processing and maintenance fees with respect to the Patents. <u>Within thirty (30) days following each due date of such maintenance fees, Rad Source shall provide to [MDS] written notice of having paid the Patent maintenance fees. In the event it is determined that any such fees are outstanding, Rad Source shall make immediate arrangements for payment failing which [MDS] may pay such fees</u> and, in addition to any other remedies it may have, may deduct the amount of such fees, and associated costs (including reasonable attorney's fees) from any amounts owing by [MDS] pursuant to this Agreement. Rad Source shall provide [MDS] an update on the status of Patent prosecution as requested by [MDS] from time to time.

J.E. 1 (emphasis added).

As such, Article 3.7 placed a reciprocal responsibility upon Nordion to monitor and remedy the payment of the patent maintenance fees or failure thereof.   As I expressed during trial, it was incongruent that Nordion believed this issue of patent maintenance fees was important yet failed to have some sort of system to ensure that Rad Source actually paid the fees.   See generally 4/5/11 Tr. at 103 106.   I also determine that the '876 Patent provides sufficient protection for the blood irradiation technology.   Contrary to Plaintiff's expert's testimony, which I do not accord significant

weight, I find that the '876 Patent adequately and substantially covers the necessary technology at issue in the RS 3000 such that a lapse of the '255 Patent does not entitle Plaintiffs to any damages. The two other patents licensed to MDS under the License Agreement remain in good standing. MDS has also not demonstrated that the expired patent caused MDS any market harm or damage, or that prevented MDS from selling or manufacturing the Raycell device prior to selling its blood irradiation business to Best Medical. Therefore, Rad Source's breach of Articles 3.7 and 11.1(e) of the License Agreement was immaterial.

**M.     Article 5.3 – non-compete provision**

Interpretation of a written non-compete provision in a contract lies with the Court, as a matter of law. *Wilson v. S. Repair Servs.*, 795 So. 2d 1121, 1124 (Fla. 5th DCA 2001). Covenants that restrict or prohibit competition are enforceable "so long as such contracts are reasonable in time, area, and line of business." Fla. Stat. § 542.335(1). Florida courts and federal courts have found that whether a business has a legitimate business interest justifying restrictions and whether the restrictions are reasonable in time, area, and line of business are questions of fact, and not of law. *LT's Benjamin Records, Inc. v. Machete Music*, 2010 U.S. Dist. LEXIS 70487, 14-15 (S.D. Fla. June 24, 2010) (citing *Proudfoot Consulting Co. v. Gordon*, 576 F.3d 1223, 1237-38 (11th Cir. 2009); *Whitby*, 951 So. 2d at 897; *accord Am. Standard, Inc. v. Humphrey*, 2007 WL 2852362 at *3 (M.D. Fla. Oct. 2, 2007)). Once the party seeking to enforce a restrictive covenant establishes a *prima facie* case, the burden shifts to the party opposing enforcement to show that the restriction is overbroad, overlong, or otherwise not

reasonably necessary to protect the interests of the party seeking to enforce the restrictive covenant. *N. Am. Prods. Corp. v. Moore*, 196 F. Supp. 2d at 1228.

Article 5.3, the non-compete provision of the License Agreement, precluded Rad Source from engaging in any "design, promote, manufacture, sell, lease or carry on any other activities, which compete in any way with the blood irradiation business (including irradiation of blood and blood products) carried on by [MDS]" for a period of seven years in the Territory, *i.e.*, worldwide. The seven year period expired on September 26, 2010.

Plaintiffs argue that Rad Source breached the License Agreement by engaging in some of the aforementioned activities with respect to the RS 3400 prior to September 26, 2010. Plaintiffs presented no evidence that Rad Source violated Article 5.3(b) of the License Agreement by providing service or maintenance of the System to third parties, or to any product, system, or components thereof to third parties, which compete with the System. As to Article 5.3(a), Rad Source did work on the design of the RS 3400 device, in addition to promoting the device. Rad Source argues that it believed it was excused from its legal obligations under Article 5.3(a) because MDS materially breached the License Agreement. I concur with Rad Source's position and determine that Nordion did breach the License Agreement first by effectively assigning its rights in the License Agreement to Best through the Sublicense Agreement and Asset Purchase Agreement and not obtaining consent prior to transferring the confidential information.[25]

The seven-year non-compete agreement in Article 5.3 is enforceable, but expired on September 26, 2010. Because the blood irradiation market is a small, highly

---

[25] As described *infra* § II.O, Plaintiffs cannot assert a claim for damages based on Rad Source's breach of Article 5.3 due to the Best Plaintiffs' lack of standing and because MDS exited the blood irradiation industry—in addition to the fact that Article 13.1 precludes consequential damages. Irrespective of this, the issue of Rad Source's breach of Article 5.3 is moot to the extent that Article 5.3 has already expired.

specialized niche market, Nordion negotiated for this non-compete provision to preclude Rad Source from competing in the blood irradiation business to preserve the value of the Licensed Technology purchased under the License Agreement.

Reading Article 5.3 in parity with Article 3.1 pursuant to Florida law, I determine that the parties did not intend to exclude Rad Source from competing until 2022, but rather, intended to permit continued development of the Licensed Technology within the context of Article 5.3.  Thus, Rad Source was only permitted to design, but not sell or market, the long tube technology during the seven year period.  This permitted Rad Source to continue developing the long tube technology and ultimately renegotiate at a time when Rad Source was in a position to license rights to the long tube technology.

Plaintiffs have legitimate business interests in the exclusive rights to, and the profitability of, the Licensed Technology and the Raycell, including protecting the $1.73 million investment and themselves from losing customers to a competitor.  However, to read Article 3.1 as Plaintiffs desire would convert the exclusive license into a non-compete until the duration of the last patent, *i.e.*, 2022 or the expiration of the License Agreement.  Such a term would violate Florida law because a duration of that length is presumptively unreasonable given that the "Territory" is defined as worldwide.

The implication of License Agreement's language and the parties' negotiations is that after seven years, Rad Source may compete in the blood irradiation business; but, subject to Article 3.1, Rad Source may not do so as to the System, defined as the RS 3000.  Accordingly, the only logical interpretation is the phrase "embodies in whole or in part the Patents" **refers only to the Patents for the System**.  This is also made clear by Article 3.8 which provides for a right of first negotiation as to "all other

irradiation application technology developed by Rad Source," referring to Rad Source's retained right.   In sum, the non-compete aspect of Article 3.1 as to the second embodiment of the RS 3000 could not be of unlimited duration and therefore broader than a seven year non-compete provision of any blood irradiation device.

## N.    Article 3.8 – right of first negotiation

Pursuant to Article 3.8 of the License Agreement, Rad Source was required to provide to Nordion a right of first negotiation for the right to acquire from Rad Source, by license or otherwise, the right to use all other irradiation application technology developed by Rad Source.  The parties do not dispute the validity of Article 3.8, but only contest whether Rad Source breached Article 3.8 by failing to offer the right of first negotiation to Plaintiffs for the long tube technology within the RS 3400.  I find that Rad Source did breach Article 3.8 of the License Agreement because it did not offer to MDS to have the right of first negotiation for the long tube technology.  However, as detailed *infra*, that has been cured following entry of my Preliminary Order.

Despite the July 2007 visit by Nordion representatives to Rad Source's facility in Georgia and the exchange of correspondence following the visit, there was no evidence presented that referred to the meeting as relating to the right of first negotiation under the License Agreement.  While I find Ms. Vandenberg's testimony not credible, I also determine that the discussions and meetings during the visit did not satisfy Rad Source's obligation to provide Nordion with the right of first negotiation for "other irradiation application technology developed by Rad Source."

At the time of the visit, as Mr. Kirk acknowledged, Rad Source had not even started its design of the RS 3400 and it had not been approved for medical use.

Further, Rad Source had not even determined whether or not the long tube could be used for blood irradiation purposes.  Essentially, though Rad Source claims it offered the right of first negotiation to MDS for the long tube technology, I find that this cannot be the case because the long tube technology was not developed at the time.  Further, there formal efforts on the part of either Rad Source or MDS to effectuate the right of first negotiation pursuant to Article 3.8.  Thus, although Rad Source seeks a declaration that it provided this right of first negotiation to MDS and MDS rejected, and though I found that long tube technology was indeed discussed at the July 2007 visit, I determined at the conclusion of trial that the parties needed to formally execute the right of first negotiation pursuant to Article 3.8.

I determine that Rad Source discussed, but did not offer the right of first negotiation for, the long tube technology with Nordion at the July 2007 meeting. Despite Ms. Vandenberg's voluminous testimony to the contrary, I determine that there were demonstrations and discussions of the x-ray long tube technology during Nordion's July 2007 visit to Rad Source's facility in Georgia.  For example, when Ms. Daley stated "engage Rad Source in discussions relating to the x-ray platform," in e-mail to Ms. Vandenberg, I find it likely that she may have been referring to the new long tube that Rad Source had developed.  Further, in light of the testimony to the contrary, Ms. Vandenberg's repeated assertions that there were no discussions of Rad Source's long tube technology are simply not credible and I decline to give this testimony any weight in light of the extensive evidence and other testimony to the contrary.

In weighing the credibility of witnesses, I find that Ms. Vandenberg's testimony was not credible; whereas the testimony of the Rad Source witnesses—at least with

respect to the July 2007 site visit—is credible.  Further, I specifically note that Ms. Vandenberg's explanation for her subsequent correspondence via e-mails regarding further discussions with Rad Source on x-ray technology is incongruent with her claims that the purpose of the visit was solely limited to discussing issues following the National Academy of Science's assessment of isotope based and X ray based technology that was being supplied for blood irradiation in the U.S. market.   At a minimum, Rad Source discussed the long tube technology with Ms. Vandenberg and other Nordion representatives at the July 2007 meeting.  However, because I find that Rad Source had an obligation, pursuant to the Article 3.8 to offer to Plaintiffs the right of first negotiation for the RS 3400, any discussions at the July 2007 visit to Rad Source's Atlanta facility did not constitute a former right of first negotiation to Plaintiffs.

In my Preliminary Order, I indicated that pursuant to Article 3.8 of the License Agreement, Rad Source shall provide to Plaintiffs a right of first negotiation for the right to acquire from Rad Source, by license or otherwise, the right to use the RS 3400 irradiation application technology developed by Rad Source.  The parties entered into a confidentiality agreement for the purposes of effectuating the right of first negotiation and subject to the confidentiality agreement, Rad Source produced information to Plaintiffs to enable Plaintiffs to exercise the right of first negotiation regarding irradiation application technology developed for the RS 3400.  The period of 120 days referenced in Article 3.8 commenced upon the date that Rad Source produced all necessary information in accordance with the preceding sentence.

Further, I ordered the parties to participate in mediation in accordance with the terms of Article 3.8 with their corporate representatives, counsel, and representatives

with decision-making authority personally attending the mediation.  I ordered that the mediator facilitate the process of the right of first negotiation and assist the parties on negotiating all relevant terms and conditions.  On August 12, 2011, the mediator filed a Report indicating that the parties reached an impasse.  **[ECF No. 347]**.  Thus, I find that the parties have now complied with Article 3.8 as it relates to Rad Source providing MDS with the right of first negotiation to acquire from Rad Source, by license or otherwise, the right to use the irradiation application technology developed by Rad Source.

## O.   Damages

### 1.    Applicable law

Florida allows parties to limit remedies contractually.  *Amoco Oil Co. v. Gomez*, 125 F. Supp. 2d 492, 511 (S.D. Fla. 2000); *Hi Neighbor Enters., Inc. v. Burroughs Corp.*, 492 F. Supp. 823, 825-27 (N.D. Fla. 1980).  The most common form of consequential damages is lost profits.  *Hardwick Props., Inc. v. Newbern*, 711 So. 2d 35, 40 (Fla. 1st DCA 1998); *Christopher Adver. Grp., Inc. v. R&B Holding Co.*, 883 So. 2d 867, 873 (Fla. Dist. 3d DCA 2004) (recognizing lost profits as consequential damages in conversion and civil theft suit).  Lost profits may indeed be the quintessential example of consequential damages.  *Nyquist v. Randall*, 819 F.2d 1014, 1017 (11th Cir. 1987).

In my Preliminary Order, I determined that neither party was entitled to recover damages.  Upon the conclusion of Phase II of the trial, I found that Phase III regarding damages was unnecessary because based on evidence presented during Phases I and II, neither party demonstrated that it was entitled to damages from the other as a matter

of law.  I now set forth in greater detail why neither Plaintiffs nor Defendant is entitled to damages.

### 2.    Lack of standing

Plaintiffs claim they were damaged by:  (1) being deprived of the benefit of MDS' bargain pertaining to the License Agreement; (2) the costs and expenses necessary to recover the patent protection lost by virtue of the expired '255 Patent; and (3) the devaluation of MDS' interest in the License Agreement.  I find that Plaintiffs cannot recover on these claims because as described *supra*, Nordion breached the License Agreement first by sublicensing all of its rights to Best.  Best lacks standing to claim lost profits and to seek damages for lapse of the '255 Patent, and MDS is no longer in the irradiation business.  Further, by entry of the original preliminary injunction enforcing the seven-year non-compete provision, Rad Source was precluded from marketing or selling the RS 3400.  As explained *supra*, I determined that Rad Source had a right to market its RS 3400 because Nordion breached the License Agreement first by sublicensing all its rights to Best.

As a threshold matter, I determine that the Best Plaintiffs are without standing to recover any damages, including from the claimed lapse of the '255 Patent, from Rad Source that Best allegedly suffered as a result of a breach of the License Agreement. *See White v. Exch. Corp.*, 167 So. 2d 324, 326 (Fla. 3d DCA 1964) ("[i]t is elementary that a person not a party to nor in privy with a contract does not have the right to sue for its breach.").  Further, "[i]t is basic Florida contract law that when a contract is designed solely for the benefit of the contracting parties, a third party cannot enforce its provisions even though the third party may derive some incidental or consequential benefit from

the enforcement."   *K-Mart Corp. v. St. Dept. of Transp.*, 636 So. 2d 131, 133 (Fla. 2d DCA 1994).  "The exception to this rule occurs when the parties to the contract *clearly* express their intent to create a right under the contract *primarily* and *directly* benefiting a third party."  *Id.* (emphasis added).

Similarly, MDS is not entitled to damages because it is no longer in the irradiation business having divested itself of any dealings in the irradiation business.  MDS claims that Rad Source's alleged breaches caused lost sales of the Raycell device and lost sales of maintenance contracts for the Raycell.  However, MDS divested its Raycell business to Best Theratronics in early 2008, and any lost sales proven would have been suffered only by Best Theratronics, which lacks standing, and not MDS.  Hence, MDS has no evidence of any lost sales suffered by it as a result of Rad Source's alleged breaches, and it cannot recover damages.  By sublicensing its rights under the License Agreement to Best, MDS no longer had any ownership or interest in the RS 3000 System.  Hence, none of the Plaintiffs can recover any damages.

### 3.      Article 13.1 – No Consequential Damages

Even assuming *arguendo* that lost sales suffered by Best Theratronics may be considered as damages suffered by MDS, Article 13.1 of the License Agreement precludes the recovery of consequential damages by either party.  Article 13.1 of the License Agreement, titled "No Consequential Damages," provides that "[n]either party shall be liable to the other under any circumstances, for any indirect, special, consequential or incidental damages."  **[ECF No. 108, p. 33]**.  To the extent Article 13.1 is ambiguous, which I do not believe it is, I note that MDS drafted this clause and such clause was not subject to negotiation by MDS and Rad Source.  *See City of*

*Homestead*, 760 So. 2d 80; *Syverson*, 10 So. 3d 1123 (to the extent any ambiguity remains in the language of a contract, such ambiguity is to be resolved by interpreting that language against the party who drafted or provided the ambiguous language).

In addition, the testimony of Gordon Ashfield, MDS' former vice-president who negotiated and signed the License Agreement on behalf of MDS, confirms that lost profits were intended to be excluded as potential damages in the event of a breach of the agreement by either MDS or Rad Source.  Similarly, Will Hartman, Rad Source's Chief Financial Officer and Executive Vice President, who negotiated the License Agreement on behalf of Rad Source, testified that Article 13.1 was intended to exclude lost profits as potential damages in the event of a breach of the License Agreement.

## P.    Phase II – patent/technical

Despite finding based on the evidence presented during Phase I that the RS 3400 is not encompassed within the "embodies in whole or in part" language of Article 3.1, I nonetheless provide the following conclusions regarding whether the proposed RS 3400 falls within Article 3.1 under a traditional patent infringement analysis.  Both Parties submitted evidence regarding an interpretation of Article 3.1 of the License Agreement that utilized an infringement analysis of the proposed RS 3400 to the claims of the Licensed Patent.  This analysis arises from the language of "embodies, in whole or in part, the Patents" found in the third sentence of Article 3.1.

While this is not a patent infringement proceeding *per se*, patents play a central role in determining whether Rad Source is liable for developing the RS 3400 because of how the parties defined the scope of the License Agreement.  Though my order granting preliminary injunction found that the RS 3000 and RS 3400 were substantially similar,

this order was based on limited evidence available at the time of the preliminary injunction hearing in 2009, *i.e.*, the 510(k) submission which was used for purposes of seeking approval to market a blood irradiation device.  The testimony presented at trial demonstrates that the two devices are in fact <u>not</u> substantially similar and neither a literal patent infringement analysis nor an examination of the RS 3400 and Claim 6 through a doctrine of equivalents analysis reveals that the RS 3400 infringes upon Claim 6.  Before I turn to the analysis of the patent claims, I must first address the parties' *Daubert* motions seeking to exclude certain expert testimony with respect to Phase II.

### 1.   *Daubert* motions

Following the Pretrial Conference, I entered an omnibus order denying without prejudice the parties' motions *in limine* and permitting the parties to raise them during the bench trial as appropriate.  **[ECF No. 315]**.[26]  In this order, I noted that "a trial court has broad discretion in determining how to perform its gatekeeper function, and nothing prohibits it from hearing a *Daubert* motion during trial."  *Club Car, Inc. v. Club Car (Quebec) Import, Inc.*, 362 F.3d 775, 780 (11th Cir. 2004).

### a.   Applicable law

Under Fed. R. Evid. 702:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1)

---

[26] Rad Source filed the Motions to Exclude Expert Testimony of the following witnesses retained by Plaintiffs:  Jon Roberts **[ECF No. 151]**; Paul Moses **[ECF No. 153]**; Glenn Newman **[ECF No. 162]**; and David Mullis **[ECF No. 291]**.  Messrs. Moses and Newman were offered to testify with respect to damages.  Since I determined that Phase III was unnecessary to the extent neither party proved entitlement to damages, the motions with respect to Messrs. Moses and Newman are moot.

the testimony is based upon sufficient facts or data, (2) the testimony is
the product of reliable principles and methods, and (3) the witness has
applied the principles and methods reliably to the facts of the case.

Under Fed. R. Evid. 702, district courts have the "task of ensuring that an
expert's testimony both rests on a reliable foundation and is relevant to the task at
hand."  *Daubert v. Merrell Dow Pharma., Inc.*, 509 U.S. 579, 579-80 (1993).  The four
non-inclusive *Daubert* factors are:  (1) whether the theory or technique can be tested;
(2) whether it has been subject to peer review; (3) whether the technique has a high
known or potential rate of error; and (4) whether the theory has attained general
acceptance.  *Id.* at 593-94.

"The burden of laying the proper foundation for the admission of the expert
testimony is on the party offering the expert."  *Allison v. McGhan Med. Corp.*, 184 F.3d
1300, 1306 (11th Cir. 1999) (citing *Daubert*, 509 U.S. at 592 n.10).  "The proponent of
the expert testimony carries a *substantial burden* under Rule 702."  *Cook v. Sheriff of
Monroe Cnty., Florida*, 402 F.3d 1092, 1107 (11th Cir. 2005) (emphasis added).  The
court must consider the testimony with the understanding that "the burden of
establishing qualification, reliability, and helpfulness rests on the proponent of the expert
opinion."  *Frazier*, 387 F.3d at 1260.

"*Daubert* requires the trial court to act as a gatekeeper to insure that speculative
and unreliable opinions do not reach the [factfinder.]"  *McClain v. Metabolife Int'l, Inc.*,
401 F.3d 1233, 1237 (11th Cir. 2005) (citing *Daubert*, 509 U.S. at 589 n.7).  Further,
"when a party offers expert testimony and the opposing party raises a *Daubert*
challenge, the trial court must 'make certain that an expert employs in the courtroom the
same level of intellectual rigor that characterizes the practice of an expert in the relevant

field.'" *McClain*, 401 F.3d at 1237 (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999)).

      **b.**    **Jon Roberts**

Courts generally look to two types of experts in determining the meaning of claims in a patent – patent law experts and technical experts.  Patents are directed to those of ordinary skill in the art and proper interpretation involves determining what the claims mean to a skilled artisan, a task within the exclusive province of the Court. *Markman v. Westview Instruments*, Inc., 52 F.3d 967, 991 (Fed. Cir. 1995).  Technical experts are qualified through their specific knowledge, experience and expertise in the relevant field of technology, and may provide scientific testimony on how those skilled in the art use and understand technical terms which appear in a patent for purposes of constructing the claims or making infringement and invalidity determinations.  *Id.*

A patent attorney lacking actual experience in the pertinent art may not serve as an expert on issues of infringement and invalidity; such testimony is inadmissible under Fed. R. Evid. 702.  *Sundance, Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356, 1363 (Fed. Cir. 2008).  Indeed, "allowing a patent law expert without any technical expertise to testify on issues of infringement and validity amounts to nothing more than advocacy from the witness stand."  *Id.* at 1364-65.  As the Federal Circuit has stated:

> Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it.  This concern is further compounded where the purported witness is an attorney. It is already difficult enough for courts to separate intricate questions of fact in patent cases from equally intricate questions of law. A technically unqualified patent attorney can do much mischief by leading the factfinder to seemingly sound conclusions without ever providing a well-grounded factual basis in the pertinent art.

> *Id.* at 1365 n.8 (citing *Daubert*, 509 U.S. at 597); *see also Flexiteek Ams., Inc. v.*

*Plasteak, Inc.*, 08-CV-60996-JIC, ECF No. 157, (July 3, 2009 S.D. Fla.) (unreported) (excluding patent attorney posing as technical expert because attorney had no skill in the pertinent art).

Rad Source moved to exclude Jon Roberts' testimony on technical matters concerning whether the RS 3400 infringes upon any claims of the patents subject to the License Agreement.  **[ECF No. 151]**.  I accord little reliability to Mr. Roberts' testimony on this issue although he was an extremely articulate patent attorney.  Though Mr. Roberts' expertise involved the process of interpreting patents, I do not find that he was qualified to address the substantive or technical issues in Phase II.  Mr. Roberts is a patent attorney with 26 years experience who Plaintiffs retained to provide expert testimony regarding whether the RS 3400 embodies in whole or in part the Patents.  Mr. Roberts purported to interpret the claims of the '255 Patent, but admittedly does not have the experience to offer the perspective of a person having ordinary skill in the art. *See* 4/13/11 Tr. at 166:15-17 ("I am not a person of ordinary skill relating to the physics of x-rays or the physics or things like that associated with the blood irradiation.").  Mr. Roberts' education and professional background do not have an adequate relationship with the technical art at issue and cannot qualify him as an expert in the field.  For these reasons, I accord Mr. Roberts' testimony significantly less weight than the testimony of Defendant's expert, Dr. Uribe.

### c.    David Mullis

Plaintiffs moved to exclude the testimony of Defendant's expert witness, David Mullis ("Dr. Mullis") who testified regarding the Food and Drug Administration's 510(k)

process[27] and the substantial equivalence patent analysis.   **[ECF No. 291]**.   Though Plaintiffs repeatedly claimed that Dr. Mullis has no expert opinion as to whether the RS 3400 embodies in whole, or in part, the patents, his testimony was helpful to the trier of fact to the extent he clarified the substantial equivalent analysis in the context of an FDA 510(k) submission.   Dr. Mullis explained the FDA's process of reviewing a proposed device with the predicate device to examine the similarities in terms of the technological characteristics.   The purpose of his testimony was to explain the regulatory review process that the FDA employs for premarket notification review process and ultimately render an opinion on the RS 3400 substantial equivalency determination.   Dr. Mullis testified regarding the 510(k) application for the RS 3400 which listed the RS 3000 as its predicate device.   He further explained how the FDA does not review patents as part of the premarket notification process.   Accordingly, as I permitted testimony despite the other *Daubert* motions in order to perform the Court's gatekeeping function at trial, I determine that Dr. Mullis' testimony was admissible, though I note that the testimony of Defendant's other expert, Dr. Uribe, was more helpful in addressing the substantive issues in Phase II.

### 2.     Claim 6 of '255 Patent

Of the three patents addressed in the License Agreement, only the '255 Patent is at issue.[28]   Specifically, the limited question presented at trial is whether Claim 6 of the

---

[27] The 510(k) is essentially an executive summary that addresses a device's basic description, its intended use, and the basis for considering the substantial equivalency of the device to the predicate.

[28] With respect to the '099 and '876 Patents, it is undisputed that all claims of the '099 Patent and all claims of the '876 Patent require a "low Z, high density material."   It is further undisputed that a "low Z, high density material" as defined by the '099 and '876 Patents "comprises boron, boron carbide, carbon or the like wherein the density is

'255 Patent—an issue the parties never discussed during negotiations of the License Agreement—is a component of the RS 3400 such that Rad Source has breached the License Agreement by developing and manufacturing the RS 3400 device.  The parties agree that Claim 6 does not cover the RS 3000 System.  According to Rad Source, Claim 6 is an embodiment resulting from Mr. Kirk's attempt to administer a uniform dose with a single tube.  Rad Source argues, and I determine, that the RS 3400 is a unique device that is not a knock-off of the licensed System and is not covered by Claim 6 either literally or under the doctrine of equivalents.

### 3.      Applicable law

Typically, patent infringement involves a determination that an act of making, using, selling, offering for sale, or importation has occurred with respect to a device, composition, article, or method which is determined to be covered by at least one valid claim of a patent.  *See, e.g.,* 35 U.S.C. § 271(a); *Markman*, 517 U.S. at 374.  Plaintiffs allege that the proposed RS 3400 would infringe at least one claim of at least one of the patents subject to the License Agreement, and therefore, Plaintiffs must prove by a preponderance of the evidence that the proposed RS 3400 reads on at least one claim of one such patent.  In a typical patent analysis, there are two ways in which a claim may read on a device: literally or under the doctrine of equivalents.  *Graver Tank*, 339 U.S. at 607.

### 4.      Literal patent infringement: whether RS 3400 infringes Claim 6

For literal infringement to occur, all elements of the claim must be found in the accused device.  Even where one or more elements of a patent claim are not exactly

about 2 to 2.5 g/cm3."  With respect to Claims 1-5 and 7-10 of '255 Patent, the parties do not dispute that Claims 1-5 and 7-10 of the '255 Patent require two x-ray tubes or sources of x-ray irradiation.

met in an accused product or method so as to "literally infringe," infringement may arise under the "doctrine of equivalents" where only insubstantial differences between the claimed invention and an accused product or method exist. *See Graver Tank*, 339 U.S. at 608-09. Literal infringement requires all of the elements of the claim to be present in the accused device. *See id.* at 607; 4/13/11 Tr. at 143:15-21.

As a preliminary matter, Claim 6 is limited to a single x-ray source. The licensed System contains two tubes. Claim 6 requires rotating the blood bag so that the bag can be irradiated on its opposite side. Dr. Roberts, Plaintiffs' expert, conceded that Claim 6 is not literally infringed by the RS 3400. 4/13/11 Tr. at 144:1-4. This is also supported by the evidence in the record: the proposed RS 3400 utilizes a different x-ray source than that in Claim 6 of the '255 Patent. The RS 3400 produces a field which is different the "beam" in Claim 6 of the '255 Patent. The beam of x-rays in Claim 6 means a cone of irradiation, such as that produced by a directional x-ray source, not a field of x-rays produced by the Long Tube of the proposed RS 3400.

The RS 3400 utilizes a cylindrical canister to hold the blood bag and position it relative to the x-ray source. A cylinder does not have an opposite surface for the surface that is parallel to the longitudinal axis of the cylinder. The RS 3400 would place the transfusion blood bag in a cylindrical container, which conforms the bag into the general shape of the cylinder because of the size of transfusion blood bags. A blood bag in the shape of a cylindrical container is not literally the same as a blood bag in the shape of a rectangular box-like container. Claim 6 refers to a "thickness dimension" limiting a dimension to four centimeters or less. The RS 3400 uses a container with "a thickness dimension of 7.5 centimeters."

It is undisputed that the RS 3400 utilizes a horizontal orientation of the blood bag relative to the x-ray source.  Plaintiffs' expert, Dr. Roberts, testified that the horizontal and vertical aspects of the '255 Patent were not literally present in the RS 3400. 4/13/11 Tr. at 143:22-25.  Therefore, the orientation of the canister in the RS 3400 is not vertical and the RS 3400 fails to meet the "vertical area" limitation of the '255 Patent. For all these reasons, I determine that the RS 3400 does not literally infringe Claim 6. For the sake of completeness, I now turn to whether the RS 3400 infringes Claim 6 under an alternative doctrine of equivalents analysis.

### 5.    Doctrine of equivalents

Even if one or more elements of a patent claim are not met exactly in an accused product or method so as to "literally infringe," infringement may be found under the "doctrine of equivalents," where there are only insubstantial differences between the claimed invention and an accused product or method.  *See Graver Tank*, 339 U.S. at 608-09; *Honeywell Int'l Inc. v. Hamilton Sundstrand Corp.*, 370 F.3d 1131, 1139-40 (Fed. Cir. 2004); *Amgen, Inc. v. Hoffman-La Roche Inc.*, 580 F.3d 1340, 1382 (Fed. Cir. 2009).  The doctrine of equivalents analysis requires a determination of whether an allegedly infringing device performed in substantially the same way to produce substantially the same result.  4/13/11 Tr. at 152:1-6.

Under the doctrine of equivalents, a device satisfies a claim if, for each and every requirement of the claim that is not literally present in the accused device, the accused device has some corresponding alternative feature that is "equivalent" to the unmet claim requirement.  *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997). ("Each element contained in a patent claim is deemed material to defining

the scope of the patented invention.   And thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole."); *see also Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315-16 (Fed. Cir. 1998); *Wavetronix v. EIS Elec. Integrated, Sys.*, 573 F.3d 1343, 1360 (Fed. Cir. 2009).

In making a determination as to whether or not a device is equivalent under the Doctrine of Equivalents, courts must look at each and every requirement of that claim and decide whether or not the device either meets that requirement or has some alternative feature that is "equivalent" to the unmet requirement.   *Warner-Jenkinson*, 520 U.S. at 29.  If any requirement of the claim is not literally present and does not have an equivalent, the claim cannot be infringed by the alleged infringing device.   *Id.*   An alternative is considered to be "equivalent" to an unmet requirement of a claim if a person having ordinary skill in the art would have considered the differences between them to be "insubstantial" at the time of the alleged infringement.   *Id.* at 36-37.   To determine whether the differences of the alternative are insubstantial, a determination of whether the alternative performs substantially the same function in substantially the same way to achieve substantially the same result is performed.   *Id.* at 38-39.   In considering whether an alternative is an equivalent, the interchangeability of the alternative at the time of the alleged infringement began must have been known to persons of ordinary skill in the art.  *Graver Tank*, 339 U.S. at 609.

Under a doctrine of equivalents analysis, the greater weight of the more credible evidence establishes that none of the elements which are not literally found in Claim 6 of the '255 Patent have equivalent alternatives in the RS 3400.  The evidence presented during Phase II revealed that the long tube technology in the proposed RS 3400 is very

different than the directional x-ray tube in the RS 3000, as it represents new technology relative to the x-ray tubes at the time of the '255 Patent.  As discussed with respect to the literal patent infringement analysis *supra*, the directional x-ray source produces a cone of x-rays, whereas the long tube technology x-ray source results in a uniform field of x-rays.  The dose uniformity of a blood bag in a rectangular box-like container (as depicted in Figure 4 of the '255 Patent) is improved if said container is flipped 180 degrees while the x-ray source is turned off as each opposite side is irradiated.  This differs from a continuous 360 degree rotation while the x-ray source is turned on.  The blood bag in the shape of a cylindrical container is not the same or an equivalent of a blood bag in the shape of a rectangular box-like container.  The positioning of the blood bag in a horizontal versus vertical arrangement is also distinct.

With respect to the source of x-rays, the uniform field produced by the Long Tube does not perform in substantially the same way to produce substantially the same result as the source of x-rays of Claim 6 of the '255 Patent.  The alternative of the limitation of "source of x-rays" and the "x-ray beam" in the RS 3400 do not have a substantially similar function, perform in substantially the same way, or produce substantially the same result as that produced by the limitation of "source of x-rays" and the "x-ray beam" of Claim 6 of the '255 Patent.  The function of the elements of Claim 6 (rectangular box-like container, vertical nature of the container, irradiator, x-ray source, and rotation), and the way in which each element performs the function, and result of performing this function, differs from the alleged counterpart in the RS 3400.  Although at a minimum the RS 3000 and RS 3400 are both blood irradiator devices, I determine that a doctrine of equivalence analysis reveals that there are sufficient differences in the functions of

each element of Claim 6 that support a finding that the RS 3400 does not infringe Claim 6 of the '255 Patent.

In conclusion, the differences identified between the RS 3400 and Claim 6 demonstrate that Claim 6 of the '255 Patent does not literally, or under the doctrine of equivalents, read on the proposed RS 3400,. Therefore, the proposed RS 3400 does not "embody, in whole or in part, the Patents" as required by Article 3.1 of the Licensed Agreement and the RS 3400 does not fall within the License Agreement.

**Q.     Conclusion**

The License Agreement is in effect until the expiration or invalidity of the last to expire of the Patents pursuant to Article 12.1 defining the term of the license grant. Consistent with the terms of the License Agreement, the Best Plaintiffs now stand in the shoes of Nordion, which has exited the blood irradiation industry. Best and Rad Source must continue to adhere to the respective obligations and duties as set forth in the License Agreement. To the extent the seven-year non-compete provision in Article 5.3 expired on its own terms and the parties have already exercised the right of first negotiation for the RS 3400 pursuant to Article 3.8, Rad Source is now free to develop, manufacture or to have manufactured, distribute, promote, market, sell, or lease the RS 3400.

Having carefully considered and reviewed the arguments of counsel, evidence presented, testimony of witnesses, operative pleadings—including Plaintiffs' Third Amended Complaint, Defendant's Answer, Defenses, and Counterclaims, and Plaintiff MDS (Canada) Inc.'s Answer to Counterclaim—the record, being otherwise fully advised

in the premises, and for the reasons stated on the record, it is hereby ORDERED and ADJUDGED that:

1.  Rad Source's Motion to Exclude Expert Testimony of Jon Roberts **[ECF No. 151]** is GRANTED.

2.  Rad Source's Motion to Exclude Expert Testimony of Paul Moses **[ECF No. 153]** is DENIED AS MOOT.

3.  Rad Source's Motion to Exclude Expert Testimony of Glenn Newman **[ECF No. 162]** is DENIED AS MOOT.

4.  Plaintiffs' Motion in Limine to Exclude Testimony of David Mullis **[ECF No. 291]** is DENIED.

5.  Plaintiffs' Motion in Limine to Exclude Parol Evidence Regarding the License Agreement **[ECF No. 292]** is DENIED.

6.  Rad Source's Motion in Limine to Exclude Best Plaintiffs' Evidence and Legal Argument as to Plaintiffs' Claims **[ECF No. 294]** is DENIED.

7.  Rad Source's Motion in Limine to Exclude Plaintiffs' Claim of Unjust Enrichment **[ECF No. 295]** is DENIED.

8.  Rad Source's Motion in Limine to Exclude Plaintiffs' Evidence of Lost Profit Damages **[ECF No. 300]** is DENIED AS MOOT.

9.  Rad Source's Motion in Limine to Exclude Argument and Evidence on Damages From Failure to Renew Patent **[ECF No. 302]** is DENIED AS MOOT.

10. Rad Source's Motion in Limine to Exclude Plaintiffs' Evidence of Speculative Damages **[ECF No. 304]** is DENIED AS MOOT.

11. Count I (Declaratory Judgment) of Plaintiffs' Third Amended Complaint **[ECF No. 286]** is DISMISSED WITH PREJUDICE.

12. Count II (Temporary Restraining Order) of Plaintiffs' Third Amended Complaint **[ECF No. 286]** is DISMISSED WITH PREJUDICE.

13. Count III (Preliminary Injunction) of Plaintiffs' Third Amended Complaint **[ECF No. 286]** is DISMISSED WITH PREJUDICE.

14. Count IV (Permanent Injunction) of Plaintiffs' Third Amended Complaint **[ECF No. 286]** is DISMISSED WITH PREJUDICE.

15. Count VI (Unjust Enrichment) of Plaintiffs' Third Amended Complaint **[ECF No. 286]** is DISMISSED WITH PREJUDICE.

16. As to the parties' declaratory judgment counts:

   a. The License Agreement, including Section 3.1, remains in full force and effect as to the RS 3000, as modified by Plaintiffs, against Defendant for the duration of the License Agreement.

   b. Section 3.1 does not apply to the RS 3400 developed by Defendant.

   c. Plaintiffs hold no exclusive license or rights to the RS 3400 by virtue of Section 3.1 of the License Agreement.

   d. The non-compete provision of the License Agreement in Section 5.3 is no longer in effect and was terminated as of the expiration date set forth therein, *e.g.*, for a period of seven (7) years from the Closing Date—September 26, 2010.

e. Pursuant to Article XII, and specifically Section 12.1, the License Agreement **[ECF No. 286-1]** shall remain in full force and effect until the expiration or invalidity of the last to expire of the Patents.

17. Plaintiffs shall recover no damages as to the claims within its Third Amended Complaint.

18. Defendant shall recover no damages as to its counterclaim.

19. Each party shall bear its own costs and fees in this matter and neither party shall recover costs or fees from the other.[29]

DONE and ORDERED in Chambers at Miami, Florida this 30th day of September, 2011.

_____
THE HONORABLE ALAN S. GOLD
UNITED STATED DISTRICT JUDGE

cc:  U.S. Magistrate Judge Jonathan Goodman
     Counsel of record

---

[29] Because the parties prevailed on some of their claims but not on others, I exercise the broad discretion afforded under Federal Rule of Civil Procedure 54(d) and prohibit the parties from filing a Motion for Bill of Costs on the basis of the instant Findings of Fact and Conclusions of Law.  Fed. R. Civ. P. 54(d)(1) ("Unless a federal statute, these rules *or a court order provides otherwise*, costs—other than attorney's fees—should be allowed to the prevailing party.") (emphasis added); *Walters v. Roadway Exp., Inc.*, 557 F.2d 521, 526–27 (5th Cir. 1977) (determining that trial court has "broad discretionary powers" in taxing post-judgment costs and may require a prevailing party to bear its own costs as long as it provides a reason for that decision).